IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

**TAMPA ELECTRIC COMPANY**

      **Plaintiff,**

vs.

**THE TRAVELERS INDEMNITY COMPANY OF**
**AMERICA and PIPELINE DISTRIBUTION, INC.,**

      **Defendants.**

_____/

Case No. _____

Division _____

## COMPLAINT AND DEMAND FOR JURY TRIAL
## AND DESIGNATION OF EMAIL ADDRESSES

Plaintiff, TAMPA ELECTRIC COMPANY ("Tampa Electric"), by and through

undersigned counsel, hereby sues the Defendants, THE TRAVELERS INDEMNITY

COMPANY OF AMERICA ("Travelers") and PIPELINE DISTRIBUTION, INC. ("PDI"), for

declaratory judgment and damages, and alleges:

## NATURE OF THE ACTION

1.      Tampa Electric is named as an additional insured under Commercial Insurance

Policy No. DT-CO-345K9388-TIA-10 (the "Policy" – **Exhibit 1** hereto) sold by Travelers to

PDI, a subcontractor and alleged "agent" of Tampa Electric.

2.      Tampa Electric seeks damages resulting from Travelers' breach of its contractual

obligations under the Policy as well as for judgment declaring that Travelers has a duty to defend

and indemnify Tampa Electric under the Policy with respect to that certain action pending before

this Court captioned *Mario Santos v. Tampa Electric Company, Johnson Engineering, Inc.,*

*Posen Construction, Inc. and Pipeline Distribution, Inc.*, Case No. 11-CA-003699 (the "Santos

Action"), in addition to damages in excess of Fifteen Thousand Dollars ($15,000.00) exclusive

of interest, costs and attorney's fees.  Tampa Electric also asserts that Travelers has tortiously interfered with Tampa Electric's business relationship with PDI.

3.      Tampa Electric seeks from PDI damages resulting from PDI's breach of its contractual obligations as well as for contribution in connection with the Santos Action.

## THE PARTIES

4.      Defendant Travelers is, upon information and belief, a Connecticut corporation with a principal place of business at One Tower Square, Hartford, CT 06183.

5.      Defendant PDI is, upon information and belief, a Florida corporation with a principal place of business at 2140 S.W. 52nd Terrace, Plantation, FL 33317.

6.      Tampa Electric is an active Florida corporation, does business in Hillsborough County, and maintains a principal office at 702 N. Franklin Street, Tampa, FL 33602.

7.      Jurisdiction over Travelers is proper in this Court in that Travelers conducts and conducted business in Florida, including registering with the Florida Office of Insurance Regulation.

8.      Jurisdiction over PDI is proper in that PDI is a Florida corporation and where PDI has consented to jurisdiction.

9.      Venue is proper in this Court in that PDI consented to venue in the state courts in Hillsborough County pursuant to paragraph 32 of the January 10, 2010 General Agreement for Contracted Work between PDI and Tampa Electric.  Travelers' obligations arise by virtue of the terms of the General Agreement and Travelers' breach of the Policy occurred when it notified Tampa Electric in Hillsborough County that Travelers was withdrawing its defense of Tampa Electric in the Santos Action.

ME1 24871695v.4

## FACTUAL SUMMARY

10.     The Santos Action involves a bodily injury claim brought by Mario Santos, ("Santos") against Tampa Electric, Johnson Engineering, Inc. ("Johnson"), Posen Construction Co. ("Posen"), and PDI concerning a construction accident that occurred on November 11, 2010.

11.     Santos was an employee of Posen which, at the time of the accident, was the prime contractor on the Colonial Boulevard expansion project in Lee County, Florida.

12.     Santos was operating a Bomag mixer at the work site when it struck an underground natural gas line.

13.     Santos claims he was injured as a result of the ensuing explosion and fire.

14.     At the location of the accident, Tampa Electric had hired PDI to reposition the existing gas line to allow Posen to perform necessary work on the road project.

15.     Santos alleged that the subject natural gas line was not marked or marked timely within two (2) business days of any notification, in violation of the Underground Facility Damage Prevention and Safety Act and no detection equipment or other reasonable means of locating the relocated underground facilities were used before or during the excavation activities which breached the underground line.

16.     Travelers has acknowledged that Santos alleged that Tampa Electric and PDI, individually and as an "agent" of Tampa Electric, were negligent for:

a.     Failing to properly install, reposition, place and/or relocate the natural gas line along the northern side of Colonial Boulevard, including the underground natural gas line between Stations 452 and 456;

ME1 24871695v.4

b.      Failing to maintain the gas line at a reasonably safe depth, specifically failing to comply with 49 C.F.R. § 192.327 (2011) and the Florida Department of Transportation's Utility Accommodation Manual § 9.3 (2007);

c.      Failing to notify, adequately notify and/or otherwise warn others working on the project of the new location and depth of underground gas line in the vicinity between Stations 452 and 456; and

d.      Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including Plaintiff [Santos].

17.     Santos alleged that as a direct proximate result of Tampa Electric's and PDI's acts and/or omissions, he was severely burned and permanently injured.

18.     PDI's work for Tampa Electric was governed by a General Agreement for Contracted Work (the "General Agreement") dated January 10, 2010 (**Exhibit 2** hereto, executed by People's Gas System, a division of Tampa Electric).  That agreement included insurance requirements, including that Tampa Electric be named as an additional insured under the Policy and other requirements that PDI would defend, indemnify, and hold Tampa Electric harmless from any and all claims for personal injury which arise or are alleged to have arisen out of or in connection with PDI's performance under the General Agreement.

19.     Specifically, in paragraph 11 of the General Agreement PDI agreed, among other things to:

a.      "indemnify Peoples Gas System and hold it harmless of and from any and all claims for personal injury, death or property damage, and any other losses, damages, charges, or expenses, including attorney's fees, which arise or are alleged to have arisen out of or in connection with performance of the Work or

Contractor's presence on Peoples Gas system (including any of its employees, subcontractors, materialmen, or agents of any tier or their respective employees). To the extent permitted under applicable law, Contractors' indemnity obligation shall extend to and include liability for the sole, contributory, or concurrent negligence of Peoples Gas System."

b.      "undertake, at its own expense, the defense of any action, which may be brought against Peoples Gas System claiming damages, which are alleged to have arisen out of or in connection with the performance of the Work under this Agreement."

c.      "indemni[fy] for all attorney's fees and expenses incurred by Peoples Gas System to enforce the terms of [the General Agreement]".

20.     PDI further agreed to "maintain … General Liability Insurance covering all operations by or on behalf of [PDI] for the limits of liability indicated below and including coverage for … Contractual Liability insuring the obligations assumed by Contractor in [the General Agreement] …"

21.     By letter dated May 29, 2014 (**Exhibit 3** hereto), Tampa Electric demanded that PDI defend, indemnify and hold Tampa Electric harmless from any and all claims, including the Santos Action, pursuant to the General Agreement.

22.     By letter dated July 11, 2014 (**Exhibit 4** hereto), Travelers advised Tampa Electric that it would defend Tampa Electric in the Santos Action, under a reservation of rights.

23.     Travelers had the right and duty to defend PDI under the Policy and defended PDI in the Santos Action.

ME1 24871695v.4

24.     Travelers had the right under the Policy, at its discretion, to "investigate any 'occurrence' and settle any claim or 'suit' that may result." Travelers investigated and ultimately settled Santos's claim against PDI.

25.     Travelers had the right and duty to defend Tampa Electric under the Policy, and initially defended Tampa Electric in the Santos Action.

26.     Santos amended his complaint a number of times. Santos's Fourth Amended Complaint is annexed hereto as **Exhibit 5**.

27.     Among other things, the Fourth Amended Complaint alleged in paragraph 24:

24. Defendant Tampa Electric, individually and by and through its agents and employees, *including but not limited to PDI, breached the above-described duties of ordinary and re*asonable care by or through one or more of the following acts of commission and/or omission:

a.  Failing to properly install, reposition, place and/or relocate the natural gas line along the northern side of Colonial Boulevard, including the underground natural gas line between Stations 452 and 456;

b.  Failing to maintain the gas line at a reasonably safe depth, specifically failing to comply with 49 C.F.R. § 192.327 (2011) and the Florida Department of Transportation's Utility Accommodation Manual§ 9.3 (2007);

c.  Failing to notify, adequately notify and/or otherwise warn others working on the project of the new location and depth of underground gas line in the vicinity between Stations 452 and 456; and

d.  Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including Plaintiff [Santos].

28.     Santos's expert in the Santos Action, Philip Powers, testified, in part, as follows:

Q: … The only two codes or regulations that you feel that my client violated as part of this single opinion number 8 against PDI is Section 18.2 and Section 18.3 of the construction manual, right?

A:     Correct. (Philip Powers Deposition Transcript at 417:4-9.)

29.     Santos's expert in the Santos Action, Don Moore, testified, in part, as follows:

ME1 24871695v.4

> A:      I would fault them [PDI] in that that is not a complete as-built. I need to know depths and that kind of thing. Now, that doesn't have to be on that plan sheet.  You can give it to them in 8-and-a-half-by-11, station numbers, offsets, depth, which is kind of one of the ways I have seen it done.  (Don Moore Deposition Transcript at 284:8-15.)

30.     The expert opinions expressed above have not been withdrawn.

31.     Based on this testimony adducing liability to PDI and other facts, Travelers settled Santos's claim against PDI.  Santos then amended his complaint (the Fifth Amended Complaint, **Exhibit 6** hereto) to remove specific allegations about PDI.  Nevertheless, he left PDI as a named defendant in the caption and still alleged:

> 7. At all material times, Tampa Electric, did for itself or <u>through 3rd parties</u> subject to its right of control, and its employees and <u>agents,</u> perform the relocation and/or diversion of the subject hidden underground natural gas lines on the north side of Colonial Boulevard during the Colonial Boulevard road widening project.

> 19. Defendant Tampa Electric, individually and by and <u>through its agents</u> and employees, breached the above-described duties of ordinary and reasonable care by or through one or more of the following acts of commission and/or omission:

>> a.  Failing to properly install, reposition, place and/or relocate the natural gas line along the northern side of Colonial Boulevard, including the underground natural gas line between Stations 452 and 456;

>> b.  Failing to maintain the gas line at a reasonably safe depth, specifically failing to comply with 49 C.F.R. § 192.327 (2011) and the Florida Department of Transportation's Utility Accommodation Manual§ 9.3 (2007);

>> c.  Failing to notify, adequately notify and/or otherwise warn others working on the project of the new location and depth of underground gas line in the vicinity between Stations 452 and 456; and

>> d.  Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including Plaintiff [Santos].

> 21. As a further direct and proximate result of Defendant Tampa Electric's acts and omissions, and the <u>acts of its agents</u> and employees, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and suffering …

> Fifth Amended Complaint ¶¶ 7, 19, 21 (emphasis added).

32.     The Fifth Amended Complaint does not assert that PDI is not Tampa Electric's "agent."

33.     Travelers has now taken the position that the omission of claims in the Fifth Amended Complaint specifically directed at PDI eliminates Travelers' duty to defend Tampa Electric, and has so advised Tampa Electric (*see* Letter of December 15, 2016, **Exhibit 7** hereto). This is incorrect, as demonstrated by 1) the facts that Travelers has specifically stated that "TECO [Tampa Electric] had hired PDI to reposition the existing gas line" and was Tampa Electric's subcontractor and 2) the allegations in the Fifth Amended Complaint of breach of duty by Tampa Electric and its "agents" are, other than the deletion of any mention of PDI, precisely the same in paragraph 19 of the Fifth Amended Complaint as in paragraph 24 of the Fourth Amended Complaint, under which Tampa Electric was defended by Travelers.

34.     There is no dispute that Santos has alleged that his injuries were caused by Tampa Electric's "agent" in the course of Tampa Electric's work.  Indeed, in its letter providing a defense under a reservation of rights, Travelers acknowledged as much (*see* Exhibit 4 hereto). When read fairly, the facts of the underlying Fifth Amended Complaint make clear that there is coverage for Tampa Electric under the Policy because Santos alleged that Tampa Electric was liable for the acts of its "agents" and PDI was such "agent".

35.     The Travelers policy provides coverage to Tampa Electric through an endorsement:

> This endorsement modifies insurance provided under the following:
>
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
>
> 1.  WHO IS AN INSURED – (Section II) is amended to include any person or organization that you agree in a "written contract requiring insurance" to include as an additional insured on this Coverage Part, but:

a) Only with respect to liability for "bodily injury", "property damage" or "personal injury"; and

b) If, and only to the extent that, the injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the "written contract requiring insurance" applies. The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

## THE UNDERLYING SANTOS ACTION IS COVERED UNDER THE POLICY

36.     The General Agreement entered into by Tampa Electric and PDI was an insured contract under the above quoted coverage part; Travelers has admitted same.

37.     The Santos Action alleges bodily injury caused by an "accident" or an "occurrence" within the meaning of the Policy.

38.     The Santos Action alleges bodily injury took place during the policy term of the Policy.

39.     Tampa Electric has complied with any conditions requisite to coverage for the Santos Action under the Policy, including, without limitation, under any applicable additional insured and insured contract provisions.

40.     In breach of its express and implied duties and obligations to Tampa Electric under the Policy and common law, Travelers has refused or otherwise failed to honor its obligation to defend Tampa Electric and/or to pay Tampa Electric's defense costs, settlements, judgments and/or any other liabilities arising from the Santos Action.

41.     In refusing to defend Tampa Electric, and in purposefully causing the isolation of Tampa Electric, its additional insured, as a defendant Travelers has failed to act fairly and honestly toward Tampa Electric and with due regard for its interests.

9

42.     As a direct and proximate result of the foregoing, Tampa Electric has been, and will continue to be, damaged and otherwise deprived of benefits to which it is entitled, and has incurred substantial actual damages.

## COUNT I

## (BREACH OF CONTRACT AGAINST TRAVELERS)

43.     Tampa Electric incorporates and realleges the allegations set forth in the foregoing Paragraphs as if fully set forth herein.

44.     Any conditions requisite to coverage (including, without limitation, any conditions as an additional insured) in the Policy have been satisfied or waived.

45.     Tampa Electric has incurred costs and expenses in defense of the Santos Action.

46.     In breach of its insurance contract, Travelers has failed to honor, and/or has disputed or unreasonably delayed, its obligation to defend Tampa Electric and/or to pay its defense fees and costs arising from the Santos Action.

47.     In breach of its insurance contract, Travelers refuses to agree to pay for any sums Tampa Electric may become obligated to pay by reason of liability for damages, either by way of settlement, judgment or otherwise, in connection with the Santos Action.

48.     By reason of Travelers' breaches of its obligations under the Policy, Travelers is liable to Tampa Electric for money damages for costs and payments which Tampa Electric has made or incurred, and may make or incur, as a result of the Santos Action, whether by defense, judgment, settlement and/or otherwise, plus the costs and disbursements of this action including, but not limited to, reasonable attorney's fees and costs, pre-judgment and post-judgment interest.

WHEREFORE, Tampa Electric respectfully requests that the Court enter judgment against Travelers and in favor of Tampa Electric, and grant the following relief:

ME1 24871695v.4

(a)      award Tampa Electric compensatory and consequential damages in an amount to be determined;

(b)      award Tampa Electric its costs, expenses and attorney's fees incurred herein, including, without limitation, all amounts due under FSA 627.428; and

(c)      grant such other and further relief as the Court deems just and proper.

## COUNT II

### (DECLARATORY JUDGMENT AGAINST TRAVELERS)

49.      Tampa Electric incorporates and realleges the allegations set forth in the foregoing Paragraphs as if fully set forth herein.

50.      Any conditions requisite to coverage for Tampa Electric under the Policy have been satisfied or waived.

51.      Travelers must fund and/or reimburse Tampa Electric for defense costs Tampa Electric incurs and has incurred by reason of the Santos Action alleging bodily injury during the term of the Policy.

52.      Travelers also must pay, on behalf of Tampa Electric, any sums Tampa Electric may become obligated to pay by reason of liability for damages, either by way of settlement, judgment or otherwise, in connection with the Santos Action alleging injury during the term of the Policy.

53.      Travelers has failed to honor and/or has disputed its obligation to defend Tampa Electric, to pay its defense costs, and/or to indemnify it for any judgment, settlement or other liabilities arising from the Santos Action.

54.      By reason of the foregoing, an actual and justiciable controversy exists between Tampa Electric and Travelers within the meaning of Section 86.011, Florida Statutes, regarding

11

their duties and obligations under the Policy, and a judicial declaration is necessary to determine Tampa Electric's rights and Travelers' duties regarding the Santos Action.

WHEREFORE, Tampa Electric respectfully requests that the Court enter judgment against Travelers and in favor of Tampa Electric and grant the following relief:

(a)      declare that Tampa Electric is entitled to complete defense and indemnification under the Policy for any and all costs, expenses, judgments, settlements, liabilities and/or other loss it has incurred or may incur in the future in connection with the Santos Action;

(b)      adjudge, determine and declare that Tampa Electric is entitled to recover from Travelers all fees, costs and other disbursements expended in connection with this liability insurance coverage claim, including but not limited to all reasonable attorney's fees and costs under FSA 627.428, and pre- and post- judgment interest; and

(c)      grant such other relief as the Court deems just and proper.

## COUNT III

## (TORTIOUS INTERFERENCE AGAINST TRAVELERS)

55.      Tampa Electric incorporates and realleges the allegations set forth in the foregoing Paragraphs as if fully set forth herein.

56.      A contract, the General Agreement, existed between Tampa Electric and PDI.

57.      The General Agreement required PDI to obtain insurance for any negligence by Tampa Electric's subcontractor, PDI.

58.      Travelers knew of the existence of the General Agreement and its requirements.

59.      Travelers took action intentionally and without legal justification, to wit, arranging for the settlement by PDI of the Santos Action, thereby attempting to negate Tampa Electric's coverage and causing PDI to breach its obligations under the General Agreement to

provide for coverage for contractual liability for the obligations assumed by PDI in the General Agreement.

60.     Tampa Electric has suffered damages as a result of Travelers' tortious interference with Tampa Electric's business relationship.

WHEREFORE, Tampa Electric respectfully requests that the Court enter judgment against Travelers and in favor of Tampa Electric, and grant the following relief:

(a)     award Tampa Electric compensatory and consequential damages in an amount to be determined; and

(b)     grant such other and further relief as the Court deems just and proper.

## COUNT IV

## (BREACH OF CONTRACT AGAINST PDI – DEFENSE AND INDEMNITY)

61.     Tampa Electric incorporates and realleges the allegations set forth in the foregoing Paragraphs as if fully set forth herein.

62.     In the General Agreement PDI agreed to defend, indemnify and hold Tampa Electric harmless "from any and all claims for personal injury … which arise or are alleged to have arisen out of or in connection with" PDI's performance under the General Agreement," including the Santos Action.

63.     PDI's agreed-to indemnity obligation extended to the sole, contributory or concurrent negligence of Tampa Electric.

64.     PDI further agreed to defend any action claiming damages "which are alleged to have arisen out of or in connection with the performance" of PDI's work under the General Agreement.

ME1 24871695v.4

65.     Despite due demand, PDI has failed and refused to hold Tampa Electric harmless from any and all claims, including the Santos Action.

66.     In the General Agreement PDI agreed to indemnify Tampa Electric for all attorney's fees and expenses incurred by Tampa Electric to enforce the terms of the General Agreement.

67.     By reason of PDI's  breaches of its obligations under the General Agreement, PDI is liable to Tampa Electric for money damages for costs and payments which Tampa Electric has made or incurred, and may make or incur, as a result of the Santos Action, whether by defense, judgment, settlement and/or otherwise, plus the costs and disbursements of this action including, but not limited to, reasonable attorney's fees and costs, pre-judgment and post-judgment interest.

WHEREFORE, Tampa Electric respectfully requests that the Court enter judgment against PDI and in favor of Tampa Electric, and grant the following relief:

(a)     award Tampa Electric compensatory and consequential damages in an amount to be determined;

(b)     award Tampa Electric its costs, expenses and attorney's fees incurred herein; and

(c)     grant such other and further relief as the Court deems just and proper.

## COUNT V

## (BREACH OF CONTRACT AGAINST PDI – PROCUREMENT OF INSURANCE)

68.     Tampa Electric incorporates and realleges the allegations set forth in the foregoing Paragraphs as if fully set forth herein.

69.     In the General Agreement PDI agreed to maintain general liability insurance covering all operations by or on behalf of PDI including coverage for contractual liability for the

ME1 24871695v.4

obligations assumed by PDI  in the General Agreement and to have Tampa Electric named as an additional insured under that policy.

70.     PDI failed to procure the required insurance under the General Agreement as demonstrated by Travelers 'refusal to defend Tampa Electric in connection with the Santos Action.

WHEREFORE, Tampa Electric respectfully requests that the Court enter judgment against PDI and in favor of Tampa Electric, and grant the following relief:

(a)     award Tampa Electric compensatory and consequential damages in an amount to be determined;

(b)     award Tampa Electric its costs, expenses and attorney's fees incurred herein; and

(c)     grant such other and further relief as the Court deems just and proper.

## COUNT VI

## (CONTRIBUTION AGAINST PDI)

71.     Tampa Electric incorporates and realleges the allegations set forth in the foregoing Paragraphs as if fully set forth herein.

72.     Because PDI is alleged to have been Tampa Electric's agent, Tampa Electric may be required to satisfy, at its own expense, obligations owed by PDI.

73.     As fairly read, the Fifth Amended Complaint alleges vicarious liability against Tampa Electric.

74.     Pursuant to FSA 768.31, Tampa Electric is entitled to contribution from PDI for any judgment rendered against Tampa Electric, or settlement entered into by Tampa Electric, in the Santos Action.

ME1 24871695v.4

WHEREFORE, Tampa Electric respectfully requests that the Court enter judgment against PDI and in favor of Tampa Electric, and grant the following relief:

(a)    award Tampa Electric compensatory and consequential damages in an amount to be determined;

(b)    award Tampa Electric its costs, expenses and attorney's fees incurred herein; and

(c)    grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Tampa Electric hereby requests a trial by jury on all issues so triable.

## NOTICE OF DESIGNATION OF E-MAIL ADDRESSES

DAVID W. ADAMS and ZACHARY J. GLASER, as counsel for Plaintiff, file this Notice of Designation of E-Mail Addresses, and state that the following primary and secondary e-mail addresses are designated for service in this proceeding:

Primary:
David W. Adams, Esq.                     dadams@bja-law.com
Zachary J. Glaser, Esq.                  zglaser@bja-law.com
Secondary:
Shirley Brant, Legal Assistant           sbrant@bja-law.com

> J. WYLIE DONALD
> Florida Bar No. 44415
> McCarter & English, LLP
> 1015 15th Street N.W., 12th Floor
> Washington, DC  20005
> Telephone:  202-753-3352
> Facsimile:  302-220-4608
> Email:  jdonald@mccarter.com
>
> AND
>
> /s/David W. Adams
> DAVID W. ADAMS
> Florida Bar No. 0892416
> ZACHARY J. GLASER

16

ME1 24871695v.4

Florida Bar No. 0048059
Bennett, Jacobs & Adams, P.A.
Post Office Box 3300
Tampa, Florida 33601
Telephone:  (813) 272-1400
Facsimile:  (866) 844-4703
Email:  dadams@bja-law.com;
zglaser@bja-law.com
Secondary:  sbrant@bja-law.com

Attorneys for Tampa Electric Company

17

**TRAVELERS** 

**Report Claims Immediately by Calling\***
**1-877-828-4132**
*Speak directly with a claim professional*
*24 hours a day, 365 days a year*

\*Unless Your Policy Requires **Written** Notice or Reporting

## COMMERCIAL INSURANCE

**A Custom Insurance Policy Prepared for:**

PIPELINE DISTRIBUTION, INC.
2140 SW 52 TERRACE
PLANTATION FL 33317

Presented by: BROWN & BROWN-MIAMI

**EXHIBIT**
*1*

 **TRAVELERS**                                    One Tower Square, Hartford, Connecticut 06183

```
                              TRAVELERS CORP. TEL: 1-800-328-2189
                              CONSTRUCTION - WATER, SEWER, & UTILITI
                              COMMON POLICY DECLARATIONS
                              ISSUE DATE: 02/01/10
                              POLICY NUMBER: DT-CO-345K9388-TIA-10
     INSURING COMPANY:
     THE TRAVELERS INDEMNITY COMPANY OF AMERICA

     1. NAMED INSURED AND MAILING ADDRESS:
        PIPELINE DISTRIBUTION, INC.
        2140 SW 52 TERRACE
        PLANTATION, FL 33317


     2. POLICY PERIOD:  From 01/18/10 to 01/18/11 12:01 A.M. Standard Time at
                                            your mailing address.
     3. LOCATIONS
          Premises  Bldg.
          Loc. No.  No.  Occupancy          Address

          SEE IL T0 03


     4. COVERAGE PARTS FORMING PART OF THIS POLICY AND INSURING COMPANIES:
        COMMERCIAL GENERAL LIABILITY COV PART DECLARATIONS   CG T0 01 11 03 TIA
        EMPLOYEE BENEFITS LIABILITY COV PART DECLARATIONS    CG T0 09 09 93 TIA




     5. NUMBERS OF FORMS AND ENDORSEMENTS
        FORMING A PART OF THIS POLICY:   SEE IL T8 01 10 93


     6. SUPPLEMENTAL POLICIES: Each of the following is a separate policy
                              containing its complete provisions:
        Policy                   Policy No.              Insuring Company


                                 SEE CALCULATION OF PREMIUM
        DIRECT BILL              COMPOSITE RATES ENDORSEMENT
     7. PREMIUM SUMMARY:
        Provisional Premium    $ 39,118
        Due at Inception       $
        Due at Each            $

     NAME AND ADDRESS OF AGENT OR BROKER:      COUNTERSIGNED BY:
        BROWN & BROWN-MIAMI (FH505)
        8000 GOVERNORS SQ BLVD STE 400         _____
        MIAMI LAKES, FL 330161588             Authorized Representative

                                              DATE:_____


     IL T0 02 11 89(REV. 09-07)     PAGE 1 OF 2
     OFFICE: ORLANDO FL
```


**TRAVELERS**

TAXES AND SURCHARGES

POLICY NUMBER: DT-CO-345K9388-TIA-10

EFFECTIVE DATE: 01/18/10

ISSUE DATE: 02/01/10

| DESCRIPTION | AMOUNT |
|---|---|
| FL CAT FUND EMERGENCY ASSESSMENT SURCHARGE - A. O. | 374.00 |
| FIGA 2006 ALL OTHER | 262.00 |
| FIGA 2006 EMERGENCY SURCHARGE - ALL OTHER | 299.00 |
| FL GUARANTY FUND SURCHARGE-ALL OTHER | 749.00 |

IL T0 02 11 89      PAGE  2 OF  2

OFFICE: ORLANDO FL            856
PRODUCER NAME: BROWN & BROWN-MIAMI          FH505

**TRAVELERS** 

| | |
|---|---|
| **POLICY NUMBER:** | DT-CO-345K9388-TIA-10 |
| **EFFECTIVE DATE:** | 01-18-10 |
| **ISSUE DATE:** | 02-01-10 |

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL T0 02 11 89   COMMON POLICY DECLARATIONS
IL T8 01 10 93   FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL T0 01 01 07   COMMON POLICY CONDITIONS
IL T0 03 04 96   LOCATION SCHEDULE
IL T3 02 07 86   CALCULATION OF PREMIUM-COMPOSITE RATE(S)
```

GENERAL LIABILITY - CONTRACTORS

```
CG T0 01 11 03   COML GENERAL LIABILITY COV PART DEC
CG T0 07 09 87   DECLARATIONS PREMIUM SCHEDULE
CG T0 08 11 03   KEY TO DECLARATIONS PREMIUM SCHEDULE
CG T0 34 11 03   TABLE OF CONTENTS
CG 00 01 10 01   COMMERCIAL GENERAL LIABILITY COV FORM
CG D2 55 11 03   AMENDMENT OF COVERAGE - POLLUTION
CG D3 73 11 05   ADD'L INSURED,OWNERS,LESSEES,CONTRACTORS
CG 20 10 10 01   ADDL INSD-OWNER/LESSEE/CONTRACTOR B
CG 21 70 01 08   CAP ON LOSSES-CERTIFIED ACTS-TERRORISM
CG D2 03 12 97   AMEND-NON CUMULATION OF EACH OCC
CG D2 11 01 04   DESIGNATED PROJECT(S) GEN AGGR LIMIT
CG D2 34 01 05   WEB XTEND - LIABILITY
CG D2 46 08 05   BLANKET ADDITIONAL INSURED (CONTRACTORS)
CG D3 16 07 04   CONTRACTORS XTEND ENDORSEMENT
CG D2 43 01 02   FUNGI OR BACTERIA EXCLUSION
CG D2 88 11 03   EMPLOYMENT-RELATED PRACTICES EXCLUSION
CG D2 93 11 03   EXCL-CONSTRUCT MANAGE ERRORS & OMISSIONS
CG D3 07 11 03   EXCLUSION-CONTRACTORS-PROFESSIONAL LIAB
CG D3 22 01 04   EXCLUSION-SUITS BY ONE NAMED INSURED
CG D3 56 01 05   MOBILE EQUIP/EXCL VEHICLES SUB TO MV LAW
CG D3 91 03 07   EXCLUSION-PROJECT SUBJECT TO WRAP UP
CG D0 76 06 93   EXCLUSION-LEAD
CG D1 42 01 99   EXCLUSION-DISCRIMINATION
CG D2 04 06 01   EXCL-EXTERIOR INSULATION & FINISH SYSTEM
CG D2 40 06 01   EXCLUSION - SILICA
CG D2 42 01 02   EXCLUSION WAR
CG T4 78 02 90   EXCLUSION-ASBESTOS
CG T4 81 11 88   EXC-HAZARD-CONNECTED DESIGNATED EXPOSURE
CG T0 09 09 93   EMPLOYEE BENEFITS LIAB COV PART DEC
CG T0 43 11 88   EMPLOYEE BENEFITS LIAB TABLE OF CONTENTS
CG T1 01 07 86   EMPLOYEE BENEFITS LIABILITY COV FORM
CG T5 30 06 89   AMENDMENT-EBL
CG D0 38 03 95   EXCLUSION-IRC VIOLATIONS
CG T4 85 11 88   ADDITIONAL EXCLUSION-EBL
CG T9 86 10 87   FL-AMENDATORY ENDORSEMENT - EBL
CG 02 20 12 07   FL-CHANGES-CANCELLATION AND NONRENEWAL
```

**TRAVELERS** 

| | |
|---|---|
| POLICY NUMBER: | DT-CO-345K9388-TIA-10 |
| EFFECTIVE DATE: | 01-18-10 |
| ISSUE DATE: | 02-01-10 |

INTERLINE ENDORSEMENTS

```
IL T3 68 08 09    FEDERAL TERRORISM RISK INS ACT DISCLOSE
IL T3 76 01 08    CAP ON LOSSES - CERTIFIED ACTS TERRORISM
IL 00 21 09 08    NUCLEAR ENERGY LIAB EXCL END-BROAD FORM
```

IL T8 01 10 93

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy or any Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. If the policy is cancelled, that date will become the end of the policy period. If a Coverage Part is cancelled, that date will become the end of the policy period as respects that Coverage Part only.

5. If this policy or any Coverage Part is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us as part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

1. The first Named Insured shown in the Declarations:

   a. Is responsible for the payment of all premiums; and

   b. Will be the payee for any return premiums we pay.

2. We compute all premiums for this policy in accordance with our rules, rates, rating plans, premiums and minimum premiums. The premium shown in the Declarations was computed based on rates and rules in effect at

the time the policy was issued. On each renewal continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

F. **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

G. **Equipment Breakdown Equivalent to Boiler and Machinery**

On the Common Policy Declarations, the term Equipment Breakdown is understood to mean and include Boiler and Machinery and the term Boiler and Machinery is understood to mean and include Equipment Breakdown.

This policy consists of the Common Policy Declarations and the Coverage Parts and endorsements listed in that declarations form.

In return for payment of the premium, we agree with the Named Insured to provide the insurance afforded by a Coverage Part forming part of this policy. That insurance will be provided by the company indicated as insuring company in the Common Policy Declarations by the abbreviation of its name opposite that Coverage Part.

One of the companies listed below (each a stock company) has executed this policy, and this policy is countersigned by the officers listed below:

The Travelers Indemnity Company (IND)

The Phoenix Insurance Company (PHX)

The Charter Oak Fire Insurance Company (COF)

Travelers Property Casualty Company of America (TIL)

The Travelers Indemnity Company of Connecticut (TCT)

The Travelers Indemnity Company of America (TIA)

Travelers Casualty Insurance Company of America (ACJ)

Secretary

President

Includes the copyrighted material of Insurance Services Office, Inc. with its permission.   **IL T0 01 01 07** (Rev. 06-09)

**LOCATION SCHEDULE**                    **POLICY NUMBER:** DT-CO-345K9388-TIA-10

This Schedule of Locations and Buildings applies to the Common Policy Declarations for the period
01-18-10 to 01-18-11 :

| Loc. No. | Bldg. No. | Address | Occupancy |
|---|---|---|---|
| 1 | 1 | 2140 SW 52ND TERRACE<br>PLANTATION, FL 33317-9999 | GAS MAINS CONTRACTOR |
| 2 | 2 | 385 ORTIZ AVE<br>FORT MYERS, FL 33905-9999 | GAS MAINS CONTRACTOR |
| 3 | 3 | 8980 HIGH COTTON LANE<br>FORT MYERS, FL 33905-9999 | VACANT LAND |

POLICY NUMBER: DT-CO-345K9388-TIA-10                    ISSUE DATE: 02-01-10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM - COMPOSITE RATES

**A. SCHEDULE**

1. This endorsement modifies insurance provided under the following Coverage Part(s):

   COMMERCIAL GENERAL LIABILITY

2. This endorsement applies to the Declarations from   01-18-10   to   01-18-11   12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

3. Definition of Premium Base (Bases):

4. Exceptions (if any) to compositing of premium calculation:

5. Premium Schedule

| COVERAGE | PREMIUM BASE |
|---|---|
| SEE CG T0 07 | |

| ESTIMATED EXPOSURE | RATE | ADVANCE PREMIUM |
|---|---|---|
| | | $ |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**B. PROVISIONS**

1. Referring to the Schedule above, the premium for the Coverage Parts shown in item 1, except with respect to any exceptions shown in item 4, shall be computed in accordance with the premium base (bases) and rate (rates) designated in item 5.

2. The premium for the excepted hazards shall be computed in accordance with the rates and rules filed by us or on our behalf.

3. The advance premium stated above is an estimated premium for the Declarations Period. Upon termination of this period, the earned premium shall be computed in accordance with the policy and this endorsement. If the earned premium thus computed exceeds the estimated advance premium paid, you shall pay the excess to us; if less, we shall return to you the unearned paid portion. Rates and premiums for any subsequent Declarations Periods shall be determined at the inception date of those respective periods and shall be specified in endorsements to be added to the policy. After termination of each period, the earned premium shall be computed in accordance with the policy and this endorsement.

IL T3 02 07 86 (Rev. 12-08)                                                                 Page 1 of 1

# GENERAL LIABILITY
# CONTRACTORS

# GENERAL LIABILITY
# CONTRACTORS

# TRAVELERS 

One Tower Square, Hartford, Connecticut 06183

**COMMERCIAL GENERAL LIABILITY** CONTRACTORS
**COVERAGE PART DECLARATIONS**

**POLICY NO.:** DT-CO-345K9388-TIA-10
**ISSUE DATE:** 02-01-10

**INSURING COMPANY:**
THE TRAVELERS INDEMNITY COMPANY OF AMERICA

**DECLARATIONS PERIOD:** From 01-18-10 to 01-18-11  12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

The Commercial General Liability Coverage Part consists of these Declarations and the Coverage Form shown below.

1. **COVERAGE AND LIMITS OF INSURANCE:**

   **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**  **LIMITS OF INSURANCE**

   | | |
   |---|---|
   | General Aggregate Limit (Other than Products-Completed Operations) | $   2,000,000 |
   | Products-Completed Operations Aggregate Limit | $   2,000,000 |
   | Personal & Advertising Injury Limit | $   1,000,000 |
   | Each Occurrence Limit | $   1,000,000 |
   | Damage To Premises Rented To You Limit (any one premises) | $     300,000 |
   | Medical Expense Limit (any one person) | $       5,000 |

2. **AUDIT PERIOD:** ANNUAL

3. **FORM OF BUSINESS:** SUBCHAPTER 'S' CORP

4. **NUMBERS OF FORMS, SCHEDULES AND ENDORSEMENTS FORMING PART OF THIS COVERAGE PART ARE ATTACHED AS A SEPARATE LISTING.**

## COMMERCIAL GENERAL LIABILITY COVERAGE
## IS SUBJECT TO A GENERAL AGGREGATE LIMIT

CG T0 01 11 03

Page 1 of 1

PRODUCER: BROWN & BROWN-MIAMI          FH505     OFFICE: ORLANDO FL          856

**DECLARATIONS PREMIUM SCHEDULE**          **POLICY NUMBER:** DT-CO-345K9388-TIA-10

This Schedule applies to the Declarations for the period of   01-18-10   to   01-18-11

It shows all of your known rating classes as of the effective date.  Any exceptions will be so noted.  This includes all locations you own, rent or occupy.

| OPN NO. | LOC/ BLDG NO. | CLASS DESCRIPT/ CODE NO. | SUBLINE | PREMIUM BASE/ EXPOSURE | RATES | ADVANCE PREMIUM |
|---|---|---|---|---|---|---|
| MINIMUM PREMIUMS | | | | | | |
| | LOB | | | $250 | | |
| | | GENERAL LIABILITY COMPOSITE-CONSTRUCTION - COST OF SUBCONTRACTED WORK | | | | |
| | | 69862    COMBINED | P | 714,000 | 51.280 | 36,614 |
| | 1/  1 | CONTRACTORS - SUBCONTRACTED WORK - IN CONNECTION WITH PIPELINE (OTHER THAN OIL OR GAS) OR COMMUNICATION OR POWER LINE CONSTRUCTION, RECONSTRUCTION OR REPAIR | | | | |
| 005 | | 91587 | PREM/OPS | C IF ANY | 6.082 | |
| 006 | | | PROD/C-OPS | C IF ANY | 3.900 | |
| | 1/  1 | ADDITIONAL INTEREST-OWNERS, LESSEES OR CONTRACTORS | | | | |
| 009 | | 49950 | PREM/OPS | | FLAT CHG | 500 |
| | 3/  3 | VACANT LAND - OTHER THAN NOT-FOR-PROFIT PRODUCTS-COMPLETED OPERATIONS ARE SUBJECT TO THE GENERAL AGGREGATE LIMIT. | | | | |
| 011 | | 49451 EACH | PREM/OPS | T ACRE | 2 | 9.764 | 20 |
| | | COVERAGE PART TOTAL | | | | 37,134 |

*This class is subject to the prem/ops transition program.

☐ If an "X" is entered in this box, these Declarations are completed on the Premium Schedule Extension CG T0 12.

CG T0 07 09 87                                             PAGE    1  (END)

## KEY TO DECLARATIONS PREMIUM SCHEDULE

**ABBREVIATIONS:**

CLASS DESCRIPT  —  means CLASS DESCRIPTION

LOC/BLDG NO.  —  means LOCATION/BUILDING NUMBER

OPN NO.  —  means OPERATION NUMBER

PREM/OPS  —  means PREMISES/OPERATIONS

PROD/C-OPS  —  means PRODUCTS/COMPLETED OPERATIONS

**PREMIUM BASE:**

| Key Letter | Premium Base | How Rates Apply |
|---|---|---|
| a | Area | per 1,000 square feet |
| c | Total Cost | per $1,000 of total cost |
| m | Admissions | per 1,000 admissions |
| o | Total Operating Expense | per $1,000 of total operating expenditures |
| p | Payroll | per $1,000 of payroll |
| s | Gross Sales | per $1,000 of gross sales |
| t | (see note* below) | (see note* below) |
| u | Units | per unit |

\*   Premium base t applies for a number of rarely used premium bases.
The specific base and how rates apply are shown with the Class Description
on the DECLARATIONS-PREMIUM SCHEDULE.

# TABLE OF CONTENTS

## COMMERCIAL GENERAL LIABILITY
## COVERAGE FORM
## CG 00 01 10 01

SECTION I—COVERAGES

Beginning on Page

Coverage A -
Bodily Injury and Property   Insuring Agreement .............................................................1
Damage Liability

Exclusions .......................................................................2

Coverage B -
Personal and Advertising   Insuring Agreement .............................................................5
Injury Liability

Exclusions .......................................................................5

Coverage C -
Medical Payments   Insuring Agreement .............................................................7

Exclusions .......................................................................7

Supplementary Payments ............................................................... 7

SECTION II—WHO IS AN INSURED .......................................................................8

SECTION III—LIMITS OF INSURANCE ..........................................................................10

SECTION IV—COMMERCIAL GENERAL LIABILITY CONDITIONS ......................................10

Bankruptcy ................................................................................................10
Duties in the Event of Occurrence, Claim or Suit .............................................................10
Legal Action Against Us ...............................................................................11
Other Insurance ...........................................................................................11
Premium Audit ............................................................................................12
Representations ...........................................................................................12
Separation of Insureds ................................................................................12
Transfer of Rights of Recovery Against Others To Us .....................................................12
When We Do Not Renew ...............................................................................12

SECTION V—DEFINITIONS ...............................................................................12

CG T0 34 11 03

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

 © ISO Properties Inc., 2000

COMMERCIAL GENERAL LIABILITY

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

### f. Pollution

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such

premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the

"bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 © ISO Properties Inc., 2000

COMMERCIAL GENERAL LIABILITY

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

© ISO Properties Inc., 2000
CG 00 01 10 01

COMMERCIAL GENERAL LIABILITY

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

COMMERCIAL GENERAL LIABILITY

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding

© ISO Properties Inc., 2000

COMMERCIAL GENERAL LIABILITY

to, or assessing the effects of "pollut-ants".

## COVERAGE C MEDICAL PAYMENTS

1. **Insuring Agreement**

   a. We will pay medical expenses as described below for "bodily injury" caused by an acci-dent:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

      (1) The accident takes place in the "coverage territory" and during the policy period;

      (2) The expenses are incurred and reported to us within one year of the date of the accident; and

      (3) The injured person submits to examina-tion, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the ap-plicable limit of insurance. We will pay rea-sonable expenses for:

      (1) First aid administered at the time of an accident;

      (2) Necessary medical, surgical, x-ray and dental services, including prosthetic de-vices; and

      (3) Necessary ambulance, hospital, profes-sional nursing and funeral services.

2. **Exclusions**

   We will not pay expenses for "bodily injury":

   a. **Any Insured**

      To any insured, except "volunteer work-ers".

   b. **Hired Person**

      To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   c. **Injury On Normally Occupied Premises**

      To a person injured on that part of prem-ises you own or rent that the person nor-mally occupies.

   d. **Workers Compensation And Similar Laws**

      To a person, whether or not an "em-ployee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

   e. **Athletics Activities**

      To a person injured while taking part in athletics.

   f. **Products-Completed Operations Haz-ard**

      Included within the "products-completed operations hazard".

   g. **Coverage A Exclusions**

      Excluded under Coverage A.

   h. **War**

      Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any claim we investi-gate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required be-cause of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the in-sured at our request to assist us in the inves-tigation or defense of the claim or "suit", in-cluding actual loss of earnings up to $250 a day because of time off from work.

   e. All costs taxed against the insured in the "suit".

   f. Prejudgment interest awarded against the in-sured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment

COMMERCIAL GENERAL LIABILITY

interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

© ISO Properties Inc., 2000     CG 00 01 10 01

COMMERCIAL GENERAL LIABILITY

2. Each of the following is also an insured:

  a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

    (1) "Bodily injury" or "personal and advertising injury":

      (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

      (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

      (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

      (d) Arising out of his or her providing or failing to provide professional health care services.

    (2) "Property damage" to property:

      (a) Owned, occupied or used by,

      (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

    you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

  b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

  c. Any person or organization having proper temporary custody of your property if you die, but only:

    (1) With respect to liability arising out of the maintenance or use of that property; and

    (2) Until your legal representative has been appointed.

  d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

  a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

  b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

  a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

  b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

  c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

 © ISO Properties Inc., 2000

COMMERCIAL GENERAL LIABILITY

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage **C**;

   b. Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person

© ISO Properties Inc., 2000

**CG 00 01 10 01**

COMMERCIAL GENERAL LIABILITY

or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

b. **Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contrib-

COMMERCIAL GENERAL LIABILITY

ute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in **a.** above;

(2) The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

© ISO Properties Inc., 2000

CG 00 01 10 01

COMMERCIAL GENERAL LIABILITY

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property

damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical

COMMERCIAL GENERAL LIABILITY

device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

      However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      (1) Equipment designed primarily for:

         (a) Snow removal;

         (b) Road maintenance, but not construction or resurfacing; or

         (c) Street cleaning;

      (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed.

         (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

         (c) When that part of the work done at a job site has been put to its intended

use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured

must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

  © ISO Properties Inc., 2000

COMMERCIAL GENERAL LIABILITY

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, qual-ity, durability, performance or use of "your work", and

      **(2)** The providing of or failure to provide warnings or instructions.

© ISO Properties Inc., 2000
**CG 00 01 10 01**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF COVERAGE – POLLUTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

Paragraph **f.(2) Pollution, Part 2. Exclusions** of **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is deleted and replaced by the following:

    **(2)** Any loss, cost or expense arising out of any:

        **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

        **(b)** Claim or "suit" by or on behalf of a governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

Copyright, The Travelers Indemnity Company, 2003

COMMERCIAL GENERAL LIABILITY
POLICY NUMBER: DT-CO-345K9388-TIA-10
ISSUE DATE:  02-01-10

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Name of Person or Organization:**

SEMINOLE GULF RAILWAY LP AND CSX
TRANSPORTATION, INC.

**Location And Description of Completed Operations:**

WHERE RAILROAD MEETS CRYSTAL DRIVE


FORT MYERS                    FL


**Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location designated and described in the schedule of this endorsement performed for that insured and included in the "products-completed operations hazard".

COMMERCIAL GENERAL LIABILITY

POLICY NUMBER: DT-CO-345K9388-TIA-10

ISSUE DATE: 02-01-10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**Name of Person or Organization:**

SEMINOLE GULF RAILWAY LP AND CSX
TRANSPORTATION, INC.

4110 CENTERPOINTE DRIVE, #207

FORT MYERS               FL 33916

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A. **Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

B. With respect to the insurance afforded to these additional insureds, the following exclusion is added:

2. **Exclusions**

This insurance does not apply to "bodily injury" or "property damage" occurring after:

(1) All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or

(2) That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 10 01

© ISO Properties Inc., 2000

Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

      COMMERCIAL GENERAL LIABILITY COVERAGE PART
      LIQUOR LIABILITY COVERAGE PART
      OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
      POLLUTION LIABILITY COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
      RAILROAD PROTECTIVE LIABILITY COVERAGE PART
      UNDERGROUND STORAGE TANK POLICY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursu-

ant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT – NON CUMULATION OF EACH OCCURRENCE LIMIT OF LIABILITY and NON CUMULATION OF PERSONAL and ADVERTISING INJURY LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. Paragraph 5 of SECTION III – LIMITS OF INSURANCE, is amended to include the following:

   Non cumulation of Each Occurrence Limit – If one "occurrence" causes "bodily injury" and/or "property damage" during the policy period and during the policy period of one or more prior and/or future policies that include a commercial general liability coverage part for the insured issued by us or any affiliated insurance company, the amount we will pay is limited. This policy's Each Occurrence Limit will be reduced by the amount of each payment made by us and any affiliated insurance company under the other policies because of such "occurrence".

2. Paragraph 4 of SECTION III – LIMITS OF INSURANCE, is amended to include the following:

   Non cumulation of Personal and Advertising Limit – If "personal injury" and/or "advertising injury" is sustained by any one person or organization during the policy period and during the policy period of one or more prior and/or future policies that include a commercial general liability coverage part for the insured issued by us or any affiliated insurance company, the amount we will pay is limited. This policy's Personal Injury and Advertising Injury Limit will be reduced by the amount of each payment made by us and any affiliated insurance company under the other policies because of such "personal injury" and/or "advertising injury".

POLICY NUMBER: DT-CO-345K9388-TIA-10

COMMERCIAL GENERAL LIABILITY
ISSUE DATE: 02-01-10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# DESIGNATED PROJECT(S)
# GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**Designated Project(s):**

EACH "PROJECT" FOR WHICH YOU HAVE AGREED,
IN A WRITTEN CONTRACT WHICH IS IN EFFECT
DURING THIS POLICY PERIOD, TO PROVIDE A
SEPARATE GENERAL AGGREGATE LIMIT, PROVIDED
THAT THE CONTRACT IS SIGNED AND EXECUTED
BY YOU BEFORE THE "BODILY INJURY" OR
"PROPERTY DAMAGE" OCCURS.

**Designated Project
General Aggregate(s):**

GENERAL AGGREGATE
LIMIT SHOWN ON THE
DECLARATIONS.

A. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under **COVERAGE A. (SECTION I)**, and for all medical expenses caused by accidents under **COVERAGE C (SECTION I)**, which can be attributed only to operations at a single designated "project" shown in the Schedule above:

1. A separate Designated Project General Aggregate Limit applies to each designated "project", and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations, unless separate **Designated Project General Aggregate(s)** are scheduled above.

2. The Designated Project General Aggregate Limit is the most we will pay for the sum of all damages under **COVERAGE A.**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under **COVERAGE C**, regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

3. Any payments made under **COVERAGE A.** for damages or under **COVERAGE C.** for medical expenses shall reduce the Designated Project General Aggregate Limit for that designated "project". Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Project General Aggregate Limit for any other designated "project" shown in the Schedule above.

4. The limits shown in the Declarations for **Each Occurrence, Damage To Premises Rented To You and Medical Expense** continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Project General Aggregate Limit.

B. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under **COVERAGE A. (SECTION I)**, and for all medical expenses caused by accidents under **COVERAGE C. (SECTION I)**, which cannot be attributed only to operations at a single designated "project" shown in the Schedule above:

CG D2 11 01 04             Copyright, The Travelers Indemnity Company, 2004             Page 1 of 2

COMMERCIAL GENERAL LIABILITY

1. Any payments made under **COVERAGE A.** for damages or under **COVERAGE C.** for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

2. Such payments shall not reduce any Designated Project General Aggregate Limit.

C. Part **2.** of **SECTION III – LIMITS OF INSURANCE** is deleted and replaced by the following:

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Damages under **Coverage B**; and

   b. Damages from "occurrences" under **COVERAGE A (SECTION I)** and for all medical expenses caused by accidents under **COVERAGE C (SECTION I)** which cannot be attributed only to operations at a single designated "project" shown in the **SCHEDULE** above.

D. When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Project General Aggregate Limit.

E. For the purposes of this endorsement the **Definitions Section** is amended by the addition of the following definition:

"Project" means an area away from premises owned by or rented to you at which you are performing operations pursuant to a contract or agreement. For the purposes of determining the applicable aggregate limit of insurance, each "project" that includes premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad shall be considered a single "project".

F. The provisions of **SECTION III – LIMITS OF INSURANCE** not otherwise modified by this endorsement shall continue to apply as stipulated.

                Copyright, The Travelers Indemnity Company, 2004                **CG D2 11 01 04**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WEB XTEND LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## PROVISIONS

Paragraph **o. Personal And Advertising Injury**, Part **2. Exclusions** of **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is deleted and replaced by the following:

**o. Personal Injury, Advertising Injury and Web Site Injury**

"Bodily injury" arising out of "personal injury", "advertising injury" or "web site injury".

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY (SECTION I – COVERAGES)** is deleted in its entirety and replaced by the following:

**COVERAGE B. PERSONAL INJURY, ADVERTISING INJURY AND WEB SITE INJURY LIABILITY**

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury", "advertising injury" or "web site injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury", "advertising injury", or "web site injury" to which this insurance does not apply. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly

provided for under Supplementary Payments – Coverages **A** and **B**.

   b. This insurance applies to:

      (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

      (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services; or

      (3) "Web site injury" caused by an offense committed in the course of the visual or audio presentation of material on "your web site" or in the numerical expression of computer code used to enable "your web site";

   but only if the offense was committed in the "coverage territory" during the policy period.

   With respect to subparagraph **b. (1)** above, bulletins, financial or annual reports, or newsletters that are not published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters will not be considered publishing.

2. **Exclusions.**

   This insurance does not apply to:

   a. **Knowing Violation Of Rights Of Another**

      "Personal injury", "advertising injury" or "web site injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal injury", "advertising injury" or "web site injury".

   b. **Material Published With Knowledge Of Falsity**

      "Personal injury", "advertising injury" or "web site injury" arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.

COMMERCIAL GENERAL LIABILITY

**c. Material Published Prior To Policy Period**

"Personal injury", "advertising injury" or "web site injury" arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal injury", "advertising injury" or "web site injury" arising out of a criminal act committed by or with the consent of the insured.

**e. Contractual Liability**

"Personal injury", "advertising injury" or "web site injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to:

**(1)** "Personal injury" liability assumed in a contract or agreement that is an "insured contract", provided the "personal injury" arises out of an offense committed subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "personal injury" provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged; and

**(2)** "Personal injury", "advertising injury" or "web site injury" that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Advertising injury" or "web site injury" arising out of a breach of contract.

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Advertising injury" or "web site injury" arising out of the failure of goods, products or services to conform with any statement of quality

or performance made in the course of advertising your goods, products or services.

**h. Wrong Description Of Prices**

"Advertising injury" or "web site injury" arising out of the wrong description of the price of goods, products or services.

**i. Insureds In Media And Internet Type Businesses**

"Personal injury", "advertising injury" or "web site injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **a.**, **b.** and **c.** of the "personal injury" definition under **SECTION V – DEFINITIONS** of this endorsement.

For the purposes of this exclusion, bulletins, financial or annual reports, or newsletters that are not published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters will not be considered publishing.

**j. Electronic Chatrooms Or Bulletin Boards**

"Personal injury", "advertising injury" or "web site injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**k. Unauthorized Use Of Another's Name Or Product**

"Personal injury", "advertising injury" or "web site injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar activities that mislead another's potential customers.

**l. Pollution**

"Personal injury", "advertising injury" or "web site injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

     Copyright 2005 The St. Paul Travelers Companies, Inc. All rights reserved.   **CG D2 34 01 05**

COMMERCIAL GENERAL LIABILITY

m. **Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or "suit" by or on behalf of a governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, "pollutants".

n. **Dishonest, Fraudulent Or Malicious Acts**

"Web site injury" arising out of dishonest, fraudulent, criminal or malicious acts, errors or omissions committed by any insured, or by anyone for whom the insured is legally responsible, whether acting alone or with others.

o. **Web Site Intellectual Property**

"Web site injury" committed by any insured whose business is providing access to intellectual property of others via "your web site".

p. **Employment-Related Practices**

"Web site injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs p.(1)(a)(b) or (c) above is directed.

This exclusion applies:

(i) Whether the insured may be held liable as an employer or in any other capacity; and

(ii) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B** (Section I – Coverages) is amended as follows:

1. Paragraph **2.d.** is deleted and replaced by the following:

    d. The allegations in the "suit" and the information we know about the "occurrence" or offense are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

2. The third sentence of Paragraph **2.** is deleted and replaced by the following:

    Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage A – Bodily Injury And Property Damage Liability and Paragraph **2.e.(1)** of Section I – Coverage B – Personal Injury, Advertising Injury And Web Site Injury Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage", or damages for "personal injury", and will not reduce the limits of insurance.

**SECTION II – WHO IS AN INSURED**

The introductory sentence of paragraph **2. a. (1)** Section II – Who Is An Insured is deleted and replaced by the following:

2. a. (1) "Bodily injury", "personal injury" or "web site injury":

Section II – Who Is An Insured, paragraph **4. c.**, is deleted and replaced by the following:

4. c. Coverage B does not apply to "personal injury", "advertising injury" or "web site injury" arising out of an offense committed before you acquired or formed the organization.

**SECTION III – LIMITS OF INSURANCE**

**SECTION III – Limits Of Insurance, paragraph 4,** is deleted and replaced by the following:

4. Subject to **2.** above, the Personal, Advertising and Web Site Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury", "advertising injury" and all "web site injury" sustained by any one person or organization.

COMMERCIAL GENERAL LIABILITY

## SECTION V – DEFINITIONS

### ADVERTISEMENT

The definition of **"Advertisement"** (SECTION V – DEFINITIONS) is deleted in its entirety.

### COVERAGE TERRITORY

The definition of **"Coverage Territory"** (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following:

a.  The United States of America (including its territories and possessions), Puerto Rico and Canada;

b.  International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

c.  All parts of the world if the injury or damage arises out of:

   (1)  Goods or products made or sold by you in the territory described in **a.** above;

   (2)  The activities of a person whose home is in the territory described in **a.** above, but who is away for a short time on your business; or

   (3)  "Personal injury", "advertising injury", and "web site injury" offenses that take place through the Internet or similar electronic means of communication; and

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

### INSURED CONTRACT

The first paragraph of part **f.** of the definition of **"Insured Contract"** (SECTION V – DEFINITIONS) is deleted and replaced by the following:

f.  That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal injury" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

### PERSONAL AND ADVERTISING INJURY

The definition of **"Personal and advertising injury"** (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following definitions of "advertising injury" and "personal injury":

"Advertising injury" means injury, arising out of one or more of the following offenses:

a.  Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services, provided that claim is made or "suit" is brought by a person or organization that claims to have been slandered or libeled, or whose goods, products or services have allegedly been disparaged;

b.  Oral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life; or

c.  Infringement of copyright, title or slogan, provided that claim is made or "suit" is brought by a person or organization claiming ownership of such copyright, title or slogan.

"Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

a.  False arrest, detention or imprisonment;

b.  Malicious prosecution;

c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor, provided that the wrongful eviction, wrongful entry or invasion of the right of private occupancy is performed by or on behalf of the owner, landlord or lessor of that room, dwelling or premises;

d.  Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services, provided that claim is made or "suit" is brought by a person or organization that claims to have been slandered or libeled, or whose goods, products or services have allegedly been disparaged; or

e.  Oral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life.

### SUIT

The definition of **"Suit"** (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following:

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury", "advertising injury" or "web site injury" to

COMMERCIAL GENERAL LIABILITY

which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

The following definitions are added to **SECTION V – DEFINITIONS**

**WEB SITE INJURY**

"Web site injury" means injury, other than "personal injury" or "advertising injury", arising out of one or more of the following offenses:

a. Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services, provided that claim is made or "suit" is brought by a person or organization that claims to have been slandered or libeled, or

whose goods, products or services have allegedly been disparaged;

b. Oral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life;

c. Oral, written or electronic publication of material that violates a person's right of publicity, provided that claim is made or "suit" is brought by the person claiming rights of publicity; or

d. Infringement of copyright, title or slogan, provided that claim is made or "suit" is brought by a person or organization claiming ownership of such copyright, title or slogan.

**YOUR WEB SITE**

"Your web site" means all computer files and data which may be accessed via the Internet using a Universal Resource Locator that includes any domain name owned by or assigned to you.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# BLANKET ADDITIONAL INSURED
# (CONTRACTORS)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. WHO IS AN INSURED – (Section II) is amended to include any person or organization that you agree in a "written contract requiring insurance" to include as an additional insured on this Coverage Part, but:

   a) Only with respect to liability for "bodily injury", "property damage" or "personal injury"; and

   b) If, and only to the extent that, the injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the "written contract requiring insurance" applies. The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

2. The insurance provided to the additional insured by this endorsement is limited as follows:

   a) In the event that the Limits of Insurance of this Coverage Part shown in the Declarations exceed the limits of liability required by the "written contract requiring insurance", the insurance provided to the additional insured shall be limited to the limits of liability required by that "written contract requiring insurance". This endorsement shall not increase the limits of insurance described in Section III – Limits Of Insurance.

   b) The insurance provided to the additional insured does not apply to "bodily injury", "property damage" or "personal injury" arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services, including:

      i. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders or change orders, or the preparing, approving, or failing to prepare or approve, drawings and specifications; and

      ii. Supervisory, inspection, architectural or engineering activities.

   c) The insurance provided to the additional insured does not apply to "bodily injury" or "property damage" caused by "your work" and included in the "products-completed operations hazard" unless the "written contract requiring insurance" specifically requires you to provide such coverage for that additional insured, and then the insurance provided to the additional insured applies only to such "bodily injury" or "property damage" that occurs before the end of the period of time for which the "written contract requiring insurance" requires you to provide such coverage or the end of the policy period, whichever is earlier.

3. The insurance provided to the additional insured by this endorsement is excess over any valid and collectible "other insurance", whether primary, excess, contingent or on any other basis, that is available to the additional insured for a loss we cover under this endorsement. However, if the "written contract requiring insurance" specifically requires that this insurance apply on a primary basis or a primary and non-contributory basis, this insurance is primary to "other insurance" available to the additional insured which covers that person or organization as a named insured for such loss, and we will not share with that "other insurance". But the insurance provided to the additional insured by this endorsement still is excess over any valid and collectible "other insurance", whether primary, excess, contingent or on any other basis, that is available to the additional insured when that person or organization is an additional insured under such "other insurance".

4. As a condition of coverage provided to the additional insured by this endorsement:

   a) The additional insured must give us written notice as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, such notice should include:

 © 2005 The St. Paul Travelers Companies, Inc.

COMMERCIAL GENERAL LIABILITY

    **i.** How, when and where the "occurrence" or offense took place;

    **ii.** The names and addresses of any injured persons and witnesses; and

    **iii.** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b)** If a claim is made or "suit" is brought against the additional insured, the additional insured must:

    **i.** Immediately record the specifics of the claim or "suit" and the date received; and

    **ii.** Notify us as soon as practicable.

The additional insured must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c)** The additional insured must immediately send us copies of all legal papers received in connection with the claim or "suit", cooperate with us in the investigation or settlement of the claim or defense against the "suit", and otherwise comply with all policy conditions.

**d)** The additional insured must tender the defense and indemnity of any claim or "suit" to any provider of "other insurance" which would cover the additional insured for a loss we cover under this endorsement. However, this condition does not affect whether the insurance provided to the additional insured by this endorsement is primary to "other insurance" available to the additional insured which covers that person or organization as a named insured as described in paragraph **3.** above.

**5.** The following definition is added to SECTION V. – DEFINITIONS:

"Written contract requiring insurance" means that part of any written contract or agreement under which you are required to include a person or organization as an additional insured on this Coverage Part, provided that the "bodily injury" and "property damage" occurs and the "personal injury" is caused by an offense committed:

    **a.** After the signing and execution of the contract or agreement by you;

    **b.** While that part of the contract or agreement is in effect; and

    **c.** Before the end of the policy period.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTORS XTEND ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**GENERAL DESCRIPTION OF COVERAGE** – Provisions A.-H. and J.-N. of this endorsement broaden coverage, and provision I. of this endorsement may limit coverage. The following listing is a general coverage description only. Limitations and exclusions may apply to these coverages. Read all the **PROVISIONS** of this endorsement carefully to determine rights, duties, and what is and is not covered.

A. Broadened Named Insured

B. Extension of Coverage – Damage To Premises Rented To You
  - Perils of fire, explosion, lightning, smoke, water
  - Limit increased to $300,000

C. Blanket Waiver of Subrogation

D. Blanket Additional Insured – Managers or Lessors of Premises

E. Incidental Medical Malpractice

F. Extension of Coverage – Bodily Injury

G. Contractual Liability – Railroads

H. Additional Insured – State or Political Subdivisions

I. Other Insurance Condition

J. Increased Supplementary Payments
  - Cost of bail bonds increased to $2,500
  - Loss of earnings increased to $500 per day

K. Knowledge and Notice of Occurrence or Offense

L. Unintentional Omission

M. Personal Injury – Assumed by Contract

N. Blanket Additional Insured –Lessor of Leased Equipment

## PROVISIONS

### A. BROADENED NAMED INSURED

1. The Named Insured in Item **1.** of the Declarations is as follows:

   The person or organization named in Item **1.** of the Declarations and any organization, other than a partnership, joint venture or limited liability company, of which you maintain ownership or in which you maintain the majority interest on the effective date of the policy. However, coverage for any such additional organization will cease as of the date, if any, during the policy period, that you no longer maintain ownership of, or the majority interest in, such organization.

2. WHO IS AN INSURED (Section II) Item **4.a.** is deleted and replaced by the following:

   a. Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

3. This Provision **A.** does not apply to any person or organization for which coverage is excluded by endorsement.

### B. EXTENSION OF COVERAGE – DAMAGE TO PREMISES RENTED TO YOU

1. The last paragraph of COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is deleted and replaced by the following:

   Exclusions **c.** through **n.** do not apply to damage to premises while rented to you, or temporarily occupied by you with permission of the owner, caused by:

   a. Fire;

   b. Explosion;

   c. Lightning;

   d. Smoke resulting from such fire, explosion, or lightning; or

   e. Water.

   A separate limit of insurance applies to this coverage as described in Section III Limits Of Insurance.

COMMERCIAL GENERAL LIABILITY

2. This insurance does not apply to damage to premises while rented to you, or temporarily occupied by you with permission of the owner, caused by:

   a. Rupture, bursting, or operation of pressure relief devices;

   b. Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water;

   c. Explosion of steam boilers, steam pipes, steam engines, or steam turbines.

3. Paragraph 6. of LIMITS OF INSURANCE (Section III) is deleted and replaced by the following:

Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under COVERAGE A. for the sum of all damages because of "property damage" to any one premises while rented to you, or temporarily occupied by you with permission of the owner, caused by: fire; explosion; lightning; smoke resulting from such fire, explosion, or lightning; or water. The Damage To Premises Rented To You Limit will apply to all "property damage" proximately caused by the same "occurrence", whether such damage results from: fire; explosion; lightning; smoke resulting from such fire, explosion, or lightning; or water; or any combination of any of these causes.

The Damage To Premises Rented To You Limit will be the higher of:

   a. $300,000; or

   b. The amount shown on the Declarations for Damage To Premises Rented To You Limit.

4. Paragraph a. of the definition of "insured contract" (DEFINITIONS – Section V) is deleted and replaced by the following:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage to premises while rented to you, or temporarily occupied by you with permission of the owner, caused by: fire; explosion; lightning; smoke resulting from such fire, explosion, or lightning; or water, is not an "insured contract";

5. This Provision B. does not apply if coverage for Damage To Premises Rented To You of COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is excluded by endorsement.

C. BLANKET WAIVER OF SUBROGATION

We waive any right of recovery we may have against any person or organization because of payments we make for injury or damage arising out of: premises owned or occupied by or rented or loaned to you; ongoing operations performed by you or on your behalf, done under a contract with that person or organization; "your work"; or "your products". We waive this right where you have agreed to do so as part of a written contract, executed by you before the "bodily injury" or "property damage" occurs or the "personal injury" or "advertising injury" offense is committed.

D. BLANKET ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization (referred to below as "additional insured") with whom you have agreed in a written contract, executed before the "bodily injury" or "property damage" occurs or the "personal injury" or "advertising injury" offense is committed, to name as an additional insured, but only with respect to liability arising out of the ownership, maintenance or use of that part of any premises leased to you, subject to the following provisions:

1. Limits of Insurance. The limits of insurance afforded to the additional insured shall be the limits which you agreed to provide in the written contract, or the limits shown on the Declarations, whichever are less.

2. The insurance afforded to the additional insured does not apply to:

   a. Any "bodily injury" or "property damage" that occurs, or "personal injury" or "advertising injury" caused by an offense which is committed, after you cease to be a tenant in that premises;

   b. Any premises for which coverage is excluded by endorsement; or

   c. Structural alterations, new construction or demolition operations performed by or on behalf of such additional insured.

3. The insurance afforded to the additional insured is excess over any valid and collectible

 Copyright, The Travelers Indemnity Company, 2004 CG D3 16 07 04

COMMERCIAL GENERAL LIABILITY

"other insurance" available to such additional insured, unless you have agreed in the written contract that this insurance must be primary to, or non-contributory with, such "other insurance".

E. INCIDENTAL MEDICAL MALPRACTICE

1. The following is added to paragraph **1.** Insuring Agreement of COVERAGE A. – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

   "Bodily injury" arising out of the rendering of, or failure to render, the following will be deemed to be caused by an "occurrence":

   a. Medical, surgical, dental, laboratory, x-ray or nursing service, advice or instruction, or the related furnishing of food or beverages;

   b. The furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances;

   c. First aid; or

   d. "Good Samaritan services." As used in this Provision **E.**, "Good Samaritan services" are those medical services rendered or provided in an emergency and for which no remuneration is demanded or received.

2. Paragraph **2.a.(1)(d)** of WHO IS AN INSURED (Section II) does not apply to any registered nurse, licensed practical nurse, emergency medical technician or paramedic employed by you, but only while performing the services described in paragraph **1.** above and while acting within the scope of their employment by you. Any "employees" rendering "Good Samaritan services" will be deemed to be acting within the scope of their employment by you.

3. The following exclusion is added to paragraph **2.** Exclusions of COVERAGE A. – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

   (This insurance does not apply to:) "Bodily injury" or "property damage" arising out of the willful violation of a penal statute or ordinance relating to the sale of pharmaceuticals committed by or with the knowledge or consent of the insured.

4. For the purposes of determining the applicable limits of insurance, any act or omission

together with all related acts or omissions in the furnishing of the services described in paragraph **1.** above to any one person will be deemed one "occurrence".

5. This Provision **E.** does not apply if you are in the business or occupation of providing any of the services described in paragraph **1.** above.

6. The insurance provided by this Provision **E.** shall be excess over any valid and collectible "other insurance" available to the insured, whether primary, excess, contingent or on any other basis, except for insurance that you bought specifically to apply in excess of the Limits of Insurance shown on the Declarations of this Coverage Part.

F. EXTENSION OF COVERAGE – BODILY INJURY

The definition of "bodily injury" (DEFINITIONS – Section V) is deleted and replaced by the following:

"Bodily injury" means bodily injury, mental anguish, mental injury, shock, fright, disability, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time.

G. CONTRACTUAL LIABILITY – RAILROADS

1. Paragraph **c.** of the definition of "insured contract" (DEFINITIONS – Section V) is deleted and replaced by the following:

   c. Any easement or license agreement;

2. Paragraph **f.(1)** of the definition of "insured contract" (DEFINITIONS – Section V) is deleted.

H. ADDITIONAL INSURED – STATE OR POLITICAL SUBDIVISIONS – PERMITS

WHO IS AN INSURED (Section II) is amended to include as an insured any state or political subdivision, subject to the following provisions:

1. This insurance applies only when required to be provided by you by an ordinance, law or building code and only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

2. This insurance does not apply to:

   a. "Bodily injury," "property damage," "personal injury" or "advertising injury" arising out of operations performed for the state or political subdivision; or

COMMERCIAL GENERAL LIABILITY

    **b.** "Bodily injury" or "property damage" included in the "products-completed operations hazard".

**I. OTHER INSURANCE CONDITION**

    **A.** COMMERCIAL GENERAL LIABILITY CONDITIONS (Section **IV**), paragraph **4.** (Other Insurance) is deleted and replaced by the following:

    **4. Other Insurance**

    If valid and collectible "other insurance" is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

    **a. Primary Insurance**

    This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the "other insurance" is also primary. Then, we will share with all that "other insurance" by the method described in **c.** below.

    **b. Excess Insurance**

    This insurance is excess over any of the "other insurance", whether primary, excess, contingent or on any other basis:

    **(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work";

    **(2)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

    **(3)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

    **(4)** If the loss arises out of the maintenance or use of aircraft, "autos", or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability; or

    **(5)** That is available to the insured when the insured is an additional insured under any other policy, including any umbrella or excess policy.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any provider of "other insurance" has a duty to defend the insured against that "suit". If no provider of "other insurance" defends, we will undertake to do so, but we will be entitled to the insured's rights against all those providers of "other insurance".

When this insurance is excess over "other insurance", we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

    **(1)** The total amount that all such "other insurance" would pay for the loss in the absence of this insurance; and

    **(2)** The total of all deductible and self-insured amounts under that "other insurance".

We will share the remaining loss, if any, with any "other insurance" that is not described in this Excess Insurance provision.

    **c. Method Of Sharing**

    If all of the "other insurance" permits contribution by equal shares, we will follow this method also. Under this approach each provider of insurance contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

    If any of the "other insurance" does not permit contribution by equal shares, we will contribute by limits. Under this method, the share of each provider of insurance is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all providers of insurance.

    **B.** The following definition is added to DEFINITIONS (Section **V**):

    "Other insurance":

    **a.** Means insurance, or the funding of losses, that is provided by, through or on behalf of:

 Copyright, The Travelers Indemnity Company, 2004 CG D3 16 07 04

(1) Another insurance company;

(2) Us or any of our affiliated insurance companies, except when the Non cumulation of Each Occurrence Limit section of Paragraph 5 of LIMITS OF INSURANCE (Section III) or the Non cumulation of Personal and Advertising Injury limit sections of Paragraph 4 of LIMITS OF INSURANCE (Section III) applies;

(3) Any risk retention group;

(4) Any self-insurance method or program, other than any funded by you and over which this Coverage Part applies; or

(5) Any similar risk transfer or risk management method.

b. Does not include umbrella insurance, or excess insurance, that you bought specifically to apply in excess of the Limits of Insurance shown on the Declarations of this Coverage Part.

## J. INCREASED SUPPLEMENTARY PAYMENTS

Paragraphs **1.b.** and **1.d.** of SUPPLEMENTARY PAYMENTS – COVERAGES A AND B (Section I – Coverages) are amended as follows:

1. In paragraph **1.b.**, the amount we will pay for the cost of bail bonds is increased to $2500.

2. In paragraph **1.d.**, the amount we will pay for loss of earnings is increased to $500 a day.

## K. KNOWLEDGE AND NOTICE OF OCCURRENCE OR OFFENSE

1. The following is added to COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV), paragraph 2. (Duties In The Event of Occurrence, Offense, Claim or Suit):

Notice of an "occurrence" or of an offense which may result in a claim must be given as soon as practicable after knowledge of the "occurrence" or offense has been reported to you, one of your "executive officers" (if you are a corporation), one of your partners who is an individual (if you are a partnership), one of your managers (if you are a limited liability company), or an "employee" (such as an insurance, loss control or risk manager or administrator) designated by you to give such notice.

Knowledge by any other "employee" of an "occurrence" or offense does not imply that you also have such knowledge.

2. Notice of an "occurrence" or of an offense which may result in a claim will be deemed to be given as soon as practicable to us if it is given in good faith as soon as practicable to your workers' compensation insurer. This applies only if you subsequently give notice of the "occurrence" or offense to us as soon as practicable after you, one of your "executive officers" (if you are a corporation), one of your partners who is an individual (if you are a partnership), one of your managers (if you are a limited liability company), or an "employee" (such as an insurance, loss control or risk manager or administrator) designated by you to give such notice discovers that the "occurrence" or offense may involve this policy.

3. This Provision **K.** does not apply as respects the specific number of days within which you are required to notify us in writing of the abrupt commencement of a discharge, release or escape of "pollutants" that causes "bodily injury" or "property damage" which may otherwise be covered under this policy.

## L. UNINTENTIONAL OMISSION

The following is added to COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV), paragraph 6. (Representations):

The unintentional omission of, or unintentional error in, any information provided by you which we relied upon in issuing this policy shall not prejudice your rights under this insurance. However, this Provision **L.** does not affect our right to collect additional premium or to exercise our right of cancellation or nonrenewal in accordance with applicable state insurance laws, codes or regulations.

## M. PERSONAL INJURY – ASSUMED BY CONTRACT

1. The following is added to Exclusion **e. (1)** of Paragraph **2.**, **Exclusions** of **Coverage B. Personal Injury, Advertising Injury, and Web Site Injury Liability** of the **Web XTEND Liability** endorsement:

Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "personal injury" provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been as-

COMMERCIAL GENERAL LIABILITY

sumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

2. Paragraph **2.d.** of SUPPLEMENTARY PAYMENTS – COVERAGES A AND B (Section I – Coverages) is deleted and replaced by the following:

d. The allegations in the "suit" and the information we know about the "occurrence" or offense are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

3. The third sentence of Paragraph 2 of SUPPLEMENTARY PAYMENTS – COVERAGES A AND B (Section I – Coverages) is deleted and replaced by the following:

Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability, or the provisions of Paragraph **2.e.(1)** of Section I – Coverage **B** – Personal Injury, Advertising Injury And Web Site Injury Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage", or damages for "personal injury", and will not reduce the limits of insurance.

4. This provision **M.** does not apply if coverage for "personal injury" liability is excluded by endorsement.

**N. BLANKET ADDITIONAL INSURED – LESSOR OF LEASED EQUIPMENT**

WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization (referred to below as "additional insured") with whom you have agreed in a written contract, executed before the "bodily injury" or "property damage" occurs or the "personal injury" or "advertising injury" offense is committed, to name as an additional insured, but only with respect to their liability for "bodily injury", "property damage", "personal injury" or "advertising injury" caused, in whole or in part, by your acts or omissions in the maintenance, operation or use of equipment leased to you by such additional insured, subject to the following provisions:

1. Limits of Insurance. The limits of insurance afforded to the additional insured shall be the limits which you agreed to provide in the written contract, or the limits shown on the Declarations, whichever are less.

2. The insurance afforded to the additional insured does not apply to any "bodily injury" or "property damage" that occurs, or "personal injury" or "advertising injury" caused by an offense which is committed, after the equipment lease expires.

3. The insurance afforded to the additional insured is excess over any valid and collectible "other insurance" available to such additional insured, unless you have agreed in the written contract that this insurance must be primary to, or non-contributory with, such "other insurance".

       Copyright, The Travelers Indemnity Company, 2004       **CG D3 16 07 04**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, Exclusions **of Section I – Coverage A – Bodily Injury And Property Damage:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** The following exclusion is added to Paragraph **2.**, Exclusions of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Personal injury" or "advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

Copyright, The Travelers Indemnity Company, 2002
Includes copyrighted material of Insurance Services Office

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONSTRUCTION MANAGEMENT ERRORS AND OMISSIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of:

1.  The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager; or

2.  Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager.

This exclusion does not apply to "bodily injury" or "property damage" due to construction or demolition work done by you, your "employees" or your subcontractors.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

1. This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

   a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

   b. Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

2. Subject to Paragraph **3.** below, professional services include:

   a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

   b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

Copyright, The Travelers Indemnity Company, 2003
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# EXCLUSION – SUITS BY ONE NAMED INSURED AGAINST ANOTHER NAMED INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. This insurance does not apply to any claim for damages by any Named Insured against another Named Insured because of "bodily injury", "property damage", "personal injury" or "advertising injury".

B. **Condition 7. Separation of Insureds** is deleted and replaced by the following:

Except with respect to the Limits of Insurance, the exclusion in A. of this endorsement and any rights or duties specifically assigned in this Coverage Part to the First Named Insured, this insurance applies:

a. As if the Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MOBILE EQUIPMENT REDEFINED
# EXCLUSION OF VEHICLES SUBJECT TO MOTOR VEHICLE LAWS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

A. Exclusion **g.** of **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** (Section I – Coverages) is deleted and replaced by the following:

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

B. **SECTION V – DEFINITIONS**

The definition of "auto" (paragraph 2.) is deleted and replaced by the following:

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

The definition of "mobile equipment" is deleted and replaced by the following:

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

COMMERCIAL GENERAL LIABILITY

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

  **(1)** Power cranes, shovels, loaders, diggers or drills; or

  **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

  **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

  **(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

  **(1)** Equipment designed primarily for:

    **(a)** Snow removal;

    **(b)** Road maintenance, but not construction or resurfacing; or

    **(c)** Street cleaning;

  **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

  **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**C. WHO IS AN INSURED**

Paragraph 3. of SECTION II – Who Is An Insured is deleted.

    Copyright, 2005 The St. Paul Travelers Companies, Inc. All rights reserved.    **CG D3 56 01 05**

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ALL PROJECTS  SUBJECT TO A WRAP-UP INSURANCE PROGRAM WITH LIMITED EXCEPTIONS FOR CERTAIN ONGOING OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
SELF-INSURED EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE PART

1.  The following exclusion is added to Paragraph **2.**, Exclusions of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to "bodily injury" or "property damage" arising out of any project that is or was subject to a "wrap-up insurance program".

This exclusion does not apply to "bodily injury" or "property damage" arising out of your ongoing operations that:

a.  Are being performed at any location owned by, or rented to, you that is outside the project site for that project and is not covered by the "wrap-up insurance program" for that project; or

b.  Are punch list or warranty work, if coverage was available to the insured under the "wrap-up insurance program" for "bodily injury" or "property damage" arising out of your ongoing operations and the "bodily injury" or "property damage" occurs after the expiration of all such coverage.

The exceptions in this exclusion do not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" even if you are required to provide such coverage for an additional insured by a written contract or agreement.

2.  The following is added to **Section V – Definitions:**

"Wrap-up insurance program" means any agreement or arrangement, including any contractor-controlled, owner-controlled or similar insurance program, under which some or all of the contractors working on a specific project, or specific projects, are required to participate in a program to obtain insurance that:

a.  Includes the same or similar insurance as that provided by this Coverage Part; and

b.  Is issued specifically for injury or damage arising out of such project or projects.

© 2007 The Travelers Companies, Inc.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION — LEAD

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> CATASTROPHE UMBRELLA POLICY

**PROVISIONS**

This insurance does not apply to any injury, damage, loss, cost, payment or expense, including, but not limited to, defense and investigation, of any kind arising out of, resulting from, caused by or contributed to by the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance. This exclusion applies, but is not limited to:

1. Any supervision, instructions, recommendations, warnings or advice given in connection with the above;

2. Any obligation to share damages, losses, costs, payments or expenses with or repay someone else who must make payment because of such injury or damage, loss, cost, payment or expense; or

3. Any request, order or requirement to abate, mitigate, remediate, contain, remove or dispose of lead, lead compounds or materials or substances containing lead.

CG D0 76 06 93

Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—DISCRIMINATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1. COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** – is amended by adding the following additional exclusion:

(This Insurance does not apply to:)

"Bodily injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

**2. COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY** – is amended by adding the following additional exclusion:

(This insurance does not apply to:)

"Personal injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEM

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury", "property damage", advertising injury" or "personal injury" arising out of:

1. The design, manufacture, construction, fabrication, distribution, sale, preparation, installation, application, maintenance or repair, including remodeling, service, correction or replacement of any "exterior insulation and finish system" (commonly referred to as synthetic stucco or EIFS) or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashing, coatings, caulking or sealants in connection with such a system; or

2. "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on any part of that structure.

The following is added to DEFINITIONS (Section V):

"Exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of:

a. A rigid or semi rigid insulation board made of expanded polystyrene or other materials; and

b. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate; and

c. A reinforced base coat; and

d. A finish coat providing surface texture and color.

---

CG D2 04 06 01              Copyright, The Travelers Indemnity Company, 2001              Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – SILICA

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of or in any way related to the actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation or respiration of silica or products or substances containing silica. This includes, but is not limited to:

a. Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

b. Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

This exclusion applies to all such "bodily injury" or "property damage" whether or not the "bodily injury" or "property damage" is included in the "products-completed operations hazard".

 Copyright, The Travelers Indemnity Company, 2001

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – WAR

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Exclusion **i.** under Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions:**

This insurance does not apply to:

**i. War**

"Bodily injury" or "property damage" arising, directly or indirectly, out of:

(1) War, including undeclared or civil war; or

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

B. The following exclusion is added to Paragraph **2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions:**

This insurance does not apply to:

**War**

"Personal injury" or "advertising injury" arising, directly or indirectly, out of:

(1) War, including undeclared or civil war; or

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury.

 Copyright, The Travelers Indemnity Company, 2002

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION — ASBESTOS

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    CATASTROPHE UMBRELLA POLICY

This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened dispersal of asbestos, asbestos fibers or products containing asbestos, provided that the injury or damage is caused or contributed to by the hazardous properties of asbestos. This includes:

a.  Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

b.  Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

 Copyright, The Travelers Indemnity Company. Page 1 of 1

POLICY NUMBER:DT-CO-345K9388-TIA-10

COMMERCIAL GENERAL LIABILITY
ISSUE DATE:02-01-10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION–ALL HAZARDS IN CONNECTION WITH A DESIGNATED EXPOSURE

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**DESCRIPTION**

"YOUR WORK" ON OR FOR ANY PROJECT THAT,
IN WHOLE OR IN PART, IS OR WILL BECOME
ANY SINGLE- OR MULTI-FAMILY HOUSING,
ANY RESIDENTIAL CONDOMINIUM, ANY
RESIDENTIAL APARTMENT OR ANY ASSISTED
LIVING FACILITY.  THIS DESCRIPTION DOES
NOT INCLUDE "YOUR WORK" WITHIN THE
BOUNDARIES OF, OR BELOW, WHAT IS OR
WILL BECOME ANY PUBLICLY OR PRIVATELY
OWNED PARKING LOT, STREET, ROADWAY
OR RIGHT OF WAY, OTHER THAN A
PRIVATELY OWNED DRIVEWAY.  THIS
DESCRIPTION ALSO DOES NOT INCLUDE "YOUR
WORK" THAT IS SITE PREPARATION AND
WATER, SEWER, GAS, COMMUNICATION OR
POWER LINE WORK.

"YOUR WORK" ON OR FOR ANY PROJECT
LOCATED IN THE STATE OF NEW YORK OR
ILLINOIS.

This insurance does not apply to "bodily injury," "property damage," personal injury" or "advertising injury"
arising out of:
1. Any exposure shown in the above schedule; or
2. Any supervision, instructions, recommendations or advice given or which should have been given in
   connection therewith.

CG T4 81 11 88

Page 1 of 1

# TRAVELERS 

One Tower Square, Hartford, Connecticut 06183

**EMPLOYEE BENEFITS LIABILITY**
**COVERAGE PART DECLARATIONS**

**POLICY NO.:** DT-CO-345K9388-TIA-10
**ISSUE DATE:** 02-01-10

**INSURING COMPANY:**
THE TRAVELERS INDEMNITY COMPANY OF AMERICA

**DECLARATIONS PERIOD:** From 01-18-10 to 01-18-11  12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

The Employee Benefits Liability Coverage Part consists of these Declarations and the Coverage Form shown below.

1. **COVERAGE AND LIMITS OF INSURANCE**

    **Employee Benefits Liability**
    **Coverage Form**

    Limits of Insurance

    Aggregate Limit

    $   2,000,000

    Each Employee Limit

    $   1,000,000

2. **AUDIT PERIOD:** ANNUAL

3. **FORM OF BUSINESS:** SUBCHAPTER 'S' CORP

4. **RETROACTIVE DATE:**

    This insurance does not apply to negligent acts, errors or omissions which occurred before the Retroactive Date, if any shown below.

    Retroactive Date: 01-18-2009

5. **EMPLOYEE BENEFIT PROGRAMS OTHER THAN THOSE LISTED IN SECTION VII—DEFINITIONS:**

6. **DEDUCTIBLE:**

    $ NONE     EACH EMPLOYEE

7. **PREMIUM COMPUTATION:**

| Estimated No. of Employees | Rate Per Employee | Estimated Premium | Minimum Premium |
|---|---|---|---|
| 26 | .320 | $    300 | $    300 |

8. **NUMBERS OF FORMS, SCHEDULES AND ENDORSEMENTS FORMING PART OF THIS COVERAGE PART ARE ATTACHED AS A SEPARATE LISTING.**

**TABLE OF CONTENTS**

# EMPLOYEE BENEFITS LIABILITY COVERAGE FORM  CG T1 01
## CLAIMS MADE

SECTION I--COVERAGES

|  |  | Beginning on Page |
|---|---|---|
| Employee Benefits Liability Coverage | Insuring Agreement | 1 |
|  | Exclusions | 1 |
| Supplementary Payments |  | 2 |

SECTION II--WHO IS AN INSURED ............ 2

SECTION III--LIMITS OF INSURANCE ............ 2

SECTION IV--DEDUCTIBLE ............ 3

SECTION V--EMPLOYEE BENEFITS LIABILITY CONDITIONS ............ 3

Bankruptcy ............ 3
Cancellation, Non-renewal, Renewal and Reduction or Deletion of Coverage ............ 4
Duties in The Event of Act, Error or Omission ............ 3
Legal Action Against Us ............ 4
Other Insurance ............ 4
Premium Audit ............ 4
Representations ............ 4
Separation of Insureds ............ 4
Transfer of Rights of Recovery Against Others To Us ............ 4

SECTION VI--EXTENDED REPORTING PERIODS ............ 4

SECTION VII--DEFINITIONS ............ 5

CG T0 43 11 88

COMMERCIAL GENERAL LIABILITY

# EMPLOYEE BENEFITS LIABILITY COVERAGE FORM

# THIS FORM PROVIDES CLAIMS MADE COVERAGE. PLEASE READ THE ENTIRE FORM CAREFULLY.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under SECTION II – WHO IS AN INSURED.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION VII – DEFINITIONS.

## SECTION I – EMPLOYEE BENEFITS LIABILITY COVERAGE

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of any negligent act, error, or omission of the insured, or of any other person for whose acts the insured is legally liable. The negligent act, error, or omission must be committed in the "administration" of your "employee benefit program." No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS. This insurance does not apply to any negligent act, error, or omission which occurred before the Retroactive Date, if any, shown in the Declarations or which occurs after the policy expires. The negligent act, error or omission must take place in the "coverage territory." We will have the right and duty to defend any "suit" seeking those damages. But:

(1) The amount we will pay for damages is limited as described in SECTION III – LIMITS OF INSURANCE.

(2) We may at our discretion, investigate any report of a negligent act, error or omission and settle any claim or "suit" that may result: and

(3) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements.

b. This insurance applies to any negligent act, error or omission of the insured, but only if a claim for damages because of the negligent act, error or omission is first made against any insured during the policy period.

(1) A claim by a person or organization seeking damages will be deemed to have been made when notice of such claim is received and recorded by any insured or by us, whichever comes first.

(2) All claims for damages sustained by any one employee, including the employee's dependents and beneficiaries, will be deemed to have been made at the time the first of those claims is made against any insured.

### 2. Exclusions

This insurance does not apply to:

a. Loss arising out of any dishonest, fraudulent, criminal or malicious act or omission, committed by any insured;

b. "Bodily injury" or "property damage" or "personal injury";

c. Loss arising out of failure of performance of contract by any insured;

d. Loss arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program";

e. Any claim or suit based upon:

(1) failure of any investment to perform as represented by any insured, or

COMMERCIAL GENERAL LIABILITY

**(2)** advice given to any person to participate or not to participate in any plan included in the "employee benefit program";

**f.** Loss arising out of your failure to comply with the mandatory provisions of any law concerning workers' compensation, unemployment insurance, social security or disability benefits;

**g.** Loss for which the insured is liable because of liability imposed on a fiduciary by the Employee Retirement Security Act of 1974, as now or hereafter amended; or

**h.** Loss or damage for which benefits have accrued under the terms of an employee benefit plan to the extent that such benefits are available from funds accrued by the insured for such benefits or from collectible insurance, notwithstanding the insured's act, error or omission in administering the plan which precluded the claimant from receiving such benefits.

**3. Supplementary Payments**

We will pay, with respect to any claim or "suit" we defend:

**a.** All expenses we incur.

**b.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**c.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work.

**d.** All costs taxed against the insured in the "suit."

**e.** Pre-judgment interest awarded against the insured on that part of the judgment we pay. If we made an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**f.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured.

**c.** An organization other than a partnership or joint venture, you are an insured. Your directors and stockholders are also insureds, but only with respect to their liability as your directors or stockholders.

**2.** Each of the following is also an insured:

**a.** Each of your partners, executive officers and employees who is authorized to administer your "employee benefit program."

**b.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire, or form the organization or the end of the policy period, whichever is earlier:

**b.** Coverage under this provision does not apply to any negligent act, error or omission that occurred before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought;

**c.** Persons or organizations making claims or bringing "suits."

**d.** Acts, errors or omissions which result in loss; or

CG T1 01 07 86

COMMERCIAL GENERAL LIABILITY

e. Plans included in your "employee benefit program";

2. The Aggregate Limit is the most we will pay for all damages because of acts, errors or omissions committed in the "administration" of your "employee benefit program."

3. Subject to the Aggregate Limit, the Each Employee Limit is the most we will pay for all damages sustained by any one employee, including the employee's dependents and beneficiaries, because of acts, errors or omissions committed in the "administration" of your "employee benefit program."

The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – DEDUCTIBLE**

1. Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in Item 6 of the Declarations as applicable to "Each Employee." The limits of insurance applicable to "Each Employee" will be reduced by the amount of this deductible. The Aggregate limit shall not be reduced by the application of such deductible amount.

2. The deductible amount stated in the Declarations applies to all damages sustained by an employee because of an act, error or omission covered by this insurance.

3. The terms of this insurance, including those with respect to:

a. Our right and duty to defend any "suits" seeking those damages; and

b. Your duties in the event of an act, error or omission claim, or suit apply irrespective of the application of the deductible amount.

4. We may pay any part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**SECTION V – EMPLOYEE BENEFITS LIABILITY CONDITIONS**

1. **Bankruptcy.**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In the Event Of Act, Error or Omission, Claim or Suit.**

a. You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a claim. Notice should include:

(1) What the act, error or omission was and when it occurred.

(2) The names and addresses of any employees who may suffer damages as a result of the act, error or omission.

Notice of an act, error or omission is not notice of a claim.

b. If a claim is received by any insured you must:

(1) Immediately record the specifics of the claim and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or a "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of damage to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

3. **Legal Action Against Us.**

No person or organization has a right under this Coverage Part:

COMMERCIAL GENERAL LIABILITY

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

a. Primary Insurance.

This insurance is primary except when paragraph 4. of Section VI – Extended Reporting Periods applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in b. below.

b. Method of Sharing.

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit.**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period.

Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations.**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. Separation of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against who claim is made or "suit" is brought.

**8. Transfer of Rights of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. Cancellation, Non-renewal, Renewal and Reduction or Deletion of Coverage:**

The following conditions also apply to this Coverage Part:

All conditions relating to cancellation, non-renewal, renewal, and reduction or deletion of coverage which would apply to a Commercial General Liability Coverage Part attached to this policy.

**SECTION VI – EXTENDED REPORTING PERIODS**

1. We will provide an automatic Extended Reporting Period as described in paragraph 3. or, if you

CG T1 01 07 86

COMMERCIAL GENERAL LIABILITY

purchase it, an Extended Reporting Period Endorsement as described in paragraph 4, only if:

a. This Coverage Part is cancelled or not renewed for any reason; or

b. We renew or replace this Coverage Part with other insurance that has a Retroactive Date later than the one shown in this Coverage Part's Declarations.

2. If we provide an Extended Reporting Period, the following is added to paragraph 1.b. of INSURING AGREEMENT – SECTION I:

(3) A claim first made during the Extended Reporting Period will be deemed to have been made on the last day of the policy period provided that the claim is for damages because of an act, error or omission that occurred before the end of the policy period of this policy (but not before any applicable Retroactive Date).

The Extended Reporting Period will not reinstate or increase the Limits of Insurance or extend the policy period.

3. The automatic Extended Reporting Period will be for 60 days, starting with the end of the policy period of this policy.

This automatic Extended Reporting Period applies only if no subsequent insurance you purchase applies to the claim, or would apply but for the exhaustion of its applicable limit of insurance.

This automatic Extended Reporting Period may not be cancelled.

4. If you purchase the optional Extended Reporting Period Endorsement, the Extended Reporting Period will be for one year, starting with the end of the policy period of this policy. We will issue that Endorsement if the first Named Insured shown in the Declarations:

a. Makes a written request for it which we receive within 60 days after the end of the policy period; and

b. Promptly pays the additional premium when due.

The Extended Reporting Period Endorsement will not take effect unless the additional premium is paid when due. If that premium is paid when due, the endorsement may not be canceled.

The Extended Reporting Period Endorsement will also amend paragraph 4.a. of SECTION V – EMPLOYEE BENEFITS LIABILITY CONDITIONS

(Other Insurance) so that the insurance provided will be excess over any other valid and collectible insurance available to the insured, whether primary, excess, contingent or on any other basis, whose policy period begins or continues after the Endorsement takes effect.

5. We will determine the actual premium for the Extended Reporting Period Endorsement in accordance with our rules and rates. In doing so, we may take into account the following:

a. The exposures insured;

b. Previous types and amounts of insurance;

c. Limits of Insurance available under this Coverage Part for future payment of damages; and

d. Other related factors.

The premium for the Extended Reporting Period Endorsement will not exceed 200% of the annual premium for the Coverage Part to which the endorsement would be attached and will be fully earned when the Endorsement takes effect.

**SECTION VII – DEFINITIONS**

1. "Administration" means:

a. Counseling employees, including their dependents and beneficiaries, with respect to the "employee benefit program";

b. Handling records in connection with the "employee benefit program"; or

c. Effecting or terminating any employee's participation in a plan included in the "employee benefit program."

2. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

3. "Coverage territory" means the United States of America (including its territories and possessions), Puerto Rico and Canada.

4. "Employee" means your officers, partners and employees whether actively employed, disabled or retired.

5. "Employee benefit program" means the following plans:

a. Group life insurance, group accident or health insurance, "profit sharing plans," pension plans and "stock subscription plans," provided that no one other than an employee may subscribe to such insurance or plans;

CG T1 01 07 86

COMMERCIAL GENERAL LIABILITY

    **b.** Unemployment insurance, social security benefits, workers' compensation and disability benefits;

    **c.** Any other similar plan designated in the Declaration or added thereto by endorsement.

**6.** "Personal injury" means injury other than "bodily injury," arising out of one or more of the following offenses:

    **a.** False arrest, detention or imprisonment;

    **b.** Malicious prosecution;

    **c.** Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

    **d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

    **e.** Oral or written publication of material that violates a person's right of privacy.

**7.** "Profit sharing plans" mean only such plans that are equally available to all full time employees.

**8.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property; or

    **b.** Loss of use of tangible property that is not physically injured.

**9.** "Stock subscription plans" mean only such plans that are equally available to all full time employees.

**10.** "Suit" means a civil proceeding in which damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT — EBL

This endorsement modifies insurance provided under the following:

EMPLOYEE BENEFITS LIABILITY COVERAGE PART

**PROVISIONS**

This coverage part is amended as follows:

1. Under Section I—EMPLOYEE BENEFITS LIA-BILITY COVERAGE—Exclusion 2.c. is amended to read as follows:

   c. Loss arising out of failure of performance of contract by any insurer;

2. Under Section II—WHO IS AN INSURED—Item 1.b. is replaced by the following:

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to their duties as partners or members of a joint venture.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – IRC VIOLATIONS

This endorsement modifies insurance provided under the following:

EMPLOYEE BENEFITS LIABILITY COVERAGE PART

**PROVISIONS**

This insurance does not apply to:

a.  Any taxes, fines, interest, penalties or other cost imposed under, or resulting from, any provision of the Internal Revenue Code of 1986, as amended, or any similar state or local law; or

b.  Any expense, loss or damages (i) arising out of the imposition of such taxes, fines, interest, penalties or other charges or (ii) resulting from any provision of the Internal Revenue Code of 1986, as amended.

 Copyright, The Travelers Indemnity Company, 1995

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL EXCLUSION--
# EMPLOYEE BENEFITS LIABILITY

This endorsement modifies insurance provided under the following:

EMPLOYEE BENEFITS LIABILITY COVERAGE PART

**PROVISIONS**

This insurance does not apply to loss arising out of:

1. The wrongful termination of an employee;
2. The coercion, demotion, reassignment, discipline, or harassment of an employee;
3. Discrimination against an employee.

CG T4 85 11 88                                                            Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDATORY ENDORSEMENT–FLORIDA EBL

This endorsement modifies insurance provided under the following:

EMPLOYEE BENEFITS LIABILITY COVERAGE PART

**PROVISIONS**

1. The following additional provision applies to SECTION VI–EXTENDED REPORTING PERIODS:

   6. Extended Reporting Periods do not reinstate or increase the Limits of Insurance applicable to any claim to which this Coverage Part applies, except to the extent described as follows:

   If the optional Extended Reporting Period is in effect, we will provide the separate aggregate limits of insurance described below, but only for claims first received and recorded during the optional Extended Reporting Period.

The separate aggregate limits of insurance will be equal to the dollar amount shown in the Declarations in effect at the end of the policy period.

Paragraphs 2. and 3. of SECTION III–LIMITS OF INSURANCE will be amended accordingly.

2. Under SECTION VI–EXTENDED REPORTING PERIODS–the first sentence of item 4 is amended to read as follows:

If you purchase the Extended Reporting Period Endorsement, the Extended Reporting period will be for three years, starting with the end of the policy period of this policy.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> ELECTRONIC DATA LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> PRODUCT WITHDRAWAL COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

**2. Cancellation Of Policies In Effect**

**a. For 90 Days Or Less**

If this policy has been in effect for 90 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 20 days before the effective date of cancellation if we cancel for any other reason, except we may cancel immediately if there has been:

**(a)** A material misstatement or misrepresentation; or

**(b)** A failure to comply with the underwriting requirements established by the insurer.

**b. For More Than 90 Days**

If this policy has been in effect for more than 90 days, we may cancel this policy only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** The policy was obtained by a material misstatement;

**(3)** Failure to comply with underwriting requirements established by the insurer within 90 days of the effective date of coverage;

**(4)** A substantial change in the risk covered by the policy; or

**(5)** The cancellation is for all insureds under such policies for a given class of insureds.

If we cancel this policy for any of these reasons, we will mail or deliver to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

**(a)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(b)** 45 days before the effective date of cancellation if we cancel for any of the other reasons stated in Paragraph **2.b.**

**B.** Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect, unless this is an audit policy.

If this is an audit policy, then, subject to your full cooperation with us or our agent in securing the necessary data for audit, we will return any premium refund due within 90 days of the date cancellation takes effect. If our audit is not completed within this time limitation, then we shall accept your own audit, and any pre-

COMMERCIAL GENERAL LIABILITY

mium refund due shall be mailed within 10 working days of receipt of your audit.

The cancellation will be effective even if we have not made or offered a refund.

**C.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy we will mail or deliver to the first Named Insured writ-

ten notice of nonrenewal, accompanied by the reason for nonrenewal, at least 45 days prior to the expiration of this policy.

2. Any notice of nonrenewal will be mailed or delivered to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

 © ISO Properties, Inc., 2007 CG 02 20 12 07

# INTERLINE ENDORSEMENTS

# INTERLINE ENDORSEMENTS

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FEDERAL TERRORISM RISK INSURANCE ACT DISCLOSURE

This endorsement applies to the insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CYBERFIRST LIABILITY COVERAGE
ELECTRONIC MANUFACTURERS AND COMPUTER SERVICES ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
ENVIRONMENTAL HAZARD POLICY
EXCESS (FOLLOWING FORM) LIABILITY INSURANCE
LAW ENFORCEMENT LIABILITY COVERAGE PART
LIMITED ABOVE GROUND POLLUTION LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PUBLIC ENTITY MANAGEMENT LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SELF-INSURED EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE FORM
SELF-INSURED EXCESS LIQUOR LIABILITY COVERAGE FORM
SELF-INSURED EXCESS EMPLOYEE BENEFITS LIABILITY COVERAGE FORM
SELF-INSURED EXCESS PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK DEPARTMENT OF TRANSPORTATION
TRIBAL BUSINESS MANAGEMENT LIABILITY COVERAGE

## PROVISIONS

On December 26, 2007, the President of the United States signed into law amendments to the Terrorism Risk Insurance Act of 2002 (the "Act"), which, among other things, extend the Act and expand its scope. The Act establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in the Act) caused by "acts of terrorism". An "act of terrorism" is defined in Section 102(I) of the Act to mean any act that is certified by the Secretary of the Treasury – in concurrence with the Secretary of State and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for Insured Losses is 85% of the amount of Insured Losses in excess of each Insurer's statutorily established deductible, subject to the "Program Trigger", (as defined in the Act). In no event, however, will the federal government or any Insurer be required to pay any portion of the amount of aggregate Insured Losses occurring in any one year that exceeds $100,000,000,000, provided that such Insurer has met its deductible. If aggregate Insured Losses exceed $100,000,000,000 in any one year, your coverage may therefore be reduced.

The charge for Insured Losses for each Coverage Part is included in the Coverage Part premium. The charge that has been included for each Coverage Part is indicated below, and does not include any charge for the portion of losses covered by the Federal Government under the Act.

• 1% of each applicable Commercial Liability Coverage premium.

 © 2009 The Travelers Indemnity Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE FORM – CONTRACTORS
> SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK DEPARTMENT OF TRANSPORTATION
> ENVIRONMENTAL HAZARD POLICY
> EMPLOYEE BENEFITS LIABILITY COVERAGE PART
> ELECTRONIC MANUFACTURERS AND COMPUTER SERVICES ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
> LIMITED ABOVE GROUND POLLUTION LIABILITY COVERAGE PART
> SELF-INSURED EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE FORM
> SELF-INSURED EXCESS LIQUOR LIABILITY COVERAGE FORM
> SELF-INSURED EXCESS EMPLOYEE BENEFITS LIABILITY COVERAGE FORM
> SELF-INSURED EXCESS PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
> EXCESS (FOLLOWING FORM) LIABILITY INSURANCE

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

© 2008 The Travelers Companies, Inc.
Includes the copyrighted material of Insurance Services Office, Inc. with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

   "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

 © ISO Properties, Inc., 2007

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

       © ISO Properties, Inc., 2007       IL 00 21 09 08

**POLICYHOLDER NOTICES**



**POLICYHOLDER NOTICES**

# IMPORTANT NOTICE – INDEPENDENT AGENT AND BROKER COMPENSATION

NO COVERAGE IS PROVIDED BY THIS NOTICE.  THIS NOTICE DOES NOT AMEND ANY PROVISION OF YOUR POLICY. YOU SHOULD REVIEW YOUR ENTIRE POLICY CAREFULLY FOR COMPLETE INFORMATION ON THE COVERAGES PROVIDED AND TO DETERMINE YOUR RIGHTS AND DUTIES UNDER YOUR POLICY. PLEASE CONTACT YOUR AGENT OR BROKER IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE OR ITS CONTENTS. IF THERE IS ANY CONFLICT BETWEEN YOUR POLICY AND THIS NOTICE, THE PROVISIONS OF YOUR POLICY PREVAIL.

For information about how Travelers compensates independent agents and brokers, please visit www.travelers.com, call our toll-free telephone number 1-866-904-8348, or request a written copy from Marketing at One Tower Square, 2GSA, Hartford, CT 06183.

# POLICYHOLDER NOTICE – ASBESTOS

Asbestos has long been a difficult problem for society as a whole and the insurance industry in particular. As a consequence, we are attaching an asbestos exclusion to your policy.

If you have questions about your insurance program, please contact your agent or local representative.

# FLORIDA POLICYHOLDERS
# AVAILABILITY OF RISK MANAGEMENT PLANS

Florida insurance statute require insurers to provide insureds, at their request, with guidelines for risk management plans. Travelers Loss Prevention & Engineering has available guidelines to assist you with your accident prevention activities.

The companion Safety Services notice describes the range of services available to our insureds. Should you desire assistance with regard to your accident prevention activities, please contact us at the Florida location specified in the notice.

# FLORIDA SAFETY SERVICES

> **Notice to policy recipient**: If you are not the person directly responsible for accident prevention activities for your company, please direct this Safety Services notice to the person that is directly responsible for them.

## SAFETY IS OUR CONCERN

Thank you for purchasing your insurance from our company. Along with your agent, we appreciate your business and welcome the opportunity to be of service.

An important part of that service concerns accident prevention and safety engineering. The Travelers Loss Prevention & Engineering Division (LP&E) has the experience, resources and capabilities to provide a range of safety services including site surveys, phone consultations or the provision of selected safety material. The following are some examples of our available services:

**Accident Prevention** - Our staff can help you identify present and potential safety hazards in your operations, premises and equipment, recommending measures for reducing or eliminating these hazards.

**Analysis of Accident Causes** - Although you investigate and keep records of accidents, we're available to help if you need us.

**Safety Consultations** - Our field staff, supported by Home Office and field specialists, can help you with special problems including Auto, General Liability, Product safety and Premises Security issues.

**Safety Videos and Literature** - We can provide you with basic videos and literature to assist you in your loss control efforts. Also, we can put you in contact with several companies able to provide additional safety materials including brochures, pamphlets and videos.

**Safety Training** - We can help you improve your safety training programs.

**Internet Website** - Visit our LP&E website page for helpful safety information. This website (**http://www.travelerspc.com/commercial**) also has hot links to other safety-related Internet sites. For all requests for loss control assistance ONLY, please directly contact your local office listed below.

> The Travelers will provide these services upon request. Telephone consultation is also available if the nature of the operations and hazards warrant such service. See below for the LP&E office nearest to you.

## SAFETY IS YOUR CONCERN

U. S. companies spend billions of dollars each year on the direct and indirect costs of accidents. Dollar figures can't begin to reflect the pain and suffering of an injured person and his or her family. But they do give some indication of the multiple consequences of an accident... loss of time, interrupted productivity, damaged materials and equipment, possible legal action from government regulatory agencies, and increased insurance costs.

It makes good sense for both companies and their employees to actively participate in a sound accident prevention program. The success of such a program depends to a large extent on your commitment to safety procedures and accident prevention techniques. Safety is a management concern. Maybe we can help.

You may want to consider the following **"Safety Checkpoints"** as you evaluate your organization's safety activities:

**SELF-INSPECTION PROGRAM:**

* Do you conduct periodic surveys of premises, equipment and operations?

* Do you analyze each activity to determine inherent hazards?
* If you discover hazards, do you follow up with immediate corrective action?
* Do you monitor such action to make sure it is implemented and effective?

**ACCIDENT INVESTIGATION:**

* Do you investigate each accident and find the cause?
* Do you take immediate steps to prevent a recurrence?
* Do you keep records of accident investigations and follow-up measures?
* Do you complete accident statistics and analyze trends?

**EDUCATION AND TRAINING:**

* Do you take the time to train each of your employees to perform tasks in a proper and safe manner?
* Do more-experienced employees receive training to correct any bad habits that developed over time?
* Do all employees understand that safety is an important part of their jobs?

| Florida | Orlando | 2420 Lakemont Avenue – Suite 100 |
|---------|---------|----------------------------------|
| Loss Prevention & | | P.O. Box 35555 |
| Engineering Offices | | Orlando, FL 32814-3555 |
| | | (407) 388-3307 |

# IMPORTANT INFORMATION FOR FLORIDA POLICYHOLDERS

Please review your policy carefully. Should you have any questions concerning coverages, billings, additions or deletions, please contact your Agent. Should you feel the need for additional information or wish to make a complaint, we offer the following number:

### FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL:

**1-860-277-0111**

PN T2 19 06 02

Page 1 of 1

POLICY OVERPRINT    PAGE 1 OF 1

POLICY NUMBER: DT-CO-345K9388-TIA-10

RATER: MM21    ISSUE DATE: 02/01/10

CONSTRUCTION - WATER, SEWER, & UTILITI

EFFECTIVE DATE:  01/18/10
EXPIRATION DATE: 01/18/11

INSUREDS NAME: PIPELINE DISTRIBUTION, INC.

| | |
|---|---|
| NEW/RENEWAL: R | PAYMODE: B |
| SOLICITOR CODE: | AUDIT FREQUENCY: A |
| SAI: 1886MA121 | RESPONSIBILITY: D |
| MSI: | WATCH FILE: 0 |
| RATING MODE: G | SURVEY CODE: 2 |
| SPECIAL CODE: | REINSURANCE: N |
| PROGRAM CODE: 8CE | AUTO FILINGS: |
| FEDERAL TAX ID: | |

PREMIUM SUMMARY

| S.B. | ACCOUNT MONTH | EFF. DATE | PREMIUM | NON PREMIUM | TOTAL |
|---|---|---|---|---|---|
| | | | 37,434.00 | 1,684.00 | 39,118.00 |
| | TOTAL: | | 37,434.00 | 1,684.00 | 39,118.00 |

OFFICE: ORLANDO FL          856
PRODUCER NAME: BROWN & BROWN-MIAMI              FH505



**TRAVELERS**

PREMIUM SPLIT FORM    PAGE  1 OF  2

POLICY NUMBER: DT-CO-345K9388-TIA-10

RATER: MM21    ISSUE DATE: 02/01/10

| ACCOUNT MONTH | EFFECTIVE DATE | COMM ITEM NC    F7 | COMM ITEM NC    F8 | COMM ITEM NC    H3 | COMM ITEM NC    J8 |
|---|---|---|---|---|---|
| | | PREMIUM | PREMIUM | PREMIUM | PREMIUM |
| | | 262.00 | 299.00 | 374.00 | 749.00 |

F7=FIGAAO    F8=FIGAEAO    H3=FLCATAO    J8=FIGA07A

OFFICE: ORLANDO FL          856
PRODUCER NAME: BROWN & BROWN-MIAMI                    FH505

 **TRAVELERS**

PREMIUM SPLIT FORM    PAGE  2 OF  2

POLICY NUMBER: DT-CO-345K9388-TIA-10

RATER: MM21      ISSUE DATE: 02/01/10

| ACCOUNT MONTH | EFFECTIVE DATE | COMM ITEM .1500 PREM PREMIUM | COMM ITEM PREMIUM | COMM ITEM PREMIUM | COMM ITEM PREMIUM |
|---|---|---|---|---|---|
| | | 37434 | | | |

OFFICE: ORLANDO FL          856
PRODUCER NAME: BROWN & BROWN-MIAMI          FH505

```
*************************************************** GEN. LIAB. - SIMPLIFIED ****************************************PAGE: 1*********
                                                           NAMED INSURED: PIPELINE DISTRIBUTION, INC.
                                                           CUSTOMER ID  : 1886MA121
                                                           POLICY NUMBER: CO  345K9388
                                                           TRAN TYPE    : RENEWAL  EFFECTIVE: 011810
**************************************************GENL LIAB POLICY LEVEL INFORMATION***********************************
```

PKG PROGRAM   : 29              PKG DESC    : CONSTRUCTION

```
          AUDIT FREQ          : 04 - ANNUAL
          POLICY TYPE         : OCCURRENCE     RETRO DATE         :               CLMS YR            :
          RETRO RATED         : NO

          GENERAL AGGR        :   2,000,000    PROD/COMPL AGGR    :   2,000,000
          PER/ADV INJ         :   1,000,000    EACH OCCURRENCE    :   1,000,000
          DMG TO RENTD PREMISES:    300,000    MEDICAL EXPENSE    :       5,000
          EXISTENCE HAZARD AGGR:

          PREM/OPS EXPER      : 11,676.00      PRODUCTS EXPER     : 2,100.00

          EMP BEN OCC         :   1,000,000    EMP BEN AGGR       :   2,000,000    EMP BEN EX         :       26

          DED SUBLINE         :               DED APPLY          :
          DED AMOUNT          :               DED TYPE           :
                                              DED LOSS TYPE      :

          PREM ILF 1          :               PREM ILF 2         :               PREM ILF 3         :
          PROD ILF A          :               PROD ILF B         :               PROD ILF C         :
```

PREMOPS EXTENSIONS: MULT AGGREG - PER JOB

PREMOPS/PRODUCTS EXTENSIONS: BLANKET ADDITIONAL INSURED

-----------------------------------------------POLICY LEVEL GENL LIAB RATING FORMULAS-----------------------------------------

```
CLASS CODE : 39002
EMPLOYEE BENEFITS       PREMIUM  =                                                                          FINAL PREM
                        300.00                                                                               300.00
```

```
**************************************************GENL LIAB CLASS CODE/LOCATION INFORMATION*******************************
```

GEN. LIAB. - SIMPLIFIED LOC # 001/BLDG # 001/CLASS 91580 INFO

```
LOC # : 001   BLDG # : 001                                     TERR STATE  : FL
2140 SW 52ND TERRACE                                           TERR RATE   : 002
PLANTATION, FL                                                 TAX DIST    : 0247
-------------------------------------------
CLASS CODE : 91580                                             DESC : CONTRACTORS - EXECUTIVE SUPERVISORS
CLASS ID   : 000                                                      OR EXECUTIVE SUPERINTENDENTS

PKG PROGRAM : 29      PKG DESC  : CONSTRUCTION                  RATE REV DATE: 09/01/08   DEV REV DATE: 02/01/09
PROD EXCLUD : N                                                DED APPLIES  : N
PREM/OPS DED                                                   PRODUCTS DED
TYPE AMOUNT                                                    TYPE AMOUNT

INCREASE LIMITS TABLES
PREM/OPS    : 3                                                PREM/OPS EXPER MAN PREM           : 1,603.00
PRODUCTS    :                                                  PRODUCTS EXPER MAN PREM           :

                                                               PREM/OPS BASIC LMT MOD: 1.00
                                                               PRODUCTS BASIC LMT MOD: 1.00

PREM/OPS (A) RATES : Y
PRODUCTS (A) RATES : N
NEW EXPOSURE       : 100000    PAYROLL/NEAREST THOUSAND         PRODUCTS EXPOSURE          :
AUD PRO-RATED EXPOS:                                           AUD PRO-RATED PROD EXPOS   :
                                                               FOREIGN SALES EXPOSURE     :
                                                               AUD PRO-RATED FOREIGN EXPOS:

CLASS EXCLUS:
CLASS EXTEN :

PREMOPS BASE OVERRIDE   :  26.719                              PRODUCTS BASE OVERRIDE   :
PREMOPS FILED BASE RATE :                                      PRODUCTS FILED BASE RATE :
```

```
                                            NAMED INSURED: PIPELINE DISTRIBUTION, INC.
                                            CUSTOMER ID  : 1086MA121
                                            POLICY NUMBER: CO 345K9388
                                            TRAN TYPE    : RENEWAL   EFFECTIVE: 011810
**********************************************GENL LIAB CLASS CODE/LOCATION INFORMATION*********************************************
```

-------------------------------------- GENERAL LIABILITY RATE MODIFICATION DEVELOPMENT --------------------------------------

----------------------------------------------------------- PREMOPS -----------------------------------------------------------

| PKG MOD | * | PKG DEV | * | SCHED (MOD | + | EXPER MOD | - | CONST ) * | (EXPNS | + | AGENT EXPNS | - | CONST ) * | OTHER MOD | * | MMRP MOD | = | RATE MOD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.0000 | | .6000 | | 1.066 | | 1.370 | | 1.0000 | | 1.000 | | 1.000 | | 1.0000 | | 1.000 | | 1.000 | | .8616 |

----------------------------------------------CLASS CODE/LOCATION GENL LIAB RATING FORMULAS----------------------------------------

CLASS CODE : 91580    DESC : CONTRACTORS - EXECUTIVE SUPERVISORS OR E

```
PREM/OPS          BASE RATE * INCR LIMIT * POL EXT II * RATE MOD = FINAL RATE * EXPOSURE =        FINAL PREM
                    26.719        1.760        1.170       0.8616      47.405      100.000         4741.00
                  ADDL FACTORS:  BASE LCM 1.00000 PREM/OPS CMM: 1
```

*** PREMIUM IS PART OF COMPOSITE GROUP 1 ***

```
**********************************************GENL LIAB CLASS CODE/LOCATION INFORMATION*********************************************
```

GEN. LIAB. - SIMPLIFIED LOC # 001/BLDG # 001/CLASS 91587 INFO

```
CLASS CODE : 91587                                  DESC : CONTRACTORS - SUBCONTRACTED WORK -
CLASS ID   : 000                                            IN CONNECTION WITH PIPELINE (OTHER
CLASS STATE: FL                                             THAN OIL OR GAS) OR COMMUNICATION
TERR RATE  : 002                                            OR POWER LINE CONSTRUCTION,
TAX DIST   : 0247                                           RECONSTRUCTION OR REPAIR
-----------------------------------------------
```

```
PKG PROGRAM : 29    PKG DESC  : CONSTRUCTION         RATE REV DATE: 09/01/08   DEV REV DATE: 02/01/09
PROD EXCLUD : N                                      DED APPLIES  : N
PREM/OPS DED                                         PRODUCTS DED
TYPE AMOUNT                                          TYPE AMOUNT
```

```
INCREASE LIMITS TABLES
PREM/OPS   : 3                                       PREM/OPS EXPER MAN PREM           :
PRODUCTS   : B                                       PRODUCTS EXPER MAN PREM           :

                                                     PREM/OPS BASIC LMT MOD: 1.00
                                                     PRODUCTS BASIC LMT MOD: 1.00
```

```
PREM/OPS (A) RATES : Y
PRODUCTS (A) RATES : Y
NEW EXPOSURE      : IF ANY    TOTAL COST/NEAREST THOUSAND    PRODUCTS EXPOSURE        :
AUD PRO-RATED EXPOS:                                         AUD PRO-RATED PROD EXPOS :
                                                             FOREIGN SALES EXPOSURE   :
                                                             AUD PRO-RATED FOREIGN EXPOS:
```

```
CLASS EXCLUS:
CLASS EXTEN :
```

```
PREMOPS BASE OVERRIDE  :   3.428                     PRODUCTS BASE OVERRIDE  :   2.289
PREMOPS FILED BASE RATE :   3.100                    PRODUCTS FILED BASE RATE :   2.070
```

-------------------------------------- GENERAL LIABILITY RATE MODIFICATION DEVELOPMENT --------------------------------------

----------------------------------------------------------- PREMOPS -----------------------------------------------------------

| PKG MOD | * | PKG DEV | * | SCHED (MOD | + | EXPER MOD | - | CONST ) * | (EXPNS | + | AGENT EXPNS | - | CONST ) * | OTHER MOD | * | MMRP MOD | = | RATE MOD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.0000 | | .6000 | | 1.066 | | 1.370 | | 1.0000 | | 1.000 | | 1.000 | | 1.0000 | | 1.000 | | 1.000 | | .8616 |

----------------------------------------------------------- PRODUCTS -----------------------------------------------------------

| PKG MOD | * | PKG DEV | * | SCHED (MOD | + | EXPER MOD | - | CONST ) * | (EXPNS | + | AGENT EXPNS | - | CONST ) * | OTHER MOD | * | MMRP MOD | = | RATE MOD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.0000 | | .6000 | | 1.066 | | 1.370 | | 1.0000 | | 1.000 | | 1.000 | | 1.0000 | | 1.000 | | 1.000 | | .8616 |

```
*** PREMIUM IS PART OF COMPOSITE GROUP 1 ***
                                                     NAMED INSURED: PIPELINE DISTRIBUTION, INC.
                                                     CUSTOMER ID  : 1886MA121
                                                     POLICY NUMBER: CO  345K9388
                                                     TRAN TYPE    : RENEWAL  EFFECTIVE: 011810

-----------------------------------------------CLASS CODE/LOCATION GENL LIAB RATING FORMULAS-----------------------------------------------

CLASS CODE : 91587    DESC : CONTRACTORS - SUBCONTRACTED WORK - IN CO

PREM/OPS                 BASE RATE  *  INCR LIMIT  *  POL EXT II  *  RATE MOD  =  FINAL RATE  *  EXPOSURE =            FINAL PREM
                            3.428        1.760          1.170         0.8616        6.082          0.000                  0.00
                         ADDL FACTORS:   BASE LCM  1.00000  PREM/OPS CMM: 1

PRODUCTS                 BASE RATE  *  INCR LIMIT  *  POL EXT  *  RATE MOD  =  FINAL RATE  *  EXPOSURE =               FINAL PREM
                            2.289        1.690         1.170       0.8616        3.900          0.000                     0.00
                         ADDL FACTORS:   BASE LCM  1.00000  PRODUCTS CMM: 1



*****************************************GENL LIAB CLASS CODE/LOCATION INFORMATION*****************************************

GEN. LIAB. - SIMPLIFIED LOC # 001/BLDG # 001/CLASS 95310 INFO


CLASS CODE : 95310                                     DESC : GAS MAINS OR CONNECTIONS CONSTRUCTION
CLASS ID   : 000
CLASS STATE: FL
TERR RATE  : 002
TAX DIST   : 0247
-----------------------------------------------

PKG PROGRAM : 29      PKG DESC  : CONSTRUCTION        RATE REV DATE: 09/01/08  DEV REV DATE: 02/01/09
PROD EXCLUD : N                                       DED APPLIES  : N
PREM/OPS DED                                          PRODUCTS DED
TYPE  AMOUNT                                          TYPE  AMOUNT

INCREASE LIMITS TABLES
PREM/OPS    : 2                                       PREM/OPS EXPER MAN PREM          : 9,975.00
PRODUCTS    : B                                       PRODUCTS EXPER MAN PREM          : 2,100.00

                                                      PREM/OPS BASIC LMT MOD: 1.00
                                                      PRODUCTS BASIC LMT MOD: 1.00

PREM/OPS (A) RATES : N
PRODUCTS (A) RATES : N
NEW EXPOSURE       : 600000    PAYROLL/NEAREST THOUSAND   PRODUCTS EXPOSURE        :
AUD PRO-RATED EXPOS:                                  AUD PRO-RATED PROD EXPOS :
                                                      FOREIGN SALES EXPOSURE   :
                                                      AUD PRO-RATED FOREIGN EXPOS:

CLASS EXCLUS:
CLASS EXTEN :


-------------------------------------- GENERAL LIABILITY RATE MODIFICATION DEVELOPMENT --------------------------------------

------------------------------------------------ PREMOPS ------------------------------------------------

PKG        PKG        SCHED     EXPER     CONST      COMP      AGENT      CONST      OTHER     MMRP      RATE
MOD    *   DEV   *    (MOD  +   MOD   -       ) *  (EXPNS  +  EXPNS  -       ) *   MOD    *   MOD   =   MOD
1.0000     .6000      1.066     1.370     1.0000     1.000     1.000      1.0000     1.000     1.000     .8616

------------------------------------------------ PRODUCTS ------------------------------------------------

PKG        PKG        SCHED     EXPER     CONST      COMP      AGENT      CONST      OTHER     MMRP      RATE
MOD    *   DEV   *    (MOD  +   MOD   -       ) *  (EXPNS  +  EXPNS  -       ) *   MOD    *   MOD   =   MOD
1.0000     .6000      1.066     1.370     1.0000     1.000     1.000      1.0000     1.000     1.000     .8616


-----------------------------------------------CLASS CODE/LOCATION GENL LIAB RATING FORMULAS-----------------------------------------------

CLASS CODE : 95310    DESC : GAS MAINS OR CONNECTIONS CONSTRUCTION

PREM/OPS                 BASE RATE  *  INCR LIMIT  *  POL EXT II  *  RATE MOD  =  FINAL RATE  *  EXPOSURE =            FINAL PREM
                           26.831        1.580          1.170         0.8616       42.735        600.000               25641.00
                         ADDL FACTORS:   BASE LCM  1.73100  PREM/OPS CMM: 1
```

```
                                                    NAMED INSURED: PIPELINE DISTRIBUTION, INC.        PAGE: 4
                                                    CUSTOMER ID : 1886MA121
                                                    POLICY NUMBER: CO  345K9388
                                                    TRAN TYPE    : RENEWAL   EFFECTIVE: 011810


   PREM/OPS ADDITIONAL INTEREST

   OWNERS, LESSEES OR CONTRACTORS   - FLAT CHARGE                                                              500.00

   PRODUCTS             BASE RATE * INCR LIMIT * POL EXT * RATE MOD = FINAL RATE * EXPOSURE  =       FINAL PREM
                          5.833      1.690       1.170     0.8616      9.937      600.000             5962.00
                       ADDL FACTORS:  BASE LCM 1.73100 PRODUCTS CMM: 1

   *** PREMIUM IS PART OF COMPOSITE GROUP 1 ***



   ***********************************************GENL LIAB CLASS CODE/LOCATION INFORMATION***********************************************

   GEN. LIAB. - SIMPLIFIED LOC # 002/BLDG # 002/CLASS 91590 INFO


   LOC # : 002   BLDG # : 002                        TERR STATE  : FL
   385 ORTIZ AVE                                     TERR RATE   : 006
   FORT MYERS, FL                                    TAX DIST    : 0103
   ------------------------------------------
   CLASS CODE : 91590                                DESC : CONTRACTORS PERMANENT YARDS -
   CLASS ID   : 000                                         MAINTENANCE OR STORAGE OF EQUIPMENT
                                                            OR MATERIAL

   PKG PROGRAM : 29   PKG DESC  : CONSTRUCTION       RATE REV DATE: 09/01/08   DEV REV DATE: 02/01/09
   PROD EXCLUD : N                                   DED APPLIES : N
   PREM/OPS DED                                      PRODUCTS DED
   TYPE  AMOUNT                                      TYPE  AMOUNT

   INCREASE LIMITS TABLES
   PREM/OPS    : 3                                   PREM/OPS EXPER MAN PREM           : 91.00
   PRODUCTS    :                                     PRODUCTS EXPER MAN PREM           :

                                                     PREM/OPS BASIC LMT MOD: 1.00
                                                     PRODUCTS BASIC LMT MOD: 1.00

   PREM/OPS (A) RATES : N
   PRODUCTS (A) RATES : N
   NEW EXPOSURE       : 14000   PAYROLL/NEAREST THOUSAND   PRODUCTS EXPOSURE          :
   AUD PRO-RATED EXPOS:                              AUD PRO-RATED PROD EXPOS   :
                                                     FOREIGN SALES EXPOSURE     :
                                                     AUD PRO-RATED FOREIGN EXPOS:

   CLASS EXCLUS:
   CLASS EXTEN :


   ------------------------------ GENERAL LIABILITY RATE MODIFICATION DEVELOPMENT -------------------------------

   ------------------------------------------------------ PREMOPS ----------------------------------------------
   PKG          PKG       SCHED      EXPER     CONST     COMP      AGENT     CONST     OTHER     MMRP      RATE
   MOD    *     DEV   *   (MOD   +   MOD   -   ) * (EXPNS +  EXPNS  -   ) *  MOD   *   MOD   =   MOD
   1.0000       .6000     1.066      1.370     1.0000    1.000     1.000     1.0000    1.000     1.000     .8616


   --------------------------------------CLASS CODE/LOCATION GENL LIAB RATING FORMULAS-------------------------------

   CLASS CODE : 91590    DESC : CONTRACTORS PERMANENT YARDS - MAINTENANC

   PREM/OPS             BASE RATE * INCR LIMIT * POL EXT II * RATE MOD = FINAL RATE * EXPOSURE  =       FINAL PREM
                          10.853     1.760        1.170       0.8616      19.255      14.000             270.00
                       ADDL FACTORS:  BASE LCM 1.73100 PREM/OPS CMM: 1

   *** PREMIUM IS PART OF COMPOSITE GROUP 1 ***
```

```
                                                              PAGE: 5
                               NAMED INSURED: PIPELINE DISTRIBUTION, INC.
                               CUSTOMER ID  : 1886MA121
                               POLICY NUMBER: CO 345K9388
                               TRAN TYPE    : RENEWAL   EFFECTIVE: 011810
*********************************************GENL LIAB CLASS CODE/LOCATION INFORMATION******************************

GEN. LIAB. - SIMPLIFIED LOC # 003/BLDG # 003/CLASS 49451 INFO


LOC # : 003   BLDG # : 003                   TERR STATE  : FL
8980 HIGH COTTON LANE                        TERR RATE   : 006
FORT MYERS, FL                               TAX DIST    : 0103
----------------------------------------------
CLASS CODE : 49451                           DESC : VACANT LAND - OTHER THAN NOT-FOR-PROFIT
CLASS ID   : 000


PKG PROGRAM : 29    PKG DESC  : CONSTRUCTION    RATE REV DATE: 09/01/08   DEV REV DATE: 02/01/09
PROD EXCLUD : N                               DED APPLIES  : N
PREM/OPS DED                                 PRODUCTS DED
TYPE AMOUNT                                  TYPE AMOUNT

INCREASE LIMITS TABLES
PREM/OPS    : 2                              PREM/OPS EXPER MAN PREM       : 7.00
PRODUCTS    :                               PRODUCTS EXPER MAN PREM       :

                                            PREM/OPS BASIC LMT MOD: 1.00
                                            PRODUCTS BASIC LMT MOD: 1.00

PREM/OPS (A) RATES : Y
PRODUCTS (A) RATES : N
NEW EXPOSURE      : 2      ACRE/EACH - UNITS OF EXPOSURE   PRODUCTS EXPOSURE         :
AUD PRO-RATED EXPOS:                         AUD PRO-RATED PROD EXPOS  :
                                            FOREIGN SALES EXPOSURE    :
                                            AUD PRO-RATED FOREIGN EXPOS:

CLASS EXCLUS:
CLASS EXTEN :

PREMOPS BASE OVERRIDE  :   6.130             PRODUCTS BASE OVERRIDE   :
PREMOPS FILED BASE RATE :                    PRODUCTS FILED BASE RATE :


--------------------------------- GENERAL LIABILITY RATE MODIFICATION DEVELOPMENT -----------------------------------

------------------------------------------------ PREMOPS -----------------------------------------------------
 PKG      PKG      SCHED     EXPER     CONST     COMP     AGENT    CONST         OTHER    MMRP     RATE
 MOD  *   DEV  *   (MOD  +   MOD   -     ) * (EXPNS  +   EXPNS -       ) *  MOD   *  MOD   =  MOD
1.0000    .6000    1.066     1.370    1.0000    1.000    1.000    1.0000        1.000    1.000    .8616


------------------------------------------CLASS CODE/LOCATION GENL LIAB RATING FORMULAS----------------------------

CLASS CODE : 49451     DESC : VACANT LAND - OTHER THAN NOT-FOR-PROFIT

PREM/OPS          BASE RATE * INCR LIMIT * POL EXT II * RATE MOD = FINAL RATE * EXPOSURE =           FINAL PREM
                   6.130       1.580        1.170       0.8616      9.764       2.000                  20.00
                  ADDL FACTORS:   BASE LCM 1.00000 PREM/OPS CMM: 1
```

***************STATE (FL) - FLORIDA HURRICANE CATASTROPHE FUND EMERGENCY ASSESSMENT SURCHARGE - FLCATAO (1%) = 374.00*************

**********************************STATE (FL) - 2006 FLORIDA GUARANTY FUND SURCHARGE - FIGAAO (0.7%) = 262.00**************************

******************STATE (FL) - 2006 FLORIDA GUARANTY FUND EMERGENCY ASSESSMENT SURCHARGE - FIGAEAO (0.8%) = 299.00****************

***************************STATE (FL) - 2007 FLORIDA GUARANTY FUND SURCHARGE - FIGAO7A (2%) = 749.00****************************

**************************************************STATE TOTAL (FL) = 39,118.00************************************************

***********************************************GENERAL LIABILITY TOTAL = 39,118.00*********************************************

```
                                                                        PAGE: 6
                              NAMED INSURED: PIPELINE DISTRIBUTION, INC.
                              CUSTOMER ID  : 186MA121
                              POLICY NUMBER: CO  345K9388
                              TRAN TYPE    : RENEWAL   EFFECTIVE: 011810
*******************************************GENERAL LIABILITY COMPOSITE SCHEDULE *********************************************

------------------------------------------------- COMPOSITE GROUP # 001 ---------------------------------------------------

    RATE PLAN   : FULL COMPOSITE                COMPOS TYPE : PREMOPS/PRODUCTS - COMBINED RATES
    PREMIUM BASIS: 43  PAYROLL                   RATING BASIS : 4 - PER 1,000
    CLASS       : 69862 CONSTRUCTION - COST OF SUBCONTRACTED WORK (TRAVELERS)

                        PREMIUM       COMPOSITE                     COMPOSITE
    COVERAGES           EXPOSURE      RATES          PRO RATA       PREMIUMS
    ---------------     --------      ----------     -----------    --------------
    COMBINED            714000        51.280         1.000          36,614.00

*********************************************** GRAND TOTAL COMBINED =    36,614.00 *****************************************

*********************************************** GRAND TOTAL COMPOSITE =   36,614.00 *****************************************

>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>> STATE COMPOSITE DETAIL ON FOLLOWING PAGES <<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
```

```
NAMED INSURED: PIPELINE DISTRIBUTION, INC.      Commercial Intellisys                              DATE    : 01/06/10
                                                                                                   TRANS TYPE: RE
INSURANCE CO : TRAV IND CO OF AMERICA
BUSINESS TYPE:                                  Hartford , CT 06105

POLICY NUM   : 345K938800                       AGY/PROD NUMBER: FH505
                                                                                                   AUD FREQ: ANNUAL
CUSTOMER ID  : 1886MA121                         PROD NAME: BROWN & BROWN-MIAMI                      OPERATOR: MLMILLS


LOB: PKG. (GL EXPERIENCE RATING)   EFFECTIVE DATE:01/18/10        EXPIRE DATE: 01/18/11             ANNIV DATE: 01/18/10


                              STATE    : FL                  POL. TERM  : 1 YEAR
                                                             PKG PROGRAM: 29
                                                             RATE REV DT: 08/01/08


****************************************************************************************************************************

            GENERAL LIABILITY EXPERIENCE RATING
            CURRENT POLICY TERM INFORMATION :


    CURRENT POLICY TYPE           : OCCURRENCE            DEDUCTIBLE BASIS :
    PREM/OPS BASIC LIMIT PREMIUM  :    11,834.00          DEDUCTIBLE TYPE  :
    PRODUCTS BASIC LIMIT PREMIUM  :     2,100.00          DEDUCTIBLE AMOUNT:
    SPECIAL U/W EXPOSURE UNITS PREM/OPS :                 TEXAS ONLY (PKG) :
****************************************************************************************************************************

            ANNUAL BASIC LIM                                  SUBJECT                        LOSS    ESTIMATED LOSS
YR SUBL     MANL LOSS COST  *  PAF1 *  PAF2 * DETREND =       LOSS COST  *     EER  *        DEV  =   DEVELOPMENT
--------------------------------------------------------------------------------------------------------------------------
08  PREM     6,923.00  *  1.000 *  1.000 *  0.907 =     6,279.00  *   0.727 *    0.473 =       2,159.00
07  PREM     6,923.00  *  1.000 *  1.000 *  0.864 =     5,981.00  *   0.727 *    0.300 =       1,304.00
06  PREM     6,923.00  *  1.000 *  1.000 *  0.823 =     5,698.00  *   0.727 *    0.177 =         733.00
08  PROD     1,229.00  *  1.000 *  1.000 *  0.873 =     1,073.00  *   0.727 *    0.728 =         568.00
07  PROD     1,229.00  *  1.000 *  1.000 *  0.816 =     1,003.00  *   0.727 *    0.585 =         427.00
06  PROD     1,229.00  *  1.000 *  1.000 *  0.763 =       938.00  *   0.727 *    0.480 =         327.00
                                                     ---------------                        --------------
                                            TOTAL     20,972.00                      TOTAL     5,518.00

****************************************************************************************************************************

    CREDIBILITY FACTOR      : 0.07   EER : 0.727      MSL  : 62400      PERMISSIBLE L/R : 0.585


    TOTAL CAPPED ACTUAL LOSSES :       90,211.00
    ESTIMATED LOSS DEVELOPMENT :        5,518.00
    TOTAL RATABLE LOSSES       :       95,729.00

    ACTUAL EXPERIENCE RATIO      : 4.565 [ TOTAL RATABLE LOSSES / TOTAL SUBJECT LOSS COST ]
    EXPERIENCE MODIFICATION      : 1.37  [ 1+((ACTUAL EXPERIENCE RATIO - EER) / EER * CREDIBILITY FAC) ]
```

LEVEL 1 - AGREEMENT NO. _L 1-145_

[LEVEL 1 AGREEMENT: For contract work that pertains to any contractors involved with new construction, maintenance and repair of underground distribution facilities, mains and service upstream of the meter, or any other activities.

## GENERAL AGREEMENT FOR CONTRACTED WORK

THIS AGREEMENT, made and entered into this _10_ day of _Jan_ 20_16_by and between Peoples Gas System, a division of Tampa Electric Company, a Florida corporation (the "Company"), and _Pipeline Distribution, Inc_ the "Contractor") whose principle place of business is _2140 SW 52nd Terrace, Plantation, FL 33317-6020_ .

WITNESSETH: THAT

WHEREAS, the Company proposes to have certain work performed towards accomplishing the project described in each Peoples Gas System Purchase Order and attachments thereto, and all drawings and specifications made a part thereof ("Purchase Order").

WHEREAS, the Company desires to engage the Contractor to perform certain work and/or services in accordance with this Agreement.

WHEREAS, the Contractor desires to perform such work and/or services in accordance with this Agreement.

NOW THEREFORE, for other valuable considerations and the mutual benefits which will accrue to the parties, the parties agree as follows:

1.     PURPOSE.  The purpose of this Agreement is to set forth the obligations, responsibilities, terms and conditions applicable to the parties in the event the Contractor performs any Work for the Company pursuant to a Purchase Order.  This Agreement does not authorize the Contractor to perform any Work for the Company, but the terms and conditions of this Agreement shall be considered a part of any and all Purchase Orders which may be issued to the Contractor.

2.     THE WORK.  The Contractor shall perform all of the work and services for the Company as set out and described in or that may be reasonably or fairly inferred from each Purchase Order, including all that is required by the drawings and specifications, when such drawings and specifications are furnished to the Contractor (collectively, the "Work").  Such drawings and specifications are made a part of this Agreement and each Purchase Order as if attached hereto or thereto.  The Contractor shall do everything required by this Agreement (and each Purchase Order) and shall execute the Work in a thorough workmanlike manner in accordance with the terms of this Agreement (and the applicable Purchase Order) and to the reasonable satisfaction of the persons employed by the Company to supervise the job (herein

EXHIBIT

**2**

tabbies

PGS 6079

called the "Representative").

Contractor represents that it is knowledgeable in the areas and requirements described in this Agreement and each Purchase Order, and that its personnel are experienced and knowledgeable regarding the same.

**3.    COMPLETION TIME.**   The Work to be executed hereunder shall be commenced as set out in each Purchase Order and shall be completed as set out therein, and if the Contractor fails to complete the work by said date or within any extended time allowed by the Representative, the Contractor shall pay or allow to the Company a sum per day as set out in the applicable Purchase Order, entitled "Compensations" as liquidated and ascertained damages for every day beyond said date or extended time during which the Work shall remain unfinished, and such damages may be deducted by the Company from any monies due the Contractor.

**4.    AGREEMENT PRICE:**

A.    The Company shall pay the Contractor as full compensation for the performance of this Agreement (subject only to such increase or decrease as is provided for herein) the amount set out in each Purchase Order based on the terms and conditions of this Agreement.

B.    **OVERTIME.**  The Contractor's work schedule shall be based on a nominal forty (40) hour week, Monday through Friday.  The Company shall have the right to require Contractor and/or its subcontractors to work overtime in order to expedite the completion of the Work.  Overtime work to be performed by subprofessional or nonsupervisory employees of the Contractor for whom payment of overtime is required by law, or subcontractors' forces, must have prior approval of the Company.  The Company, when such approval is given, agrees to pay Contractor for the actual additional premium time, plus insurance and taxes thereon.

**5.    INVOICING AND PAYMENTS.**  Invoices and payments shall be as follows:

A.    All invoices for payment(s) pertaining to this Agreement shall be in accordance with all provisions stated herein, and shall also be in accordance with all the terms and provisions of the applicable Purchase Order issued by the Company applying to the Work to be performed.  The Company will not make payments unless properly invoiced.   All invoices must be originals and shall contain the Employer's Identification Number in accordance with Internal Revenue Service requirements and the associated Purchase Order under which Work is being performed.

B.    The Company shall make progress payments, payments based on scheduled percentages of the contract value as retainage, or in the manner set out in and according to the terms and conditions of the applicable Purchase Order.

C.    **WITHHOLDING PAYMENT.**  The Company may withhold to such extent as

---

may be necessary to protect the Company from loss on account of any lien, or any failure of Contractor to make payments properly to subcontractors and vendors of equipment, dues, services, materials or labor. The Company may withhold final payment without penalty or interest, if, at the time of substantial completion, a dispute exists between the parties. The parties shall make all reasonable efforts to resolve the dispute at which time, upon compliance with Paragraph 5.D. herein, the Company shall make final payment.

D.   **FINAL PAYMENT.** Upon completion of the Work performed by the Contractor as agreed to by the parties as set out in each Purchase Order, the Contractor shall render the Work to the Company for final payment. Upon satisfactory completion of all Work required pursuant to each Purchase Order, as agreed to by the Representative, the Contractor shall forward final invoices for the Work to the Company, together with appropriate affidavits in a form approved by the Company stating that all payrolls, material bills, subcontractors and other indebtedness in connection with the Work have been paid.

If, after the services provided by the Contractor have been substantially completed, full completion as agreed to by the parties as set out in each Purchase Order and Attachments thereto, is delayed through no fault of the Contractor, and the Representative so certifies, the Company shall make payments of the balance due for that portion fully completed and accepted under the terms and conditions governing final payment.

6.   **CHANGE ORDERS.** The Company reserves the right to revise the specifications and/or detail drawings at any time during the continuance of this Agreement, and so far as the Work called for by the revised specifications or drawings may be fairly inferred from the originals thereof, the same shall be executed for the Agreement price specified in the applicable Purchase Order. Any increase or decrease in the amount of the Work to be performed, and/or the materials to be furnished hereunder which is caused by such revisions, shall be adjusted and paid for by or credited to the Company, as the case may be, after a detailed estimate of any resulting increase or decrease in the Agreement price, computed on the basis of the unit labor and/or material costs on which the original Agreement price was determined, has been furnished by the Contractor to the Company, together with an estimate of any additional time that may be required for completion of the Work. Such estimate shall be furnished within ten (10) days after the Company notifies the Contractor of the changes desired. Upon agreement between the Contractor and the Company as to the amount of any such increase or decrease in the Agreement price and/or any additional time required for completion of this Agreement, or in the event of inability to so agree, upon arbitration as herein provided, the Company shall give the Contractor a signed memorandum directing such changes as he may desire and specifying the resulting increase or decrease in the Agreement price and/or the change in the time required for completion, fixed as aforesaid, and thereupon the Contractor shall forthwith comply with such change order. No additional compensation or time for completion shall be allowed unless pursuant to such a change order. Loss of anticipated profits shall not be considered in estimating any decrease in the original price.

The Agreement price specified in each Purchase Order includes applicable taxes, and shall not be increased as a result of any change in the Contractor's tax liabilities or failure of the Contractor to include applicable tax.

7.    **CONTRACTOR'S BONDS.**  The Company shall have the right to require the Contractor to furnish a bond guaranteeing the faithful performance of the Work described in each Purchase Order and the payment of all obligations arising hereunder, in such form and amount and with such surety as the Company may prescribe.  If such bond is required by instructions given previous to the submission of bids, the premium shall be paid by the Contractor; if subsequent thereto, it shall be paid by the Company.

8.    **LIENS.**  Contractor shall keep the work property free and clear from liens, and, as a condition to final payment hereunder, Contractor shall deliver to Company (i) waivers or releases of all liens, (ii) receipts in full for all work and materials, and (iii) an affidavit that all claims have been fully satisfied, or such other documents, waivers or releases, as Company may request.  Contractor shall defend, indemnify and save Peoples Gas System harmless from all damages, losses, costs and expenses (including attorneys' fees) which Peoples Gas System may incur by reason of claims or liens against the work property arising out of the performance of this Agreement by Contractor, its employees, agents, subcontractors and suppliers.  For purposes of this Section 8, "Peoples Gas System" shall have the meaning provided in Section 9, below.

9.    **INSURANCE.**  Contractor, at its sole cost and expense, shall maintain in effect, and shall cause its subcontractors and any other agents of Contractor performing Work hereunder to maintain in effect, at its and their sole cost and expense, at all times during the performance of any Work performed pursuant to this Agreement or any Purchase Order, the insurance coverages described below, with minimum limits not less than those set forth below, with insurers and under forms of policies satisfactory to Company.  For purposes of this Section 9, "Peoples Gas System" shall mean the Company, TECO Energy, Inc. and the subsidiaries and affiliates of each, and the respective officers, directors, agents, servants, employees, successors and assigns of each of the foregoing companies. The insurance provisions of this Agreement are intended to be a separate and distinct obligation of the Contractor. Therefore, these provisions shall continue to be enforceable irrespective of other provisions of this Agreement.

     A.    <u>Workers' Compensation Insurance; Employer's Liability Insurance.</u>  Contractor shall maintain, and shall require each of its subcontractors or agents performing Work hereunder to maintain, Workers' Compensation Insurance (including coverage for Occupational Disease) in accordance with all applicable laws and regulations for all of Contractor's (and all of its subcontractors') employees. If any of the Work involves exposure of injury to Contractor's or any of its subcontractors' employees under the U.S. Longshoremen's and Harbor Worker's Compensation Act, the Jones Act or under laws, regulations or statutes applicable to maritime employees, Contractor shall maintain (and shall cause each of its subcontractors or agents performing Work hereunder to maintain) coverage for such injuries or claims.  Contractor shall maintain (and shall cause each of its

PGS 6082

subcontractors or agents performing Work hereunder to maintain) Employer's Liability insurance of not less than $100,000 for each accident.

B.   General Liability Insurance. Contractor shall maintain, and shall require each of its subcontractors or agents performing Work hereunder to maintain, General Liability Insurance covering all operations by or on behalf of Contractor (or any of its subcontractors or agents, as applicable) for the limits of liability indicated below and including coverage for:

      (i)    Premises and Operations;

      (ii)   Products and Completed Operations;

      (iii)  Contractual Liability insuring the obligations assumed by Contractor in this Agreement;

      (iv)   Broad Form of Property Damage (including Completed Operations);

      (v)    Bodily Injury Liability;

      (vi)   Explosion, Collapse and Underground Hazards; and

      (vii)  Personal Injury Liability

The General Liability Insurance shall be the Occurrence Coverage Form. Contractor shall maintain General Liability Insurance with no general annual aggregate limit and combined single limits of liability for bodily injury, property damage and personal injury, with a limit of not less than $5,000,000 each occurrence, plus a separate $5,000,000 annual aggregate for Products-Completed Operations.

The required limits may be met by a combination of primary policy and an excess or umbrella policy.

As provided in Subsection 9.E., below, Peoples Gas System shall be named as additional insured under the Contractor's (and each subcontractor's) General Liability policy. In lieu of naming Peoples Gas System as additional insured under the General Liability Policy, the Contractor may maintain Owners and Contractors Protective Liability insurance. Such insurance shall name Peoples Gas System as named insureds and shall have a combined single limit for bodily injury or property damage of not less than $5,000,000 each occurrence and $5,000,000 annual aggregate.

If such policy covers more than one project, the Work to be performed under this Agreement (or any Purchase Order hereunder) shall be designated in the policy

PGS 450 R01/10

declarations.

C.    Automobile Liability Insurance. Contractor shall maintain, and shall require each of its subcontractors or agents performing Work hereunder to maintain, Automobile Liability insurance including coverage for all owned, hired, leased and non-owned automobiles. The Automobile Liability insurance shall include coverage for Automobile Contractual Coverage. The combined single limit for bodily injury and property damage liability shall be not less than $2,000,000 for any one accident or loss. The required limits may be satisfied by a combination of a primary policy and an excess or umbrella policy.

D.    Special Services.

(1)    Watercraft. If the Work involves watercraft owned or operated by Contractor or any subcontractor, Contractor (and the subcontractor that owns the watercraft) shall maintain a policy with a combined single limit for bodily injury and property damage liability of not less than $10,000,000 each occurrence.

(2)    Transit and Cargo Insurance. If the Work involves the hauling and/or rigging of property valued in excess of $300,000, Contractor (and any subcontractor performing such Work) shall also maintain "All Risk" Transit Insurance, or "All Risk" Cargo Insurance, or such similar form of insurance that will insure against physical loss or damage to the property being transported, moved or handled by Contractor pursuant to the terms of this Contract. Such insurance shall provide a limit of not less than the replacement cost of the property being lifted or moved, whichever is greater.

(3)    Aircraft. If the Work involves aircraft (fixed wing or helicopter) owned, operated or chartered by the Contractor or any of Contractor's subcontractors, Contractor (or the subcontractor owning such aircraft) shall maintain a policy insuring against liability associated with such aircraft with a combined single limit not less than $5,000,000 for each occurrence and such limit shall apply to Bodily Injury (including passengers) and Property Damage Liability. In the event Contractor charters aircraft, Contractor shall ensure that the foregoing insurance and evidence is furnished by the owner of the chartered aircraft.

(4)    Professional Liability Insurance. If the Work involves design work or other professional services, then Contractor shall maintain (and any Subcontractor performing Work hereunder shall maintain), at the Company's sole and absolute discretion, a Professional Liability Insurance policy with minimum limits of $1,000,000.

(5)    Builders Risk Insurance. If the Work to be performed pursuant to a Purchase Order calls for the construction of a building or other related property in the

course of construction, then Contractor shall purchase a Builders Risk Insurance policy on an "All Risk" basis for the benefit of Peoples Gas System, Contractor and/or subcontractors as their interest may appear, if necessary. The limit shall equal the full replacement value of the facility.

E.   Peoples Gas System shall be named as additional insured in all of the foregoing policies (except for any workers' compensation and Professional Liability policy), including the policies of any subcontractor or agent of Contractor performing Work hereunder, with respect to liability arising out of the Work being performed under this Agreement. Such insurance shall be primary coverage afforded the additional insured and shall contain a cross-liability or severability of interest clause. Contractor hereby waives and shall cause its subcontractors and suppliers and their insurers to waive all rights of subrogation against Peoples Gas System in the event of any covered loss under the policies described above or under any policy maintained by Contractor covering Contractor's construction equipment used for the Work.

F.   The requirements contained herein as to types and limits, as well as Company's approval of insurance coverage to be maintained by Contractor (or any of Contractor's subcontractors), are not intended to and shall not in any manner limit or qualify the liabilities and obligations assumed by Contractor under this Agreement. Contractor shall be solely responsible for any unpaid premium or breach of warranty by Contractor. Contractor shall permit any authorized representative of Company to examine Contractor's original insurance policies, should Company so request. Should Contractor (or any of Contractor's subcontractors) at any time neglect or refuse to provide the insurance required herein, or should such insurance be canceled, without waiving any other rights or remedies which Company may have under the circumstances, Company shall have the right to purchase such insurance and the cost thereof shall be deducted from monies due Contractor. Failure to provide insurance in accordance with this clause shall constitute a material breach of this Agreement.

G.   The Certificates of Insurance shall clearly evidence that Contractor's insurance policies contain the minimum limits of coverage and special provisions prescribed in this Section 9 of the Agreement. Contractor shall not commence Work under this Agreement or any Purchase Order until the Company has been furnished a certificate in duplicate, from Contractor's insurance carrier, certifying that policies of insurance providing coverage, as listed above, have been issued to the Contractor and are in force, and until the certificate has been examined and approved by Company. The certificate shall state that it is issued at the request of Peoples Gas System, Attention: Materials Management, Plaza 7, Peoples Gas System, Post Office Box 2562, Tampa, Florida 33601, to which address it shall be mailed or delivered. In addition, the certificate shall state that the insurance carrier will give the Company thirty (30) days' prior written notice of any cancellation of, termination of or change in coverage of these policies.

PGS 450 R01/10

Additionally, the following statement shall be quoted in full on the certificate: "It is further expressly certified that the General Liability Policy includes contractual coverage to the full limits of the policy for all bodily injury and property damage liability assumed by the Contractor under Section 11 of this Agreement."

**10. CONTRACTOR RESPONSIBLE FOR WORK UNTIL ACCEPTED.** The Contractor agrees that he will carry on said Work at his own risk until the same is fully completed and accepted by Company, and will, in case of any accident, destruction or injury to the Work and/or materials before its final completion and acceptance, repair or replace forthwith the Work and/or materials so injured, damaged and destroyed, at his own expense and to the satisfaction of the Representative.

## 11.   HOLD HARMLESS AGREEMENT

Contractor assumes the entire responsibility for performance of the Work described in each Purchase Order issued pursuant to this Agreement. Contractor agrees to indemnify Peoples Gas System and hold it harmless of and from any and all claims for personal injury, death or property damage, and any other losses, damages, charges or expenses, including attorney's fees, which arise or are alleged to have arisen out of or in connection with performance of the Work or Contractor's presence on Peoples Gas System property (including any of its employees, subcontractors, materialmen, or agents of any tier or their respective employees). To the extent permitted under applicable law, Contractors' indemnity obligation shall extend to and include liability for the sole, contributory, or concurrent negligence of Peoples Gas System. The phrase "property damage" as used herein includes, but is not limited to, damage to the property of Contractor, Peoples Gas System, and of any third parties.

Contractor further agrees to undertake, at its own expense, the defense of any action, which may be brought against Peoples Gas System claiming damages, which are alleged to have arisen out of or in connection with the performance of the Work under this Agreement.

If any Purchase Order issued pursuant to this Agreement involves construction, alteration, repair, or demolition of a building, structure, appurtenance, or appliances, including moving or excavation, the following limitations shall apply to Contractor's indemnification obligation hereunder with respect to such Purchase Order: (i) Contractor's obligation to indemnify Peoples Gas System for property damage or personal injury (including death) caused by the sole, contributory, or concurrent negligence of Peoples Gas System shall be limited, on a per occurrence basis, to the greater of $1,000,000 (as prescribed by Section 725.06(1) of the Florida Statutes), the applicable Purchase Order price, or the limits of liability of the insurance policies provided pursuant to Section 8 of this Agreement, which Contractor and the Company both acknowledge and agree bear a reasonable commercial relationship to this Agreement and each Purchase Order issued in connection herewith; (ii) Contractor's obligation to indemnify Company for property damage or personal injury (including death) caused, in whole or in part, by any act, omission, or default shall apply to any act, omission or default of Contractor (including any of Contractor's contractors, subcontractors, sub-subcontractors, materialmen, or agents of any tier or their respective employees) and the Company or its officers, directors, agents, or

PGS 6086

employees; and (iii) Contractor's indemnification obligations hereunder shall not include claims of, or damages resulting from, gross negligence, or willful, wanton or intentional misconduct of Peoples Gas System or its officers, directors, agents, or employees, or for statutory violation or punitive damages except and to the extent the statutory violation or punitive damages are caused by or result from the acts or omissions of the Contractor or any of the Contractor's contractors, subcontractors, sub-subcontractors, materialmen, or agents of any tier or their respective employees.

Contractor agrees that its indemnity obligation shall include, but not be limited to, liability for damages resulting from the personal injury or death of an employee under the Workers' Compensation Law of the State of Florida, or other similar federal or state legislation for the protection of employees, regardless of whether Contractor has paid the employee under such law or other similar federal or state legislation. The Contractor's obligation also includes indemnity for all attorney's fees and expenses incurred by Peoples Gas System to enforce the terms of this Agreement.

"Peoples Gas System" as used herein shall include Peoples Gas System, TECO Energy, Inc., and the respective officers, directors, agents, servants, employees, successors and assigns of both companies.

   12.   **SAFETY PRECAUTIONS.**  Contractor understands that the transmission and distribution of natural gas involves the handling of a product which, when not properly controlled, poses significant risk to person and property. Contractor further understands that due to the nature of the work to be performed hereunder, other hazardous or dangerous conditions, which are not necessarily related to the risks posed by natural gas, may also be involved in the Work. Accordingly, Contractor agrees, prior to the commencement of any Work hereunder, to make necessary inspection and to ascertain the existence and extent of any actual or potential hazardous or dangerous conditions and to instruct its employees with respect to said conditions and to the safety measures to be taken in connection therewith. Contractor further agrees to take all necessary safety precautions, to furnish and install all safeguards necessary for the prevention of accidents, to provide and maintain a safe work site for the protection of persons and property, to keep the work site free from materials and debris, and to otherwise fully comply with all laws, rules and regulations pertaining to health, safety and accident prevention. To accomplish this obligation, Contractor shall also be responsible for the development and maintenance of a health and safety plan for its employees and that of subcontractors' employees.

   13.   HAZARDOUS MATERIALS.

   A.   Contractor shall not, under any circumstances, bring onto Peoples Gas System's property, the job site, or adjacent property, any petroleum or petroleum product, asbestos in any form, dielectric fluid containing levels of polychlorinated biphenyl (PCB's), mercury (whether sealed in equipment or otherwise), explosives, or any material or substance which is deemed a pollutant, or hazardous or toxic substance under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C., §9601 et seq., the Resource Conservation and Recovery

PGS 6087

Act, 42 U.S.C., §6901 et seq., the Toxic Substances Control Act, 15 U.S.C., §2601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C., §1801, et seq., and any other U.S. federal law, rule, regulation, ordinance or requirement, all as amended or hereafter amended, or deemed to be such by a Governmental Authority, generally or relating to the generation, excavation, transportation, removal or disposal of pollutants or hazardous or toxic substances, waste and materials (collectively, "Hazardous Materials"), or allow the use of the same without the prior written approval of the Company. **"Governmental Authority"** shall mean any national, state or local government and any political subdivision thereof and any other governmental, quasi-governmental, administrative, judicial, public or statutory body, ministry, department, instrumentality, agency, authority, board, bureau, corporation or commission with jurisdiction over the applicable property.

B.      When the written approval of the Company is received as required in subsection A., above, and the use or storage of explosives or other Hazardous Materials is necessary for the performance of the Work, Contractor shall exercise proper care and shall only carry on such activities when performed under the supervision of properly qualified personnel.  Contractor shall be responsible for and shall provide written notice of presence at the job site of Hazardous Materials which it or its subcontractors bring on the site to local fire, medical, and law enforcement agencies with a copy of such notification to the Company.  Also, Contractor shall provide labeling of Hazardous Materials; appropriate and applicable training for its employees in the safe use of such Hazardous Materials (and records certifying such training); Material Safety Data Sheets covering all Hazardous Materials furnished under or associated with the Work; and a detailed plan to the Company outlining handling, usage, collection, storage and disposal of such Hazardous Materials. Additionally, Contractor shall provide an inventory of all materials identified on the Material Safety Data Sheets as containing Toxic Release Inventory (TRI) chemicals.  Such inventory shall identify the product and the quantity introduced to the job site.

C.      Contractor shall, at its sole expense, properly collect, containerize, and transport to a location on the job site designated by the Company, any Hazardous Materials used or applied at the job site by Contractor or any of its subcontractors as a result of the Work activities at the job site including, but not limited to, used oils, greases, and solvents from flushing and cleaning processes performed under this Agreement. The Company shall then have the right to elect whether to arrange for the disposal of all such Hazardous Materials used or applied by Contractor or to have Contract arrange for such disposal, provided that if Company elects to have Contractor arrange for the disposal of such Hazardous Waste, Contractor shall do so in accordance with all applicable laws, rules and regulations and the terms and conditions of this Contract.

D.   Unused or surplus Hazardous Materials brought onto the job site by Contractor or any of its subcontractors shall remain the property of Contractor or its subcontractors. Contractor, at its sole expense, shall be responsible for the proper handling, collection, transportation and removal from the job site of any such unused or surplus Hazardous Materials. Prior to the Company's issuing written notice of acceptance of the Work to Contractor, Contractor shall remove and certify to the Company the removal of any explosives or other unused Hazardous Materials, stored or located on the job site or any neighboring property by Contractor or its subcontractors in connection with the Work, and shall provide a written report of the quantity of TRI chemicals used in performance of the Work.

E.   All costs associated with the handling, storage on the job site, transporting Hazardous Materials introduced or generated on the job site or any neighboring property by any act of Contractor or its subcontractors and the disposal of unused Hazardous Materials are included in the Agreement Price.

F.   Contractor warrants that it is knowledgeable of, and will comply with, all environmental laws, rules and regulations in connection with the Work. All activities in connection with the foregoing shall be performed in strict accordance with any applicable federal, state or local laws, regulations, administrative rulings or pronouncements, or the like, regarding or applicable to Hazardous Materials.

G.   In the event Contractor encounters on the job site material reasonably believed to be Hazardous Materials, Contractor shall immediately stop Work in the affected area, and immediately notify the Company, with confirmation in writing within twenty-four (24) hours after encountering Hazardous Materials, detailing the particulars of the substance(s) encountered. Contractor shall not take further action in the affected area until instructions from the Company are received. Work in unaffected areas shall not be interrupted.

H.   Contractor shall indemnify, defend, and hold harmless Peoples Gas System from and against any all claims, loss or liability in any manner arising directly or indirectly out of Contractor's failure to comply with the Hazardous Materials requirements of this Contract. For purposes of this Section 13, "Peoples Gas System" shall have the meaning provided in Section 9, above.

**14.   EMPLOYEES.** The Contractor shall employ competent, experienced, qualified and capable workers and personnel, who shall be under the exclusive care, custody and control of Contractor, and shall immediately remove from the Work, whenever requested to do so by the Representative, any person considered by the Representative incompetent, disposed to be disorderly or otherwise failing to meet the standards or requirements of this Section 14, and such person shall not again be employed upon the Work.

The Contractor hereby agrees that such field labor shall be employed as will cause no conflict or interference with other trades or operations.

15.   **WARRANTY AND GUARANTEE.**

A.   Contractor warrants to the Company that all materials and equipment furnished under this Agreement will be new unless otherwise specified in writing, and that all work will be of good quality, free from faults and defects and in conformance with any Purchase Order and attachments thereto, including any specifications stipulated therein.  All Work not so conforming to these standards may be considered defective, and the Contractor shall promptly repair and make good, after notice by the Company and without cost to the Company, any damages, defects or faults resulting from imperfect or defective Work done or materials furnished by the Contractor.  The Contractor warrants that all materials and equipment furnished under this Agreement shall be covered by warranty for a period of one (1) year (or during a longer period if required by the specifications and stipulated therein) from the date of acceptance of the completed Work by the Company.

B.   Where material or equipment furnished by the Contractor is normally covered by a manufacturer's warranty or guarantee or other special warranty or guarantee applying for a longer warranty period than the standard one (1) year warranty provided for above, the Contractor shall provide such additional or extended warranty or guarantee to the Company.

16.   **REMOVAL OF REFUSE.**  The Contractor agrees to clean up the Work as it progresses from day-to-day, and to remove therefrom and from the adjoining premises, driveways and streets all waste materials and rubbish, and, when the Work is finished, to remove from the site of the Work all tools, machinery, rubbish and all waste materials for which, in the opinion of the Representative, the Contractor or its subcontractors are responsible, and to leave the work free and clear from all obstructions and hindrances.  In addition, the Company reserves the right to stop all construction Work until the work area is restored to a neat and orderly appearance, if, in the Company's opinion, this action is justified by excessive public complaints.

17.   **INDEPENDENT CONTRACTOR.**  It is mutually understood and agreed between the parties that the Contractor in doing the Work under the provisions of this Agreement and each Purchase Order shall act as an independent contractor and not as a subcontractor, agent, or employee of the Company maintaining complete control and responsibility for his own employees and operations and those of his subcontractors, if any.  This Agreement shall not establish a partnership or joint venture between the parties.  No agency or implied authority is created by this Agreement, and neither party shall have the authority to enter into any obligation or create any liability on behalf of the other party.  The means and methods employed for performing any of the Work under this Agreement shall be at the option of the Contractor subject to the provisions of this Agreement.  Any inspection or suggestion by Company shall be to insure performance of the Work in accordance with this Agreement and not to control the detail, manner or methods of performance.  The Company shall have no liability for and the Contractor agrees that he is responsible for the payment of all required Federal taxes pursuant to the Federal Insurance Contributions Act, the Social Security Act, the Federal Unemployment Tax Act, and

all income tax withholding.  Further the parties agree that the Company shall not provide any employee benefits pursuant to any Federal or State law or regulation.

**18.   REFERENCE AND ARBITRATION.**   Any controversy arising under or in connection with this Agreement shall be submitted to the decision of a competent person to be agreed upon by the Contractor and the Company as referee, and his decision thereon shall be final.  In case of failure to agree upon such referee, such controversy shall be submitted to the decision of three arbitrators, one arbitrator to be chosen by the Company, one by the Contractor and the third by the two so chosen; and the decision of any two of such arbitrators shall be final. Such arbitration shall be governed by the arbitration laws of the State of Florida. The referee or arbitrators shall determine which party shall pay the cost of the reference or arbitration or the manner in which such cost shall be divided between the parties. The Contractor shall, if required by the Company, proceed with all Work pending the result of any such reference or arbitration, but final settlement for Work done or materials furnished under this Agreement need not be made until the final decision of the referee or arbitrators has been rendered.  In lieu of the use of reference and arbitration as described herein, the parties shall submit any controversy to another form of alternative dispute resolution as agreed to by the parties.  The parties agree and recognize that acceptance of this provision is an effort to eliminate the need for litigation in the Federal and State Courts of the United States and to reduce the cost of resolving any controversy which may arise between the parties.

**19.   SUBLETTING, ASSIGNING.**  The Contractor agrees that it will not sell, assign, transfer or sublet this Agreement or any part thereof or interest therein, either by power of attorney or otherwise, without the prior written consent of the Company, and that any such sale, assignment, transfer or subletting, without such consent of the Company shall be null and void. Any subcontracts entered into by the Contractor shall be submitted to the Company for its prior approval and the Company shall have the right to reject any subcontractor whom it considers incompetent or unable to satisfactorily perform the portion of the Work involved.

**20.   ALTERATIONS AND AMENDMENTS.**  No alteration or amendment of this Agreement shall be valid unless the same is made in accordance with the provisions of this Agreement or by an instrument in writing signed by the Company and by the Contractor; and, in case of any such alteration or amendment, so much of this Agreement as is not necessarily thereby changed shall remain in force, and no act or conduct of either party shall be held to operate as a waiver of any provision or provisions of this Agreement, unless in the form of a writing signed by the party against which it is asserted.

**21.   TERMINATION OF AGREEMENT:**

A.   The Company shall have the right, without cause or reason, to terminate this Agreement upon giving the Contractor seven (7) days' prior written notice and in such event the Contractor shall be paid in accordance with each Purchase Order for all work performed to the date of termination without further liability on the part of the Company.

B.    It is agreed that if, at any time during the continuance of this Agreement, the Contractor is petitioned into bankruptcy or the hands of receivers, either voluntarily or involuntarily, or the Representative is satisfied that the Contractor is neglecting or is unable to provide equipment and/or materials or to perform the Work required, is careless or incompetent, is not prosecuting the Work with promptness and diligence, or is failing in any way to comply with the Agreement, the applicable Purchase Order, specifications or drawings, the Company shall have the right, after having first given the Contractor two (2) days' notice in writing of such intention, to enter upon the Work immediately upon the day mentioned in such notice, exclude the Contractor and its employees, retain or remove the equipment, tools, implements and/or materials thereon, obtain other equipment, tools, implements, materials, and labor, if necessary, take assignment of contracts entered into by Contractor as described in subsection C., below, enter into other agreements for Work or materials, remove such parts of the Work as the Company considers necessary, and complete the Work according to the Purchase Order, specifications and drawings, charging to the Contractor the cost of completing the Work, including the cost of obtaining new proposals and letting new agreements, if any, together with all the damages caused by the delays thus occasioned in completing the Work. In such event, the Contractor shall be entitled to no further payments under this Agreement until the Work is completed. If the cost to the Company of thus completing the Work, together with any damages caused by delays as aforesaid, shall exceed the balance due to the Contractor on account of the Agreement price, the Contractor shall forthwith pay such excess amount to the Company; but if the balance due on the Agreement price shall exceed the expense incurred by the Company in so completing the Work, together with any damages for delay, such excess shall be paid by the Company to the Contractor.

C.    In the event of a termination of this Agreement, Company shall, to the extent that it so desires, have the right to assume and become liable for such obligations, commitments, and unliquidated claims as Company so desires, that Contractor may have theretofore in good faith undertaken or incurred in connection with the Work. Contractor shall, as a condition of receiving the payments covered in any Purchase Order, execute and deliver all such documents and take such steps, including the legal assignment of its contractual rights, as Company may require for the purpose of fully vesting in Company, the rights and benefits of Contractor under the obligations or commitments to be assumed by Company.

**22.  ABANDONMENT OF PROJECT.** In the event the project or Work is abandoned by Company, Company shall pay Contractor for all Work performed to date in accordance with each Purchase Order without further liability on the part of the Company.

**23.   LIABILITY OF REPRESENTATIVES.** It is expressly agreed and understood that the Representative does not assume and shall not be subject to any liability whatsoever for the obligations entered into hereunder by the Company or by the Representative on behalf of the Company and that the Contractor must look solely to the Company for payment and for the enforcement of any claims or liabilities whatsoever arising hereunder.

24.  **CONFLICT OF INTEREST:**

A.  Contractor represents that there is no actual or potential conflict of interest to its best information and belief between the Company (or any of the Company's subsidiaries or affiliates) and the Contractor, Contractor's family, business or financial interest.

B.  In the event of any change in the Contractor's status, any potential conflicts shall be reported to the Company as soon as Contractor becomes aware of them.

C.  Contractor shall not employ any employee of the Company to perform any part of this Agreement.

25.  **WORK PRODUCT.** All documents, information, data analyses, and permitting instruments arising out of this Agreement, shall be owned by Company as and when produced.

26.  **CONFIDENTIAL INFORMATION.** In the course of performance of services of Contractor for Company, it is inevitable that certain confidential information will be revealed to Contractor by Company or that Contractor will obtain knowledge of such confidential information through other sources. Contractor agrees to maintain such confidential information except when such confidential information is made known publicly or by a third party authorized to release such confidential information. Contractor shall not release any information pertaining to this Agreement or use the name of the Company on any public releases without the prior written consent of the Company.

27.  **AUDIT.** During the period of this Agreement, the Contractor shall maintain a set of accounts and records including all documents, correspondence, data files, record layouts and codes, and any other evidence which shows and supports all direct reimbursable costs incurred or anticipated, and any applicable credits. The system of accounts to be used by the Contractor shall be acceptable to and subject to approval of the Company and shall be in accordance with generally accepted accounting principles. The Contractor shall preserve these records for a period of three (3) years after performance of the Agreement. The Contractor shall maintain all records of any type pertaining to this Agreement and each Purchase Order and attachments thereto for a period of five (5) years after final acceptance of the Work performed under this Agreement.

All books of accounts, records, documents, correspondence, data files, record layouts and codes, and any other evidence pertaining to the direct charges of this Agreement shall be subject to inspection, copying, and audit at all reasonable times by the Company or its authorized representatives.

In all cases of cost reimbursable subcontracts, the subcontractor's records, documents, correspondence, data files, record layouts and codes, and any other evidence pertaining to this Agreement shall be subject to inspection, copying and audit by the Company or its authorized representatives during the same time periods as the Contractor's records are available. The Contractor shall require all subcontractors to maintain a set of books of accounts and other records in the same manner required of the Contractor as set out in this Agreement. This right to audit shall be guaranteed by the Contractor. Payment of any statement, in whole or in part, shall not bar the Company's rights to take later exception thereto.

PGS 6093

28.   STANDARDS; COMPLIANCE WITH LAWS.  In all Work to be performed hereunder, Contractor agrees same shall meet the standards necessary to satisfy the Company. Contractor agrees to fully comply with all rules and regulations of every governmental agency having jurisdiction over the work covered herein, and shall comply with all applicable federal, state and local laws and ordinances applicable to the Work, and shall obtain, at its own cost and expense, all licenses and permits identified in any Purchase Order and all other licenses and permits or other government approvals necessary for the Work.  Contractor agrees to indemnify and hold harmless Peoples Gas System for Contractor's failure to comply with the provisions of this Section, including but not limited to fines, penalties, forfeitures, and attorneys fees and costs. For purposes of this Section, "Peoples Gas System" shall have the meaning provided in Section 9, above.

29.   PATENTS.   Patents, inventions or discoveries made or conceived by the Contractor in connection with this Agreement shall be the property of the Company, as well as any other work product described in Paragraph 25 of this Agreement.  The Company shall have the sole discretion to determine if, when and by whom a patent application shall be filed.  The Contractor shall, at the Company's direction and expense, handle any patent application in the proper manner.

Contractor warrants that the Work performed hereunder does not infringe on any patents or copyrights issued by the United States or any foreign governments.  Contractor covenants and agrees to defend, hold harmless and protect the Company from and against any and all damages, claims and demands based upon an alleged infringement of such patent or copyright by reason of the Company's sale or use of the Work performed hereunder and to defend the Company at the Contractor's expense in any suits at law or in equity arising therefrom to which the Company may be made a party.

30.   COMPLIANCE WITH COMPANY POLICY.  Company policy prohibits the use of drugs and alcohol while on the job-site or on Company property.  Contractors agree that it will require its employees to abide by the Company's policies related to the use of drugs and alcohol.  Failure of Contractor to abide by this provision shall be considered a material breach of this Agreement.

Any Contractor performing work on the Company's pipeline facility shall comply with the requirements of Pipeline Safety Regulations C.F.R. Part 199, Drug and Alcohol Testing. Contractors shall be required to submit a Drug and Alcohol Plan to the Company prior to performing any Work hereunder and shall be required to submit an updated report quarterly.

Additionally, upon request by the Company, Contractor shall submit a written Qualification Program beginning April 27, 2001 pursuant to applicable Department of Transportation, Research and Special Programs Administration, regulations.

31.   FORCE MAJEURE.  Except as otherwise expressly provided herein, neither party shall be liable for any delay due to causes not reasonably within the affected party's control, including but not limited to, acts of civil or military authority, including courts and regulatory agencies, acts of God, war, riot or insurrection, inability to obtain required construction permits, blockades, embargoes, sabotages, epidemics, fires, floods, strikes, lockouts or other labor difficulties, provided such labor difficulties do not arise from inequitable labor practices. Failure of subcontractors and inability to obtain materials shall not be considered as a force majeure delay.

In the event of any delay resulting from such causes, upon notice to the other party within five (5) days of occurrence of the event giving rise to the delay, the time for performance hereunder shall be extended for a period of time reasonably necessary to overcome the effects of such delays. This shall constitute the sole remedy to either party in the event of such delays. The party experiencing the delay shall undertake all diligent efforts to make up for the time lost through delay and no additional compensation shall be payable as a result of such Force Majeure delay.

32.    **JURISDICTION AND VENUE.**  This Agreement memorializing the total agreements of the parties hereto, and all respective rights and obligations of the parties hereto, shall be governed by the laws of the State of Florida. Any litigation arising hereunder or related hereto shall be tried by the State Courts for the county (Hillsborough County) or the Federal Court of the United States (Middle District of Florida) where the principal office of the Company is located, whichever is applicable.

33.    **TERM OF AGREEMENT.** This Agreement shall expire five (5) years after the date of this Agreement unless subsequently mutually extended by written amendment for an additional period or periods, and upon mutual agreement of the parties of any revision to any of the terms of this Agreement.

34.    **CONSCIENCE OF AGREEMENT.** This Agreement, along with each Purchase Order entered into pursuant hereto, represents the entire Agreement between the parties and supersedes all prior representations or agreements, whether written or oral, with respect to work hereunder. It is specifically agreed that any and all preprinted provisions set forth in each Purchase Order and Contractor's acknowledgements used in confirmation herewith which are inconsistent with the provisions herein or which impose any additional obligations on the parties shall have no effect on the parties hereto.

35.    **SEVERABILITY, SAVINGS.** In the event that any provision of this Agreement shall be held unconscionable, unenforceable, or void for any reason by any tribunal of competent jurisdiction, it is agreed that the portion of the provision in question shall be modified only to the extent necessary to eliminate the portion held unconscionable, unenforceable or void by the tribunal and such modified portion, together with all other parts of the provision in question, shall then be binding on the parties hereto. The remaining provisions of this Agreement shall not be affected by the action of any tribunal or modification of such provision, and shall remain in full force and effect. If Contractor's obligation to indemnify for Peoples Gas System's negligence under Section 11 is held to be void or unenforceable for any reason whatsoever, Contractor shall continue to be obligated to indemnify Peoples Gas System to the extent under Section 11 as if such obligation to indemnify for Peoples Gas System's negligence was not a requirement of this Agreement.

36.    **PARTIES BOUND.** This Agreement shall be binding upon the parties hereto and their respective successors, heirs, personal representatives and permitted assigns.

37.    **WAIVER.** Failure of either party to enforce at any time, or for any period of time, one or more of the terms or conditions of this Agreement shall not be a waiver of such term or condition or of such party's rights thereafter to enforce each and every term and condition of this Agreement.

38.    **HEADINGS.** All Section headings herein are for convenience only and are in no

PGS 6095

way to be construed as part of this Agreement or as a limitation of the scope of the particular Sections to which they refer.

**39.    SURVIVAL.** All covenants, representations, warranties, guarantees, indemnifications, hold harmless agreements, and remedy provisions contained in this Agreement shall survive the termination of this Agreement.

**40.    ATTORNEY'S FEES.** In the event that it is necessary to take legal action either pursuant to Section 18 of this Agreement or through litigation in the courts of the United States or of any of the several states (including appellate proceedings) to enforce the terms of this Agreement, the prevailing party shall be entitled to attorneys' fees and costs from the losing party as determined by the court or agreed to by the parties.

**41.    NOTICES.** Any notice, communication, or statement required or permitted to be given shall be in writing and shall be deemed to have been sufficiently given when delivered in person or by registered mail, postage prepaid, to the address of the respective party below:

|  |  |
|---|---|
| If to Company: | Peoples Gas System |
|  | 702 N. Franklin Street |
|  | Tampa, Florida 33602 |
| If to Contractor: | _Pipeline Distribution, Inc_ |
|  | _2140 SW 52nd Terrace ___ |
|  | _Plantation, FL 33317-6020 _ |

**42.    ABANDONMENT OF PROJECT.** In the event the project is abandoned, Company shall pay Contractor for all work performed to date in accordance with each Company Purchase Order and Attachments thereto without further liability on the part of the Company.

**43.    ADDITIONAL PROVISIONS.**_____

_____

_____

WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Executed in the presence of:

_____

Witnesses to execution by Contractor

_____
Date

_____

Witnesses to execution by Contractor
1-10-10
_____
Date

_____

Witnesses to execution by Company
2/11/10
_____
Date

_____

Witnesses to execution by Company

_____
Date

**CONTRACTOR**

By _David Insel_

Title _President_

Date _1/10/10_


**PEOPLES GAS SYSTEM,** a division of
   Tampa Electric Company

By _Fran M. McGurk, C.P.M._
Fran M. McGurk, C.P.M.

Title _Manager – Purchasing and Contracts_

Date _Feb 11, 2010_

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

OP ID C3
PIPEL-1

| | DATE (MM/DD/YYYY) |
|---|---|
| | 01/20/10 |

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| BROWN & BROWN OF FLORIDA INC 8000 GOVERNORS SQUARE BLVD 400 MIAMI LAKES FL 33016-1588 Phone: 305-364-7800    Fax: 305-822-5687 | |

| INSURED | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A:  CHARTER OAK FIRE INS CO | 25615 |
| PIPELINE DISTRIBUTION, INC 2140 SW 52 TERRACE PLANTATION FL 33317 | INSURER B:  ST PAUL FIRE & MARINE INS CO | 24767 |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY** | DT-CO-345K9388-COF-0901/18/10 | | 01/18/11 | EACH OCCURRENCE | $1,000,000 |
| | X | X COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $300,000 |
| | | CLAIMS MADE   X   OCCUR | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | POLICY X   PRO-JECT   LOC | | | | | |
| | | **AUTOMOBILE LIABILITY** | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | |
| | | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | | SCHEDULED AUTOS | | | | | |
| | | HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | NON-OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | ANY AUTO | | | | OTHER THAN   EA ACC | $ |
| | | | | | | AUTO ONLY          AGG | $ |
| B | | **EXCESS/UMBRELLA LIABILITY** | QK06803574 | 01/18/10 | 01/18/11 | EACH OCCURRENCE | $4,000,000 |
| | X | X OCCUR   CLAIMS MADE | | | | AGGREGATE | $4,000,000 |
| | | | | | | | $ |
| | | DEDUCTIBLE | | | | | $ |
| | | X RETENTION   $10000 | | | | | |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | | | | WC STATU-TORY LIMITS   OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | | | E L EACH ACCIDENT | $ |
| | | If yes, describe under SPECIAL PROVISIONS below | | | | E L DISEASE - EA EMPLOYEE | $ |
| | | | | | | E L DISEASE - POLICY LIMIT | $ |
| | | **OTHER** | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| TEC-601 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL  10  DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| TECO PEOPLES GAS SYSTEM/TPI P O BOX 2562 TAMPA FL 33601 | AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)

© ACORD CORPORATION 1988



May 29, 2014

*Certified Mail-Return Receipt*
*#70133020000088689270*

Pipeline Distribution, Inc.
c/o George L. Fernandez, Esquire
Quintairos, Prieto, Wood & Boyer, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156

      Re:   Mario Santos
           DOA:  November 11, 2010

Dear Mr. Fernandez,

      This law firm represents Peoples Gas System ("PGS") in connection with the above-referenced claim.  On behalf of PGS, we are providing Pipeline Distribution, Inc. ("PDI") (and through PDI, its insurers, Charter Oak Fire Ins. Co. and St. Paul Fire & Marine Ins. Co.) with PGS' demand that PDI defend, indemnify and hold PGS harmless for any damages which may arise from Mr. Santos' claim.  We request that you provide a copy of this letter to your insurers from which you procured coverage for PGS as an additional insured.

      Mr. Santos' claims arise from certain work PDI conducted for PGS under Purchase Order PG06588-13.  As part of a long-term road construction project, PDI constructed and installed an offset to PGS' gas main between Stations 452 and 456 on the north side of Colonial Boulevard in Lee County, Florida in March, 2010.  Mr. Santos alleges that PDI's work was done improperly and that the required depth requirements for the installation of the offset to the gas main were not met.  On November 11, 2010, Mr. Santos was operating a BOMAG Mixer in the area of Station 455 and ruptured the offset gas main, resulting in the ignition of escaping natural gas.  Mr. Santos sustained second and third degree burns and has incurred significant medical expenses.  It appears he will need long-term care for the remainder of his life.

      Mr. Santos initiated a lawsuit in Lee County, Florida against several defendants, including PGS, and recently, PDI.  That lawsuit is styled *Mario Santos v. Tampa Electric Company, et al.*, Case No: 11-CA-003699.

Bajo : Cuva | Cohen : Turkel

100 North Tampa Street, Suite 1900, Tampa Florida 33602
Telephone: (813) 443-2199 / Facsimile: (813) 443-2193
www.BajoCuva.com

{BC00049036:1}

**EXHIBIT**

tabbies

**3**

Pipeline Distribution, Inc.
May 29, 2014
Page 2

As you know, there is a General Agreement between PDI and PGS dated January 10, 2010. The General Agreement addresses, among other things, claims which may arise as a result of PDI conducting work on behalf of PGS. In Section 11 of the General Agreement, PDI assumes the entire responsibility for performance of the Work described in each Purchase Order issued pursuant to the General Agreement. Section 11 of the General Agreement further provides for PDI to defend, indemnify, and hold PGS harmless from any and all claims for personal injury which arise or are alleged to have arisen out of or in connection with PDI's performance of work as defined under the General Agreement. PDI's indemnity obligation extends to and includes liability based on the sole, contributory, or concurrent negligence on the part of PGS. This indemnity obligation also includes the expenses and attorney's fees which have been incurred by PGS to defend Mr. Santos' claim. Moreover, pursuant to Section 9 of the General Agreement, PGS was to have been named as an additional insured on PDI's policy. We attach a copy of the General Agreement and Certificate of Insurance produced by Brown & Brown naming PGS as an additional insured under PDI's policies for your convenience.

Pursuant to the General Agreement, PGS hereby demands that PDI defend, indemnify, and hold PGS harmless from Mr. Santos' claim which has arisen out of or in connection with the performance of the Work being performed by PDI. At the request of its general counsel, PGS requests that the undersigned law firm continue to represent PGS based on our firm's background and experience in defending similar claims for PGS in the past, as well as potential exposure to PGS in excess of PDI's insurance limits. This law firm has been involved with all aspects of this incident on behalf of PGS since the date it occurred and has represented PGS in related litigation for the past 3½ years. We believe that we can provide you with valuable insight into legal defenses available to both PDI and PGS and would look forward to working with PDI's counsel in defending against Mr. Santos' claim. Should you have any questions regarding the foregoing request, please feel free to contact David M. Nicholson, Esq., Associate General Counsel, TECO Energy, Inc., (813) 228-1556, dmnicholson@tecoenergy.com.

In the meantime, if you have any questions regarding the foregoing demand, please do not hesitate to contact the undersigned at any time. I look forward to your prompt reply.

Very truly yours,

BAJO | CUVA | COHEN | TURKEL

Pedro F. Bajo, Jr.

PFB/td
Enclosure

Bajo | Cuva | Cohen | Turkel

100 North Tampa Street, Suite 1900, Tampa Florida 33602
Telephone: (813) 443-2199 / Facsimile: (813) 443-2193
www.BajoCuva.com

{BC00049036:1}

Pipeline Distribution, Inc.
May 29, 2014
Page 3


bcc without enclosure via email:

David M. Nicholson, Esquire
Javier Cuebas, Esquire
Ms. Diana L. Nunez
Ms. Amy Leto

Bajo | Cuva | Cohen | Turkel

100 North Tampa Street, Suite 1900, Tampa Florida 33602
Telephone: (813) 443-2199 / Facsimile: (813) 443-2193
www.BajoCuva.com

{BC00049036:1}

JUL 1 5 2014

 **TRAVELERS J**

Gregory S. Kasbarian, AIC CPCU
Southern Region Construction Claim
1 N. Dale Mabry Hwy
Tampa, FL 33609
(813) 357-2909
e-mail: GKASBARI@travelers.com

CERTIFIED MAIL 7007 0220 0004 1268 4021 and via e-mail to Pedro.Bajo@BajoCuva.com

July 11, 2014

Mr. Pedro Bajo, Esq.
Bajo, Cuva, Cohen, Turkel
Suite 1900
100 N. Tampa St.
Tampa, FL 33602

Re:   <u>Mario Santos, Plaintiff vs. Tampa Electric Company, a Florida Corporation, et al, Defendants</u>
      <u>Lee County, Florida Case Number 11-CA-003699</u>
      Policyholder:     Pipeline Distribution, Inc.
      Primary Insurer:  Travelers Indemnity Company of America
      Policy No.;       DT-CO-345K9388-TIA-10
      Policy Term:      01/18/2010 to 01/18/2011
      Umbrella Insurer: St. Paul Fire and Marine Insurance Company
      Policy No.:       QK06803574
      Policy Term:      01/18/2010 to 01/18/2011
      File No.:         CDP5677
      Loss Date:        11/11/2010

Dear Attorney Bajo,

The Travelers Indemnity Company of America and St. Paul Fire and Marine Insurance Company (hereinafter collectively "Travelers"/"us"/"we") is the insurance company for Pipeline Distribution, Inc. ("PDI"/"you"/"yours") having issued certain Commercial General Liability ("CGL") and Commercial Umbrella policies to PDI through the Brown & Brown Insurance Agency in Miami, Florida bearing the above-referenced policy numbers.

Travelers is providing a defense to PDI in the above-referenced personal injury litigation pending against PDI in Lee County, Florida as filed by Mario Santos. We have retained Attorney George Fernandez of the Quintarios firm in Miami, Florida as defense counsel for PDI. Mr. Fernandez has previously communicated with you in regards to this matter. This letter is to address your May 29, 2014 tender of defense under the Additional Insured provisions of the policies and as required in the written contract entered into by PDI and TECO and attached to your May 29th correspondence to Mr. Fernandez. As we discussed on the telephone, Mr. Fernandez is defending PDI and any contractual indemnity claims by TECO/People's Gas will be addressed by the file handler on that claim, Ms. Milena Ivanis.

This letter is to advise you we will accept your tender of defense effective May 29, 2014 subject to the terms and conditions of the policies. <u>This is for defense only</u>. Travelers will provide a defense in this litigation subject to a full and complete Reservation of Rights. We are reserving our right under the policy to disclaim coverage and withdraw from your defense should it be determined that you are not an insured under our policy. Travelers will agree to pay for reasonable and necessary expenses incurred in the defense of this matter subsequent to your tender letter dated May 29, 2014 and will not accept responsibility for nor will we pay for expenses incurred prior to May 29, 2014.



**EXHIBIT**
**4**

1

Factual Summary

This action involves a bodily injury claim brought by Mario Santos, ("Plaintiff") against Tampa Electric Company ("TECO"), Posen Construction Co. ("Posen") and Pipeline Distribution, Inc. ("PDI") concerning a construction accident that occurred on November 11, 2010. Plaintiff was an employee of Posen which was at the time of the accident, the prime contractor on the Colonial Boulevard expansion project in Lee County, Florida. Plaintiff was operating a Bomag mixer at the work site when it struck an underground natural gas line owned, controlled and maintained by TECO. Plaintiff was injured as a result of the ensuing explosion and fire. At the location of the accident, TECO had hired PDI to reposition the existing gas line to allow Posen to perform necessary work on the road project.

Plaintiff alleges that the subject natural gas line was not marked or marked timely within 2 business days of any notification, in violation of the Underground Facility Damage Prevention and Safety Act and no detection equipment or other reasonable means of locating the relocated underground facilities were used before or during the excavation activities which breached the underground line.

Plaintiff alleges that TECO and PDI, individually and as an agent of TECO, were negligent for:

a.  Failing to properly install, reposition, place and/or relocate its natural gas line along the northern side of Colonial Boulevard, including the underground natural gas line between Stations 452 and 456;

b.  Failing to maintain its gas line at a reasonably safe depth, specifically failing to comply with 49 C.F.R. § 1g2.327 (2011) and the Florida Department of Transportation's Utility Accommodation Manual§ 9.3 (2007);

c.  Failing to notify, adequately notify and/or otherwise warn others working on the project of the new location and depth of its hidden, underground gas line in the vicinity between Stations 452 and 456; and

d.  Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including MARIO SANTOS.

Plaintiff also alleges that TECO was negligent per se for failing mark the location of the pipeline as required by statute.

Plaintiff alleges that as a direct proximate result of Defendants' acts and/or omissions, he was severely burned and permanently injured.

PDI's work for TECO was governed by a General Agreement for Contracted Work dated January 10, 2010. That agreement included the following insurance requirements:

B.  General Liability Insurance. Contractor shall maintain, and shall require each of its subcontractors or agents performing Work hereunder to maintain, General Liability Insurance covering all operations by or on behalf of Contractor (or any of its subcontractors or agents, as applicable) for the limits of liability indicated below and including coverage for:

   (i)  Premises and Operations;

   (ii)  Products and Completed Operations;

2

(iii) Contractual Liability insuring the obligations assumed by Contractor in this Agreement;

(iv) Broad Form of Property Damage (including Completed Operations);

(v) Bodily Injury Liability;

(vi) Explosion, Collapse and Underground Hazards; and

(vii) Personal Injury Liability

The General Liability Insurance shall be the Occurrence Coverage Form. Contractor shall maintain General Liability Insurance with no general annual aggregate limit and combined single limits of liability for bodily injury, property damage and personal injury, with a limit of not less than $5,000,000 each occurrence, plus a separate $5,000,000 annual aggregate for Products-Completed Operations.

The required limits may be met by a combination of primary policy and an excess or umbrella policy.

As provided in Subsection 9.E., below, Peoples Gas System shall be named as additional insured under the Contractor's (and each subcontractor's) General Liability policy. In lieu of naming Peoples Gas System as additional insured under the General Liability Policy, the Contractor may maintain Owners and Contractors Protective Liability insurance. Such Insurance shall name Peoples Gas System as named insureds and shall have a combined single limit for bodily injury or property damage of not less than $5,000,000 each occurrence and $5,000,000 annual aggregate.

* * *

E.   Peoples Gas System shall be named as additional insured in all of the foregoing policies (except for any workers' compensation and Professional Liability policy), including the policies of any subcontractor or agent of Contractor performing Work hereunder, with respect to liability arising out of the Work being performed under this Agreement. Such insurance shall be primary coverage afforded the additional insured and shall contain a cross-liability or severability of interest clause.

## Coverage

The Travelers Indemnity Company insured PDI under policy number DT-CO-345K9388-TIA-10 effective 01/18/10 to 01/18/11 that provides $1,000,000 per occurrence limit for completed operations and a $2,000,000 completed operations aggregate limit.

The policy contains Form CG D2 46 08 05 BLANKET ADDITIONAL INSURED (CONTRACTORS)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1.   WHO IS AN INSURED -- (Section II) is amended to include any person or organization that you agree in a "written contract requiring insurance" to include as an additional insured on this Coverage Part, but:

3

a) Only with respect to liability for "bodily injury", "property damage" or "personal injury"; and

b) If, and only to the extent that, the injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the "written contract requiring insurance" applies. The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

2. The insurance provided to the additional insured by this endorsement is limited as follows:

a) In the event that the Limits of Insurance of this Coverage Part shown in the Declarations exceed the limits of liability required by the "written contract requiring insurance", the insurance provided to the additional insured shall be limited to the limits of liability required by that "written contract requiring insurance". This endorsement shall not increase the limits of insurance described in Section III – Limits Of Insurance.

b) The insurance provided to the additional insured does not apply to "bodily injury", "property damage" or "personal injury" arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services, including:

   i.  The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders or change orders, or the preparing, approving, or failing to prepare or approve, drawings and specifications; and

   ii. Supervisory, inspection, architectural or engineering activities.

c) The insurance provided to the additional insured does not apply to "bodily injury" or "property damage" caused by "your work" and included in the "products-completed operations hazard" unless the "written contract requiring insurance" specifically requires you to provide such coverage for that additional insured, and then the insurance provided to the additional insured applies only to such "bodily injury" or "property damage" that occurs before the end of the period of time for which the "written contract requiring insurance" requires you to provide such coverage or the end of the policy period, whichever is earlier.

3. The insurance provided to the additional insured by this endorsement is excess over any valid and collectible "other insurance", whether primary, excess, contingent or on any other basis, that is available to the additional insured for a loss we cover under this endorsement. However, if the "written contract requiring insurance" specifically requires that this insurance apply on a primary basis or a primary and non-contributory basis, this insurance is primary to "other insurance" available to the additional insured which covers that person or organization as a named insured for such loss, and we will not share with that "other insurance". But the insurance provided to the additional insured by this endorsement still is excess over any valid and collectible "other insurance", whether primary, excess, contingent or on any other basis, that is available to the additional insured when that person or organization is an additional insured under such "other insurance".

4. As a condition of coverage provided to the additional insured by this endorsement:

4

a) The additional Insured must give us written notice as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, such notice should include:

   i. How, when and where the "occurrence" or offense took place;

   ii. The names and addresses of any injured persons and witnesses; and

   iii. The nature and location of any injury or damage arising out of the "occurrence" or offense.

b) If a claim is made or "suit" is brought against the additional insured, the additional insured must:

   i. Immediately record the specifics of the claim or "suit" and the date received; and

   ii. Notify us as soon as practicable.

The additional insured must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c) The additional insured must immediately send us copies of all legal papers received in connection with the claim or "suit", cooperate with us in the investigation or settlement of the claim or defense against the "suit", and otherwise comply with all policy conditions.

d) The additional insured must tender the defense and indemnity of any claim or "suit" to any provider of "other insurance" which would cover the additional insured for a loss we cover under this endorsement. However, this condition does not affect whether the insurance provided to the additional insured by this endorsement is primary to "other insurance" available to the additional insured which covers that person or organization as a named insured as described in paragraph 3. above.

5. The following definition is added to SECTION V. – DEFINITIONS:

"Written contract requiring insurance" means that part of any written contract or agreement under which you are required to include a person or organization as an additional insured on this Coverage Part, provided that the "bodily injury" and "property damage" occurs and the "personal injury" is caused by an offense committed:

   a. After the signing and execution of the contract or agreement by you;

   b. While that part of the contract or agreement is in effect; and

   c. Before the end of the policy period.

Subject to the terms and conditions contained in the Travelers policy, TECO qualifies as an additional insured **but only to the extent that plaintiff's injuries were caused by the acts or omissions of PDI** in the performance of its work.  TECO does not qualify as an additional insured with respect to its own independent acts or omissions of such person or organization.  The coverage provided to TECO is primary to other insurance available to TECO as a named insured, but is excess over any other insurance available to TECO as an additional insured.

5

Per the above additional insured endorsement, the policy does not provide insurance to TECO for its liability arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services.

In addition to the limitations on coverage contained in the additional insured endorsement, the policy contains Form CG D3 07 11 03 EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY which states as follows:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability and Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

1. This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

    a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

    b. Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you per-form.

2. Subject to Paragraph 3. below, professional services include:

    a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

Pursuant to this endorsement, the Travelers policy does not provide insurance for any bodily injury arising out of the rendering or failure to render professional services by Pipeline Distribution or someone on its behalf.

St. Paul Fire and Marine Insurance Company insured PDI under policy number QK06803574 effective 01/18/2010 to 01/18/2011 that provides $4,000,000 each occurrence limit and general aggregate subject to a $10,000 self-insured retention.

The policy contains form SU001 Ed. 10-02 which contains the following:

II. Defense

A. We shall have the right and duty to assume control of the defense of any Claim or Suit seeking damages covered by this policy, and we shall have the right to investigate and settle such Claim or Suit, when the Retained Limit has been exhausted by payment of Judgments or settlements that would be covered by this policy. These rights and duties apply even if the Claim or Suit is groundless, false or fraudulent.

B. Prior to the exhaustion of the Retained Limit we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any Claim or Suit seeking damages that would be covered by this policy. This right includes the opportunity to participate in the defense of any Claim or Suit that may result in damages covered by this policy. If we exercise this right, we will do so at our own expense.

C. We have no duty to defend, investigate or settle any Claim or Suit seeking damages not covered by this policy.

D. We will not defend any Claim or Suit after the applicable limits of insurance under this policy have been exhausted by payment of judgments or settlements.

E. All expenses we incur in the defense of any Claim or Suit are in addition to the limits of insurance under this policy.

F. When we assume the defense of any Claim or Suit we will pay the following, to the extent that they are not included in the Scheduled Underlying Insurance, Scheduled Retained Limits or in any Other Insurance:

   1. premiums on bonds to release attachments for amounts not exceeding our limits of insurance, but we are not obligated to apply for or furnish any such bond;

   2. premiums on appeal bonds required by law to appeal any Claim or Suit we defend, but we are not obligated to apply for or furnish any such bond;

   3. all costs taxed against the Insured for Bodily Injury, Property Damage, Personal Injury or Advertising Injury, covered by this policy, in any Suit we defend;

   4. pre-judgment interest awarded against the Insured on that part of the judgment we pay. But if we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer;

   5. all interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within the applicable limit of insurance under this policy; and

   6. the Insured's reasonable expenses incurred at our request.


IV. Definitions
Insured means each of the following, to the extent set forth:
1. the Named Insured;
2. any person or organization, other than the Named Insured, included as an additional insured in any Scheduled Underlying Insurance but then for no broader coverage than is provided to such person or organization under such Scheduled Underlying Insurance;

L. Other Insurance
If Other Insurance applies to damages that are also covered by this policy, this policy will apply excess of, and shall not contribute with, that Other Insurance, whether it is primary, excess, contingent or on any other basis. However, this provision will not apply if the Other Insurance is specifically written to be

7

excess of this policy.

**Please advise if there is any other insurance available to participate in the defense of this matter.**

The policy contains endorsement SU074 Ed. 10-02 which contains a Professional Services Exclusion:
This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of the rendering of, or failure to render, any professional service by or on behalf of the Insured.

We need the following as part of our due diligence in setting up our file:
1. We need a signed rate agreement for Senior Partners, Partners, Associates and Paralegals which the undersigned will send under separate cover. This is our Retention and Billing Policy for Outside Counsel. It is imperative this be reviewed and signed and returned to the undersigned as soon as possible.
2. Travelers reserves for legal expenses so we will need a litigation budget. The undersigned will forward you a sample Excel spreadsheet which can be updated as need be. Try to be as accurate as possible.
3. Please forward a copy of your firm resume for the file since we have not worked together previously.

Travelers strives to be a paperless environment as to that end we request all correspondence to the extent possible be sent via electronic mail. We appreciate your cooperation as we work together in the mutual defense of our clients.

Travelers' position is based upon the facts and information available at this time and is subject to the availability of further information and review. Travelers may revise its position and raise other issues or coverage defenses without prejudice, waiver, and estoppel. Nothing in this letter should be construed as a waiver of Travelers rights under any of the provisions of the Travelers policy or any other defense that Travelers may have. Travelers expressly reserves all of its rights to limit or deny coverage on the basis of any other grounds, whether or not expressly set forth herein.

Portions of the policy have been excerpted and incorporated by reference as if fully set forth herein. The policies contain other language that could become relevant for reasons not now foreseen or because of the discovery of facts not currently known by Travelers with respect to the referenced matter. Travelers does not intend any of its actions, as set forth in this correspondence, and did not intend any past communication, correspondence, action, or inaction to be a waiver of any of the rights and defenses to coverage available to Travelers, including, but not limited to the rights and defenses provided under the captioned policies.

If you have any questions or would like to further discuss this matter please contact the undersigned at the number on the letterhead.

Sincerely,

Gregory S. Kasbarian, AIC CPCU
Major Case Specialist for
Travelers Indemnity Company of America
gkasbari@travelers.com

cc:     David M. Nicholson, Esq.
        dmnicholson@tecoenergy.com

cc:     David Insel, President
        pipelinedist@aol.com

IN THE CIRCUIT COURT OF THE 20TH JUDICIAL CIRCUIT IN AND FOR LEE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO.: 11-CA-003699

MARIO SANTOS,

      Plaintiff,

vs.

TAMPA ELECTRIC COMPANY, a Florida corporation, JOHNSON ENGINEERING, INC., a Florida corporation, POSEN CONSTRUCTION, INC., a Michigan corporation,and PIPELINE DISTRIBUTION, INC., a Florida corporation

      Defendants.

_____/

### FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Pursuant to this Court's Order granting Plaintiff leave to amend his Third Amended Complaint, Plaintiff MARIO SANTOS files his Fourth Amended Complaint and Demand for Jury Trial, and sues Defendants, TAMPA ELECTRIC COMPANY, a Florida corporation, JOHNSON ENGINEERING, INC., a Florida corporation, POSEN CONSTRUCTION, INC., a Michigan corporation doing business in the State of Florida, and PIPELINE DISTRIBUTION, INC., a Florida Corporation for damages and alleges:

### ALLEGATIONS AS TO ALL COUNTS

1. This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00) exclusive of interest, costs and attorney's fees.

2. The incident which gives rise to this Complaint occurred in Lee County, Florida, therefore venue is proper in this court.

1



EXHIBIT
5

3. At all material times, Plaintiff, MARIO SANTOS, was and is a resident of Lee County, Florida.

4. At all material times, Defendant TAMPA ELECTRIC COMPANY (hereinafter "TAMPA ELECTRIC") was and is an active Florida corporation licensed, authorized, and doing business in the State of Florida, including Lee County, with principal offices located at 702 N. Franklin Street, Tampa, FL 33602.

5. At all material times, Defendant TAMPA ELECTRIC owned, controlled and maintained the underground natural gas lines running along the Northern side of Colonial Boulevard in Lee County, Florida.

6. At all material times, TAMPA ELECTRIC was responsible for diverting and repositioning its hidden underground natural gas lines that were located within and beneath the Lee County Right of Way along the north side of Colonial Boulevard in order that the "Colonial Boulevard Road Widening Project" as well as associated drainage improvements across and along the north side of Colonial Boulevard undertaken in connection with that project could be completed by co-Defendant Posen Construction, Inc.

7. At all material times, TAMPA ELECTRIC, did for itself or through 3rd parties subject to its right of control, including but not limited to Pipeline Distribution Inc. (Hereinafter "PDI") and its employees and agents, perform the relocation and/or diversion of the subject hidden underground natural gas lines on the north side of Colonial Boulevard during the Colonial Boulevard road widening project.

8. At all material times, Defendant JOHNSON ENGINEERING, INC. (hereinafter "JOHNSON") was and is an active Florida corporation licensed, authorized, and

2

doing business in the State of Florida with principal offices located at 2122 Johnson Street, Ft. Myers, Florida 33901.

9. At all material times, pursuant to contract or otherwise, Defendant JOHNSON managed, inspected, supervised and/or authorized or approved operations and continued operations at the road expansion work site on and along Colonial Boulevard in Lee County, Florida (hereinafter "work site").

10. At all material times, Defendant POSEN CONSTRUCTION, INC. (hereinafter "POSEN") was and is a Michigan corporation doing business in the State of Florida with its principal place of business and registered agent located at 9200 Estero Park Commons Boulevard, Suite #4, Estero, Florida 33928.

11. At all material times, POSEN was the prime contractor for the road expansion project which includes the work site.

12. At all material times, POSEN was working at and was lawfully upon the work site.

13. At all material times, Defendant PIPELINE DISTRIBUTION INC. (hereinafter "PDI") was and is an active Florida corporation licensed, authorized, and doing business in the State of Florida, including Lee County, with principal offices located in Plantation, Florida.

14. At all material times, Defendant PDI controlled, constructed, altered, laid, diverted and maintained the underground natural gas lines running along the Northern side of Colonial Boulevard in Lee County, Florida.

15. At all material times, PDI was responsible for diverting and repositioning hidden underground natural gas lines that were located within and beneath the Lee County Right of Way along the north side of Colonial Boulevard in order that the

3

"Colonial Boulevard Road Widening Project" as well as associated drainage improvements across and along the north side of Colonial Boulevard undertaken in connection with that project could be completed.

16. At all material times, PDI, did for itself or through 3rd parties subject to its right of control, perform the relocation and/or diversion of the subject hidden underground natural gas lines on the north side of Colonial Boulevard during the Colonial Boulevard road widening project.

17. On or about November 11, 2010, while lawfully upon the work site at the invitation and direction of POSEN, MARIO SANTOS sustained severe 2nd and 3rd degree burns to a majority of his body in a natural gas explosion which occurred when the Bomag mixer he was operating at the work site made contact with and subsequently breached the subject underground natural gas line.

**UNDERGROUND FACILITY DAMAGE PREVENTION AND SAFETY ACT**

18. Florida prescribes a statutory mechanism, codified at Chapter 556, Florida Statutes (2010), to prevent damage to persons and property as a result of excavation or demolition activity in the area of underground utility facilities known as the Underground Facility Damage Prevention and Safety Act (the "Act").

15. Pursuant to the definitions established by the Act:

a. Defendant TAMPA ELECTRIC and PDI were "member operators" of an "underground facility" at the time of the incident;

b. Defendant POSEN was an "excavator" engaged in "excavation activities" at the time of the incident; and,

4

c. MARIO SANTOS belonged to the class of persons the Act was designed to protect.

19. Accordingly, TAMPA ELECTRIC, PDI, POSEN and MARIO SANTOS were subject to the provisions of the Act at the time of the incident.

20. The purpose of the Act is to aid the public by preventing injury to persons or property and the interruption of service resulting from damage to an underground facility caused by excavation or demolition activity as well as to foster awareness of federal laws and regulations that promote safety with respect to underground facilities by requiring and facilitating the advance notice of activities by those who engage in excavation or demolition operations. *See generally*, § 556.101, Florida Statutes (2010).

21. The Act provides legislatively mandated, specific procedures for providing advance notice of excavation activities to utilities.

22. Specifically, § 556.105 of the Act requires that excavators first notify Sunshine One of the proposed excavation so that all utilities operating underground facilities in the area of the proposed excavation may have the opportunity to identify, locate and mark their underground facilities before commencing excavation. Member operators must then, within 2 business days, identify a horizontal route alongside the underground facility by placing markers within 24 inches of the underground facility.

23. § 556.105 of the Act further requires that an excavator avoid excavation until the underground facility has been marked and located. However, that section of the Act also provides that if the underground facilities have not been timely located

5

and marked, the excavator may proceed with excavation if the excavator does so with reasonable care and if detection equipment or other acceptable means to locate the underground facilities are used.

24. Upon information and belief, the subject underground natural gas lines were not marked or marked timely within 2 business days of any notification to Sunshine One and no detection equipment or other reasonable means of locating the relocated underground facilities were used before or during the excavation activities which breached the underground line.

<u>COUNT I</u>
<u>NEGLIGENCE CLAIM AGAINST TAMPA ELECTRIC COMPANY</u>

25. At all material times, Defendant TAMPA ELECTRIC, owed a duty to exercise ordinary and reasonable care to ensure that its underground natural gas line running along the northern side of Colonial Boulevard was properly installed, placed, positioned, repositioned and otherwise compliant with applicable standards and regulations.

26. Defendant TAMPA ELECTRIC also owed a duty to exercise ordinary and reasonable care to notify and otherwise warn others on the Colonial Boulevard Road Widening Project, including those doing excavation in the area of the diverted lines, of the fact that portions of its underground natural gas line, inclusive of the portion breached herein, had been relocated, where it was relocated to, the manner in which it was relocated, whether lowered or offset, how deep it was placed and where it was in relation to the existing and/or anticipated location for drainage structures, improved shoulder and widened roadway.

24. Defendant TAMPA ELECTRIC, individually and by and through its agents and employees, including but not limited to PDI, breached the above-described duties of ordinary and reasonable care by or through one or more of the following acts of commission and/or omission:

   a. Failing to properly install, reposition, place and/or relocate its natural gas line along the northern side of Colonial Boulevard, including the underground natural gas line between Stations 452 and 456;

   b. Failing to maintain its gas line at a reasonably safe depth, specifically failing to comply with 49 C.F.R. § 192.327 (2011) and the Florida Department of Transportation's Utility Accommodation Manual § 9.3 (2007);

   c. Failing to notify, adequately notify and/or otherwise warn others working on the project of the new location and depth of its hidden, underground gas line in the vicinity between Stations 452 and 456; and

   d. Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including MARIO SANTOS.

27. As a direct and proximate result of Defendant TAMPA ELECTRIC's above-described acts and/or omissions, MARIO SANTOS was severely burned and permanently injured in a natural gas explosion occurring at or about Station 455.50 on the north side of Colonial Boulevard.

28. As a further direct and proximate result of Defendant TAMPA ELECTRIC's acts and omissions, and the acts of its agents and employees, including but not limited to PDI, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of

7

life, aggravation of a pre-existing disease or defect, incurred medical expenses in the treatment of his injuries, loss of earnings, loss of earning capacity, and has incurred other costs and expenses in maintaining this cause of action.   The injuries are either permanent or continuing in nature and Plaintiff will suffer these losses and impairments in the future.

**WHEREFORE** the Plaintiff, MARIO SANTOS, demands judgment against the Defendant, TAMPA ELECTRIC COMPANY, for damages, interest and costs and any further relief to which Plaintiff is entitled under the applicable law.

**COUNT II**
**NEGLIGENCE PER SE CLAIM AGAINST TAMPA ELECTRIC COMPANY –**
**VIOLATION OF THE UNDERGROUND FACILITY DAMAGE**
**PREVENTION AND SAFETY ACT**

29. Under the Act, TAMPA ELECTRIC had a duty to accurately identify and mark the horizontal route alongside the underground facility within 2 business days of receiving notification from Sunshine One.

30. On October 18, 2010, Sunshine One notified a POSEN Representative that three tickets (specifically Ticket #'s: 291002325, 291002355, and 291002387) had been opened in order to address the existing utilities alongside Colonial Boulevard between I-75 and S.R. 82 and submitted to all utility companies in the area covered by the tickets. (see Exhibit "A").

31. TAMPA ELECTRIC failed to carry out its statutory duty to mark said facilities within the statutorily-prescribed time.

32. As a direct and proximate result of Defendant TAMPA ELECTRIC's above-described acts and/or omissions, an excavation accident occurred and MARIO SANTOS was severely burned and permanently injured.

33. As a further direct and proximate result of Defendant TAMPA ELECTRIC's acts and omissions, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, aggravation of a pre-existing disease or defect, incurred medical expenses in the treatment of his injuries, loss of earnings, loss of earning capacity, and has incurred other costs and expenses in maintaining this cause of action. The injuries are either permanent or continuing in nature and Plaintiff will suffer these losses and impairments in the future.

**WHEREFORE** the Plaintiff, MARIO SANTOS, demands judgment against the Defendant, TAMPA ELECTRIC COMPANY, for damages, interest and costs and any further relief to which Plaintiff is entitled under the applicable law.

**COUNT III**
**NEGLIGENCE CLAIM AGAINST JOHNSON ENGINEERING, INC.**

34. At all material times, Defendant JOHNSON inspected and supervised the construction and work associated with the road expansion project along Colonial Boulevard in Lee County, Florida. Copies of the contracts between the State of Florida and JOHNSON and Lee County, Florida and JOHNSON are attached hereto and marked as Exhibits "B" and "C" respectively.

35. At all material times, JOHNSON owed a duty to facilitate and ensure a reasonably safe workplace for persons lawfully upon the work site, including MARIO SANTOS. In particular, Defendant JOHNSON had a duty to exercise reasonable care to ensure that all dangerous conditions such as the location of natural gas lines existing upon and/or beneath the work site were conspicuously identified and that operations it authorized to proceed did not interfere with

9

underground natural gas lines and that excavation and mixing work not proceed unless and until such lines were marked.

36. JOHNSON went beyond the duties set forth in its contract with the State of Florida and undertook to provide additional services, such additional services being those undertaken by JOHNSON's employee(s) at the time and place of the explosion; specifically, walking behind and supervising the excavator while it was engaged in excavation in the vicinity of hidden underground gas lines in the absence of markings.

37. Additionally, in the performance of its construction engineering, testing and inspection services under its contract with the State of Florida, JOHNSON, itself or through its agents and employees, acted or engaged in actions or conducted itself in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard for human rights, safety or property.

38. Specifically, JOHNSON knew, by or through its employees, of the presence of underground natural gas lines in the general vicinity of excavation operations which it allowed to occur despite knowing that the location and relocation of such natural gas lines was unmarked and not visible from the surface.

39. Defendant JOHNSON breached its contractual, common law, and assumed duties to exercise reasonable care for the health, safety, and welfare of persons at the work site, including MARIO SANTOS, by or through one or more of the following acts of commission and/or omission:

10

a. Approving the work site with knowledge of the presence of underground gas lines and without reasonably investigating for the location of any and all dangers lying on or beneath the work site;

b. Failing to verify whether Defendant POSEN conducted inspections of the work site;

c. Failing to exercise diligence in inspecting Defendant POSEN's operations at the work site;

d. Failing to require that POSEN determine the location of the lines prior to performing excavation activities at the site;

e. Failing to take reasonable steps to protect individuals lawfully upon the premises, including MARIO SANTOS, by not verifying the location of underground natural gas lines at the work site;

f. Failing to maintain gas line markers at the work site in reasonably visible positions;

g. Failing to replace gas line markers after having actual and/or implied knowledge of their absence and a reasonable time to replace them;

h. Failing to adhere to contract and to the standard of care recognized by others in the business of professional inspectors and engineers;

i. Allowing excavation to occur in an area where it knew or should have known there were underground natural gas lines; and,

j. Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including MARIO SANTOS.

11

40. As a direct and proximate result of Defendant JOHNSON's above-described acts and/or omissions, contact with the subject natural gas line was made and an explosion occurred, causing serious and permanent injuries to MARIO SANTOS.

41. As a further direct and proximate result of Defendant JOHNSON's acts and omissions, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, aggravation of a pre-existing disease or defect, incurred medical expenses in the treatment of his injuries, loss of earnings, loss of earning capacity, and has incurred other costs and expenses in maintaining this cause of action. The injuries are either permanent or continuing in nature and Plaintiff will suffer these losses and impairments in the future.

**WHEREFORE** the Plaintiff, MARIO SANTOS, demands judgment against the Defendant, JOHNSON ENGINEERING, INC., for damages, interest and costs and any further relief to which Plaintiff is entitled under the applicable law.

**COUNT IV**
**NEGLIGENCE CLAIM AGAINST POSEN CONSTRUCTION, INC.**

42. POSEN is not entitled to immunity under *Fla. Stat.* § 440.01 *et seq.* ("Workers' Compensation Law") because:

   a. POSEN knew, based on explicit warnings from Defendants TAMPA ELECTRIC and JOHNSON and from other third parties, that an underground natural gas line existed at the work-site;

   b. POSEN knew that contact between the underground natural gas line and the heavy construction machinery it directed its employees to operate was

12

virtually and substantially certain to result in injury or death to employees operating said machinery;

c. Plaintiff MARIO SANTOS was not aware of the risks of operating heavy machinery at the work site because the subject underground natural gas line was buried and unmarked and thus not apparent to him; and,

d. By directing MARIO SANTOS to commence excavation activities at the work site, POSEN misrepresented the proximity of the gas line to the work site after it knew of the existence of an underground natural gas line underneath the work site and knew said line had not been located and marked.

43. At all material times, Defendant POSEN owed a duty to maintain a reasonably safe workplace for the benefit of all workers at the site, including MARIO SANTOS. In particular, Defendant POSEN had a duty to exercise reasonable care to ensure that all dangerous conditions existing upon and/or beneath the work site were conspicuously identified; specifically POSEN owed a duty to ensure that the construction workers were made aware of such dangerous conditions, including the existence of unmarked natural gas lines, and to cease excavation activities until such time as the location and placement of the underground natural gas line was accurately identified and marked.

44. Defendant POSEN breached its duty to exercise reasonable care for the health, safety, and welfare of its workers, including MARIO SANTOS, by or through one or more of the following acts of commission and/or omission:

13

a.  Requesting, authorizing and directing excavation/mixing work to be done at the work site when it knew of the existence of unmarked natural gas lines beneath and around the work site;

b.  Approving the work site without reasonably investigating for any and all dangers lying on or beneath the work site;

c.  Failing to take reasonable steps to protect individuals lawfully upon the premises, including MARIO SANTOS, by not verifying the location of underground natural gas lines at the work site;

d.  Failing to ensure that the location of underground gas lines were clearly established and marked before initiating construction;

e.  Failing to replace gas line markers after having actual and/or implied knowledge of their absence and a reasonable time to replace them;

f.  Failing to adhere to the standard of care recognized by others in the business of professional construction services; and,

g.  Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including MARIO SANTOS.

45. As a direct and proximate result of Defendant POSEN's above-described acts and/or omissions, contact with the subject natural gas line was made and an explosion occurred, causing serious injuries to MARIO SANTOS.

46. As a further direct and proximate result of POSEN's acts and omissions, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, aggravation of a pre-existing disease or defect, incurred medical expenses in the treatment

14

of his injuries, loss of earnings, loss of earning capacity, and has incurred other costs and expenses in maintaining this cause of action.  The injuries are either permanent or continuing in nature and Plaintiff will suffer these losses and impairments in the future.

**WHEREFORE** the Plaintiff, MARIO SANTOS, demands judgment against the Defendant, POSEN CONSTRUCTION, INC., for damages, interest and costs and any further relief to which Plaintiff is entitled under the applicable law.

<u>COUNT V</u>
**<u>NEGLIGENCE PER SE CLAIM AGAINST POSEN CONSTRUCTION, INC. –
VIOLATION OF THE UNDERGROUND FACILITY DAMAGE
PREVENTION AND SAFETY ACT</u>**

47. Plaintiff MARIO SANTOS realleges and reincorporates paragraphs 47(a) through 47(d) above as if fully set forth herein.

48. Under the Act, POSEN had the following duties:

   a. To provide advance notice to Sunshine One of the proposed excavation including, among other things, the commencement date and anticipated duration of the excavation, the type of work to be done, and the approximate depth of the excavation;

   b. To refrain from excavating until such time as TAMPA ELECTRIC accurately identified and marked the subject gas line; and,

   c. Alternatively to use reasonable care and to use detection equipment or other acceptable means to locate the underground facilities when proceeding with excavation activities in the absence of markers.

49. POSEN breached its statutory duties by:

15

a. Failing to diligently notify Sunshine One of the proposed excavation including the commencement date and anticipated duration of the excavation, the type of work to be done, and the approximate depth of the excavation; and/or,

b. Directing and/or allowing its workers to commence excavation activities at the work site after having actual knowledge of the presence of an underground gas line and no markers indicating the exact location of the line; and/or,

c. Failing to use reasonable care by not using detection equipment or other acceptable means of detecting the underground gas line and thereafter directing and/or allowing its workers to commence excavation activities.

50. As a direct and proximate result of Defendant POSEN's above-described acts and/or omissions, contact with the subject natural gas line was made and an explosion occurred, causing serious injuries to MARIO SANTOS.

51. As a further direct and proximate result of POSEN's acts and omissions, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, aggravation of a pre-existing disease or defect, incurred medical expenses in the treatment of his injuries, loss of earnings, loss of earning capacity, and has incurred other costs and expenses in maintaining this cause of action.   The injuries are either permanent or continuing in nature and Plaintiff will suffer these losses and impairments in the future.

**WHEREFORE** the Plaintiff, MARIO SANTOS, demands judgment against the Defendant, POSEN CONSTRUCTION, INC., for damages, interest and costs and any further relief to which Plaintiff is entitled under the applicable law.

16

<u>COUNT VI</u>
<u>NEGLIGENCE CLAIM AGAINST PIPELINE DISTRIBUTION INC.</u>

52. At all material times, Defendant PDI, owed a duty to exercise ordinary and reasonable care to ensure that its underground natural gas line running along the northern side of Colonial Boulevard was properly installed, placed, positioned, repositioned and otherwise compliant with applicable standards and regulations.

53. Defendant PDI also owed a duty to exercise ordinary and reasonable care to notify and otherwise warn others on the Colonial Boulevard Road Widening Project, including those doing excavation in the area of the diverted lines, of the fact that portions of its underground natural gas line, inclusive of the portion breached herein, had been relocated, where it was relocated to, the manner in which it was relocated, whether lowered or offset, how deep it was placed and where it was in relation to the existing and/or anticipated location for drainage structures, improved shoulder and widened roadway.

25. Defendant PDI, individually and by and through its agents and employees, breached the above-described duties of ordinary and reasonable care by or through one or more of the following acts of commission and/or omission:

   e. Failing to properly install, reposition, place and/or relocate the natural gas line along the northern side of Colonial Boulevard, including the underground natural gas line between Stations 452 and 456;

   f. Failing to maintain the gas line at a reasonably safe depth, specifically failing to comply with 49 C.F.R. § 192.327 (2011) and the Florida Department of Transportation's Utility Accommodation Manual § 9.3 (2007);

17

g. Failing to notify, adequately notify and/or otherwise warn others working on the project of the new location and depth of the hidden, underground gas line in the vicinity between Stations 452 and 456; and

h. Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including MARIO SANTOS.

54. As a direct and proximate result of Defendant PDI's above-described acts and/or omissions, MARIO SANTOS was severely burned and permanently injured in a natural gas explosion occurring at or about Station 455.50 on the north side of Colonial Boulevard.

55. As a further direct and proximate result of Defendant PDI's acts and omissions, and the acts of its agents and employees, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, aggravation of a pre-existing disease or defect, incurred medical expenses in the treatment of his injuries, loss of earnings, loss of earning capacity, and has incurred other costs and expenses in maintaining this cause of action. The injuries are either permanent or continuing in nature and Plaintiff will suffer these losses and impairments in the future.

**WHEREFORE** the Plaintiff, MARIO SANTOS, demands judgment against the Defendant, PIPELINE DISTRIBUTION, INC., for damages, interest and costs and any further relief to which Plaintiff is entitled under the applicable law.

18

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right by jury.

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of Plaintiff's Fourth Amended Complaint and Demand for Jury Trial was furnished via email this 26th day of September, 2013 to the recipients on the attached service list.

                     **THE HAGGARD LAW FIRM, P.A.**
                     *Attorneys for Plaintiff*
                     330 Alhambra Circle, First Floor
                     Coral Gables, FL 33134
                     (305) 446-5700
                     (305) 446-1154 Fax


                     BY: s/Christopher L. Marlowe
                          CHRISTOPHER MARLOWE, ESQ.
                          FBN: 571441

19

## SERVICE LIST
### *Santos v. Tampa Electric Company et al.*

**Pedro F. Bajo, Jr., Esq.**
**V. Stephen Cohen, Esq.**
Bajo Cuva Cohen & Turkel, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL 33602
*Attorneys for Tampa Electric Company*
pedro.bajo@bajocuva.com
scohen@bajocuva.com
teri.deleo@bajocuva.com
lisa.meriwether@bajocuva.com

**Carl Joseph Coleman, Esq.**
**G. Calvin Hayes, Esq.**
Fowler White Boggs, P.A.
2235 First Street
Fort Myers, FL 33901
*Attorneys for Tampa Electric Company*
jcoleman@fowlerwhite.com
calvin.hayes@fowlerwhite.com
Nichole.Jane@fowlerwhite.com

**Michael J. Corso, Esq.**
**Mark Schultz, Esq.**
Henderson, Franklin, Starnes & Holt, P.A.
P.O. Box 280
Fort Myers, FL 33902
*Attorneys for Johnson Engineering, Inc.*
michael.corso@henlaw.com
mark.schultz@henlaw.com
sherry.zellner@henlaw.com

**Kevin W. Crews, Esq.**
**R. Baron Ringhofer, Esq.**
Wicker, Smith, O'Hara
McCoy & Ford, P.A.
9128 Strada Place, Suite 10200
Naples, FL 34108
*Attorney for Posen Construction, Inc.*
kcrews@wickersmith.com
Rringhofer@wickersmith.com
ldufee@wickersmith.com
dmodugno@wickersmith.com

Filing # 49751641 E-Filed 12/07/2016 03:30:05 PM

IN THE CIRCUIT COURT OF THE 20TH
JUDICIAL CIRCUIT IN AND FOR LEE
COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO.: 11-CA-003699

MARIO SANTOS,

        Plaintiff,

vs.

TAMPA ELECTRIC COMPANY, a Florida
corporation, JOHNSON ENGINEERING, INC.,
a Florida corporation, POSEN CONSTRUCTION,
INC., a Michigan corporation, and PIPELINE
DISTRIBUTION, INC., a Florida corporation

        Defendants.

_____/

### FIFTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, MARIO SANTOS, by and through undersigned counsel hereby sues the

Defendant TAMPA ELECTRIC COMPANY d/b/a PEOPLES GAS SYSTEM, a Florida

corporation, for damages and alleges:

### ALLEGATIONS AS TO ALL COUNTS

1.    This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00)

exclusive of interest, costs and attorney's fees.

2.    The incident which gives rise to this Complaint occurred in Lee County, Florida,

therefore venue is proper in this court.

3.    At all material times, Plaintiff, MARIO SANTOS, was and is a resident of Lee County,

Florida.


EXHIBIT
6

4.      At all material times, Defendant TAMPA ELECTRIC COMPANY d/b/a PEOPLES GAS SYSTEM (hereinafter "TAMPA ELECTRIC") was and is an active Florida corporation licensed, authorized, and doing business in the State of Florida, including Lee County, with principal offices located at 702 N. Franklin Street, Tampa, FL 33602.

5.      At all material times, Defendant TAMPA ELECTRIC owned, controlled and maintained the underground natural gas lines running along the Northern side of Colonial Boulevard in Lee County, Florida.

6.      At all material times, TAMPA ELECTRIC was responsible for diverting and repositioning its hidden underground natural gas lines that were located within and beneath the Lee County Right of Way along the north side of Colonial Boulevard in order that the "Colonial Boulevard Road Widening Project" as well as associated drainage improvements across and along the north side of Colonial Boulevard undertaken in connection with that project could be completed.

7.      At all material times, TAMPA ELECTRIC, did for itself or through 3rd parties subject to its right of control, and its employees and agents, perform the relocation and/or diversion of the subject hidden underground natural gas lines on the north side of Colonial Boulevard during the Colonial Boulevard road widening project.

8.      On or about November 11, 2010, while lawfully upon the work site, MARIO SANTOS sustained severe 2nd and 3rd degree burns to a majority of his body in a natural gas explosion which occurred when the Bomag mixer he was operating at the work site made contact with and subsequently breached the subject underground natural gas line.

**UNDERGROUND FACILITY DAMAGE PREVENTION AND SAFETY ACT**

9.      Florida prescribes a statutory mechanism, codified at Chapter 556, Florida Statutes (2010), to prevent damage to persons and property as a result of excavation or demolition activity in the area of underground utility facilities known as the Underground Facility Damage Prevention and Safety Act (the "Act").

10.     Pursuant to the definitions established by the Act:

      a.      Defendant TAMPA ELECTRIC was a "member operator" of an "underground facility" at the time of the incident;

      b.      Posen Construction, Inc., was an "excavator" engaged in "excavation activities" at the time of the incident; and,

      c.      MARIO SANTOS belonged to the class of persons the Act was designed to protect.

11.     Accordingly, TAMPA ELECTRIC, Posen and MARIO SANTOS were subject to the provisions of the Act at the time of the incident.

12.     The purpose of the Act is to aid the public by preventing injury to persons or property and the interruption of service resulting from damage to an underground facility caused by excavation or demolition activity as well as to foster awareness of federal laws and regulations that promote safety with respect to underground facilities by requiring and facilitating the advance notice of activities by those who engage in excavation or demolition operations. *See generally*, § 556.101, Florida Statutes (2010).

13.     The Act provides legislatively mandated, specific procedures for providing advance notice of excavation activities to utilities.

14.     Specifically, § 556.105 of the Act requires that excavators first notify Sunshine One of the proposed excavation so that all utilities operating underground facilities in the area of the

proposed excavation may have the opportunity to identify, locate and mark their underground facilities before commencing excavation. Member operators must then, within 2 business days, identify a horizontal route alongside the underground facility by placing markers within 24 inches of the underground facility.

15.     § 556.105 of the Act further requires that an excavator avoid excavation until the underground facility has been marked and located. However, that section of the Act also provides that if the underground facilities have not been timely located and marked, the excavator may proceed with excavation if the excavator does so with reasonable care and if detection equipment or other acceptable means to locate the underground facilities are used.

16.     Upon information and belief, the subject underground natural gas lines were not marked or marked timely within 2 business days of any notification to Sunshine One and no detection equipment or other reasonable means of locating the relocated underground facilities were used before or during the excavation activities which breached the underground line.

**COUNT I**
**NEGLIGENCE CLAIM AGAINST TAMPA ELECTRIC COMPANY**

17.     At all material times, Defendant TAMPA ELECTRIC, owed a duty to exercise ordinary and reasonable care to ensure that its underground natural gas line running along the northern side of Colonial Boulevard was properly installed, placed, positioned, repositioned and otherwise compliant with applicable standards and regulations.

18.     Defendant TAMPA ELECTRIC also owed a duty to exercise ordinary and reasonable care to notify and otherwise warn others on the Colonial Boulevard Road Widening Project, including those doing excavation in the area of the diverted lines, of the fact that portions of its underground natural gas line, inclusive of the portion breached herein, had been relocated, where it was relocated to, the manner in which it was relocated, whether lowered or offset, how deep it

was placed and where it was in relation to the existing and/or anticipated location for drainage structures, improved shoulder and widened roadway.

19.     Defendant TAMPA ELECTRIC, individually and by and through its agents and employees, breached the above-described duties of ordinary and reasonable care by or through one or more of the following acts of commission and/or omission:

a.     Failing to properly install, reposition, place and/or relocate its natural gas line along the northern side of Colonial Boulevard, including the underground natural gas line between Stations 452 and 456;

b.     Failing to maintain its gas line at a reasonably safe depth, specifically failing to comply with 49 C.F.R. § 192.327 (2011) and the Florida Department of Transportation's Utility Accommodation Manual § 9.3 (2007);

c.     Failing to notify, adequately notify and/or otherwise warn others working on the project of the new location and depth of its hidden, underground gas line in the vicinity between Stations 452 and 456; and

d.     Otherwise failing to take reasonable steps to protect the health and safety of persons lawfully upon the work site, including MARIO SANTOS.

20.     As a direct and proximate result of Defendant TAMPA ELECTRIC's above-described acts and/or omissions, MARIO SANTOS was severely burned and permanently injured in a natural gas explosion occurring at or about Station 455.50 on the north side of Colonial Boulevard.

21.     As a further direct and proximate result of Defendant TAMPA ELECTRIC's acts and omissions, and the acts of its agents and employees, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and suffering, mental anguish, loss of capacity for the

enjoyment of life, aggravation of a pre-existing disease or defect, incurred medical expenses in the treatment of his injuries, loss of earnings, loss of earning capacity, and has incurred other costs and expenses in maintaining this cause of action. The injuries are either permanent or continuing in nature and Plaintiff will suffer these losses and impairments in the future.

**WHEREFORE** the Plaintiff, MARIO SANTOS, demands judgment against the Defendant, TAMPA ELECTRIC COMPANY, for damages, interest and costs and any further relief to which Plaintiff is entitled under the applicable law.

## COUNT II
## NEGLIGENCE PER SE CLAIM AGAINST TAMPA ELECTRIC COMPANY – VIOLATION OF THE UNDERGROUND FACILITY DAMAGE PREVENTION AND SAFETY ACT

22.     Under the Act, TAMPA ELECTRIC had a duty to accurately identify and mark the horizontal route alongside the underground facility within 2 business days of receiving notification from Sunshine One.

23.     On October 18, 2010, Sunshine One notified a POSEN Representative that three tickets (specifically Ticket #'s: 291002325, 291002355, and 291002387) had been opened in order to address the existing utilities alongside Colonial Boulevard between I-75 and S.R. 82 and submitted to all utility companies in the area covered by the tickets. (see Exhibit "A").

24.     TAMPA ELECTRIC failed to carry out its statutory duty to mark said facilities within the statutorily-prescribed time.

25.     As a direct and proximate result of Defendant TAMPA ELECTRIC's above-described acts and/or omissions, an excavation accident occurred and MARIO SANTOS was severely burned and permanently injured.

26.     As a further direct and proximate result of Defendant TAMPA ELECTRIC's acts and

omissions, Plaintiff MARIO SANTOS suffered serious bodily injuries and resulting pain and

suffering, mental anguish, loss of capacity for the enjoyment of life, aggravation of a pre-existing

disease or defect, incurred medical expenses in the treatment of his injuries, loss of earnings, loss

of earning capacity, and has incurred other costs and expenses in maintaining this cause of

action.  The injuries are either permanent or continuing in nature and Plaintiff will suffer these

losses and impairments in the future.


        **WHEREFORE** the Plaintiff, MARIO SANTOS, demands judgment against the

Defendant, TAMPA ELECTRIC COMPANY, for damages, interest and costs and any further

relief to which Plaintiff is entitled under the applicable law.

## DEMAND FOR JURY TRIAL

        Plaintiff demands a trial by jury of all issues triable as of right by jury.

## CERTIFICATE OF SERVICE

        **I HEREBY CERTIFY** that a true and correct copy of Plaintiff's Fifth Amended
Complaint and Demand for Jury Trial was furnished via email this 7th day of December, 2016 to
the recipients on the attached service list.

                                        **THE HAGGARD LAW FIRM, P.A.**
                                        *Attorneys for Plaintiff*
                                        330 Alhambra Circle, First Floor
                                        Coral Gables, FL 33134
                                        (305) 446-5700
                                        (305) 446-1154 Fax


                                        BY: s/Douglas J. McCarron
                                             Douglas J. McCarron
                                             FBN: 0077453

**SERVICE LIST**
*Santos v. Tampa Electric Company et al.*

**Pedro F. Bajo, Jr., Esq.**
**V. Stephen Cohen, Esq.**
Bajo Cuva Cohen & Turkel, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL 33602
*Attorneys for Tampa Electric Company*
pedro.bajo@bajocuva.com
scohen@bajocuva.com
teri.deleo@bajocuva.com
lisa.meriwether@bajocuva.com



Gregory S. Kasbarian, AIC CPCU
Claim Professional/Construction
P.O. Box 715
Orlando, FL 32802-0715
W: 813-357-2909
e-mail: GKASBARI@travelers.com

CERTIFIED MAIL 91 7199 9991 7035 8517 7876 and e-mail pedro.bajo@bajocuva.com

December 15, 2016

Mr. Pedro F. Bajo
Bajo Cuva Cohen Turkel
Suite 1900
100 N.Tampa St.
Tampa, FL 33602

Re:    *Mario Santos v. Tampa Electric Company, et al,*
       Lee County Circuit Civil Case No. 11-CA-003699
       Named Insured:   Pipeline Distribution, Inc.
       Issuing Primary Insurer:  Travelers Indemnity Company of America
       Primary Policy No.:    DT-CO-345K93888-TIA-10
       Policy Period:    01/18/2010 to 01/18/2011
       Issuing Umbrella Insurer:  St. Paul Fire and Marine Insurance Company
       Policy No.:    QK06803574
       Policy Period:    01/18/2010 to 01/18/2011
       Claim No.:    CDP5677
       Loss Date:    11/11/2010

Dear Mr. Bajo:

The purpose of this letter is to update Travelers Indemnity Company of America's and St. Paul Fire and Marine Insurance Company's (together, "Travelers") coverage position letter dated July 11, 2014 regarding the captioned lawsuit to you as counsel for Tampa Electric Company and Peoples Gas System (together, "TECO").

On December 7, 2016, plaintiff Mario Santos ("Santos") filed his Fifth Amended Complaint in the captioned lawsuit. The Fifth Amended Complaint only asserts claims against TECO and no longer asserts direct claims against Pipeline Distribution, Inc. ("PDI"), Travelers' named insured, or claims against TECO based upon TECO's alleged vicarious liability for the negligence of PDI.

As you were previously advised, pursuant to Blanket Additional Insured (Contractors) Endorsement, Form CG D2 46 08 05, contained in Travelers Policy No. DT-CO-345K93888-TIA-10, TECO would have potential additional insured status in connection with the captioned lawsuit only with respect to bodily injury caused by the acts or omissions of PDI in the performance of PDI's "work". TECO does not qualify as an additional insured with respect to TECO's own independent acts or omissions.

Because the Fifth Amended Complaint no longer alleges that TECO is potentially liable for bodily injury caused by the acts or omissions of PDI and instead exclusively alleges that TECO is liable for Mr. Santos' injuries as a result of TECO's own independent acts or omissions, TECO does not qualify as a potential additional insured under the Travelers Policies. Under Florida law, a liability insurer's duty to defend terminates upon the elimination of potentially covered allegations from a



EXHIBIT
7

Page 2
December 15, 2016
*Santos v. Tampa Electric Company*
Lee County Circuit Civil Case No. 11-CA-003699
Updated Coverage Position Letter

---

pending lawsuit. Accordingly, Travelers is withdrawing the defense previously extended to TECO in connection with captioned lawsuit; the effective date of Travelers' withdrawal of its defense will be the close of business 5:00 PM ET 12/30/2016.

Travelers reserves the right to further amend or supplement its coverage position. The statements contained in this letter shall not be deemed to waive or limit any other defense (or claim) which Travelers may have in connection with this matter.

Please contact me should you or your client have questions regarding Travelers' coverage position as set forth in this letter.

Yours truly,

Gregory S. Kasbarian, AIC CPCU
Claim Professional/Construction
For Travelers Indemnity Company of America and
St. Paul Fire and Marine Insurance Company

cc:    David M. Nicholson dmnicholson@tecoenergy.com

       David Insel Pipelinedist@aol.com

       Javi Cuebas Jcuebas@tecoenergy.com